JOHN STARK,                 )
                                 )
            Plaintiff,         )      Civil Action No. 2:12-cv-00195-NT
v.                                  )
                                 )
HARTT TRANSPORTATION     )
SYSTEMS INC.,              )
                                 )
            Defendant.      )

## DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT
## TOGETHER WITH INCORPORATED MEMORANDUM OF LAW
### (ADA Discrimination/MWPA/STAA Claims)

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant Hartt Transportation Systems, Inc. ("Hartt") moves for summary judgment on certain claims contained in Plaintiff John Stark's Complaint. In support of this motion, Hartt relies upon the incorporated memorandum of law, the Statement of Material Facts ("SMF"), with record citations, and the Affidavits of Rick Parisien, Todd Cotier, and Sharon Webber.

## I.      INTRODUCTION

Plaintiff John Stark ("Plaintiff") filed a Complaint against Hartt that alleges Hartt: (1) retaliated against him in violation of the Maine Whistleblowers' Protection Act ("MWPA") (enforced through the Maine Human Rights Act ("MHRA")), and the Surface Transportation Assistance Act of 1982 ("STAA"); and (2) violated the Americans with Disabilities Act ("ADA") by terminating him because Hartt regarded him as having a disability, and regarded him as having a record of a disability. Plaintiff also requests punitive damages.

## II.    RELEVANT FACTUAL BACKGROUND

### A.    Hartt Transportation Systems, Inc.

Hartt is a national, family owned and managed, dry goods motor carrier service that has been in business since 1948.  Hartt's main office is located in Bangor, Maine, and Hartt has a terminal located in Auburn, Maine.  SMF ¶ 1.  Hartt has been recognized for its superior safety record by the American Trucking Association's Safety Management Council, the Maine Motor Transport Association, and Reliance Insurance Company each year beginning with 1991.  SMF ¶ 2.

Hartt maintains a comprehensive Employee Handbook (the "Handbook"), which Hartt refers to as its "Human Resource Directive:  Company Drivers."  SMF ¶ 3.  Prior to beginning work, all Hartt Drivers go through an intensive eight-hour Driver Orientation.  SMF ¶ 4.  On October 8, 2010, Plaintiff attended Hartt's Driver Orientation.  SMF ¶ 4.  During Orientation, Plaintiff received a copy of the Handbook.  SMF ¶ 5.  During Orientation, Hartt reviews its policies with the Drivers regarding compliance with the laws regarding disabilities and whistleblower protection.  SMF ¶ 5.  Hartt also tells Drivers that they should report any and all work-related issues and that there will be no repercussions for doing so.  SMF ¶ 5.  Plaintiff understood that Hartt had a policy against unlawful discrimination and harassment.  SMF ¶ 5.

The Handbook contains Hartt's Employee Conduct and Disciplinary Action Policy, which includes the following relevant provisions:

> **Employee Conduct and Work Rules.**  The following are examples of infractions of rules of conduct that may result in disciplinary action, up to and including termination of employment:
>
> - Dishonesty
> - Falsification of timekeeping records or other Hartt Transportation Systems, Inc. documents
> - Failure to comply with Hartt Transportation Systems, Inc. policies and rules
> - Excessive absenteeism, tardiness or any absence without notice

The foregoing examples are not all inclusive, and there are many other grounds upon which disciplinary action, up to and including termination of employment, may be imposed.

**Attendance and Punctuality.** To maintain a safe and productive work environment, Hartt Transportation Systems, Inc. expects employees . . . to be reliable and to be punctual in reporting for scheduled work. You are expected to be at work, on time, each business day.

\*                                                   \*                                                   \*

If you do not report to work for three consecutive days without prior notification, Hartt Transportation Systems, Inc. will consider this an abandonment of your position and that you have voluntarily resigned your employment.

**Abandonment of Position.** An employee . . . who is absent three consecutive workdays and has not contacted his/her supervisor is considered to have abandoned their position and employment will be terminated.

**Overview of Prohibited Discrimination and Harassment:** Any decision or action granting or denying employment . . . benefits as to an individual . . . is in violation of this policy when such decision or action is based, in whole or in part, upon the . . . disability, or any other legally protected characteristic of such individual . . .

SMF ¶ 6.

Plaintiff acknowledged that he received, read and understood Hartt's Employee Conduct & Disciplinary Action Policy on October 8, 2010. SMF ¶ 7.

Plaintiff understood that failure to comply with Hartt's policies and rules could be grounds for termination. Plaintiff also understood that dishonesty could be grounds for termination. Plaintiff also understood that excessive absenteeism, tardiness or any absence without notice from work could be grounds for termination. Finally, Plaintiff understood that Hartt had a policy against unlawful discrimination and harassment. SMF ¶ 8.

The Handbook also contains Hartt's Vehicle and Equipment Use Policy:

**Maintenance.** Please notify a supervisor if any . . . vehicle appears to be damaged, defective, or in need of repair. Prompt reporting of damages, defects, and the need for repairs could prevent deterioration of equipment and possible injury to employees or others.

SMF ¶ 10.  Plaintiff acknowledged that he received, read and understood Hartt's Vehicle and Equipment Use Policy on October 8, 2010.  SMF ¶ 11.

The Handbook also contains Hartt's Position Objective and Responsibilities Policy:

**Safety and Maintenance.**  Safety and maintenance involves delivering freight safely, following regulations, and safely operating and maintaining your commercial motor vehicle.

- Check your equipment daily by doing a pre-trip inspection.
- Report any unsafe equipment or working conditions to your supervisor.
- Report any needed repairs or special maintenance to the Maintenance Department.

SMF ¶ 12.  Plaintiff acknowledged that he received, read and understood Hartt's Position Objective and Responsibilities Policy on October 8, 2010.  SMF ¶ 13.  Plaintiff understood that he was responsible for following all of Hartt's policies.  SMF ¶ 14.

The Handbook also contains an entire Safety Manual providing detailed information to Drivers about how to safely operate their trucks and how to properly complete Driver's Inspection Report forms (also called Vehicle Inspection Reports) ("DIRs").  The Safety Manual contains a "Pre-Trip and Post-Trip Vehicle Safety Inspections" policy, which states that all Drivers must "check each safety aspect of the vehicle prior to taking it out on the road," should "mak[e] management and maintenance aware of [any] problem," and should also complete a post-trip inspection after each trip as well.  The Manual also includes a checklist and detailed procedure for both inspections.  The Safety Manual also provides a sample DIR form, and states that "[a]nytime you find damage or defects to the equipment, not only must it be written on the VIR but you must call the shop to get the defects repaired immediately."  SMF ¶ 15.

Plaintiff acknowledged that he received Driver Safety Orientation, which includes a review of the Safety Manual, on October 8, 2010.  SMF ¶ 16.  Plaintiff was well aware of the process for completing pre-trip inspections, and filling out DIR forms, as he had worked as a driver of commercial vehicles for several years prior to his employment at Hartt.  SMF ¶ 17.

The Handbook also contains an entire Maintenance Manual providing detailed information to Drivers about how to properly operate and maintain the trucks they are driving, the fact that Drivers are not allowed to repair their own trucks, and procedures for obtaining repairs both on-site at Hartt's terminals and on the road.  SMF ¶ 18.  The Maintenance Manual also includes the "Vehicle Inspection Reports" policy, which provides that "[a]ll company drivers . . . are required by law to complete a [Vehicle Inspection Report] for each tractor and trailer combination" and "[i]f you haul the same trailer for consecutive days you need to fill one out for each day."  SMF ¶ 19.

Plaintiff acknowledged that he received Driver Orientation by the Maintenance Department on October 8, 2010.  SMF ¶ 20.  Plaintiff understood that he was required to "operate vehicles and equipment in a safe responsible manner and in compliance with federal and state laws and regulations governing vehicle use."  Plaintiff also understood that he was "expected to inspect vehicles or equipment before operating to ensure that the vehicle equipment will function in a safe manner."  Plaintiff was aware of who he needed to call at Hartt if he needed repairs while he was on the road.  Finally, Plaintiff understood that Hartt's policy is that "when a driver fails to perform proper maintenance of a vehicle it will result in appropriate disciplinary action."  SMF ¶ 21.

Plaintiff also attended Northeast Technical Institute in Scarborough, Maine, where he studied to obtain his commercial driver's license ("CDL").  As part of that schooling, Plaintiff studied Maine's Commercial Driver License Manual (the "Manual") published by Maine's Bureau of Motor Vehicles. The Manual contains all of the information regarding pre-trip and post-trip inspections contained in Hartt's Handbook.  SMF ¶ 22.

**B.**    **Plaintiff's Employment With Hartt**

Prior to working for Hartt as an employee, Plaintiff drove for Hartt for a brief period as an Owner/Operator.  Plaintiff voluntarily ceased driving for Hartt because he wanted to be home more

often. In October of 2010, Hartt hired Plaintiff as an "Over The Road" Truck Driver ("OTR Driver"). Plaintiff was dispatched out of Hartt's terminal in Auburn, Maine. An OTR Driver generally drives for two weeks at a time before returning to the terminal. SMF ¶¶ 23-24.

## C.     Plaintiff Reported Mechanical Issues With His Truck, And These Issues Were Immediately Addressed By Hartt Mechanics

Hartt does not permit its Drivers to drive trucks that have mechanical defects or other safety issues. Whenever a Driver reports that a vehicle is, or could potentially be unsafe, the truck is taken out of rotation and immediately inspected. SMF ¶ 28. As per the policies contained in the Maintenance Manual portion of the Handbook, Hartt Drivers are required to conduct pre-trip and post-trip inspections of their trucks using specific procedures. If a Driver has a concern about the safety of the vehicle, the Driver is required to report his concerns to Hartt. SMF ¶ 29.

During each day of a trip, the Driver also must complete a DIR form containing information on any maintenance issues that arise with the truck. Drivers turn these DIR forms into the Maintenance Department at Hartt at the end of each trip. SMF ¶ 30. Plaintiff was familiar with these requirements when he was hired by Hartt because he previously held jobs as a commercial truck driver, including a brief stint at Hartt as an Owner/Operator. He also understood that he was required to complete pre-trip safety inspections on his truck while he was employed by Hartt, and that he was required to report any unsafe equipment or working conditions to his supervisor while he was employed at Hartt. Plaintiff reported the mechanical defects with his truck because that was his job. SMF ¶ 31.

Plaintiff drove Unit 9478 while he was employed by Hartt. SMF ¶ 32. Throughout his employment with Hartt, Plaintiff, using the DIR forms, informed Hartt's Maintenance Department about various mechanical issues that he was having with his truck. For each and every issue that arose, Hartt immediately had its mechanics investigate the problem, and to the extent necessary, make repairs. SMF ¶ 33. By making immediate repairs, Hartt avoided violating the Federal Motor Carrier Safety

Regulations (the "FMCSR"). SMF ¶ 34.

If Plaintiff noticed a defect during his pre-trip inspection, and it was serious enough, he would not take the truck out. SMF ¶ 35. Instead, he would go right to the Maintenance Department to have it fixed. SMF ¶ 35. Plaintiff admits that a driver with a CDL is not permitted to drive a vehicle that he knew had a mechanical defect, unless he had been instructed to drive it somewhere for repairs. SMF ¶ 36. Plaintiff never went out on the road with his vehicle when he knew it had a mechanical defect. SMF ¶ 36. If Plaintiff discovered an issue on the road, he would report that issue to Hartt's Maintenance Department. SMF ¶ 36.

Plaintiff recorded any mechanical issues he had with his vehicle on his Driver's Daily Logs forms and DIR forms. SMF ¶ 37. Plaintiff acknowledges that all of the mechanical issues that he reported to Hartt were repaired. SMF ¶ 37.

Plaintiff believes that Hartt did not repair two mechanical issues – involving an exhaust leak and a broken bunk heater – in a timely manner. SMF ¶ 38. With respect to the broken bunk heater, Plaintiff's expert, Jan Stetson Reynolds, opined that a broken bunk heater would not constitute a violation of either the FMCSR or Maine's Motor Vehicle Inspection Rules (the "MMVIR"). SMF ¶ 39. With respect to the exhaust leak issue, Plaintiff reported the exhaust leak to the Maintenance Department at Hartt, and told them "I have an exhaust leak and you should look at it." SMF ¶ 40. Plaintiff claims he reported the exhaust leak two or three times but he does not recall when he reported it or when it was fixed. SMF ¶ 40.

Plaintiff's Driver's Logs and DIR forms give no indication that Plaintiff reported an exhaust leak. SMF ¶ 41. However, on December 8, 2010, Hartt's Repair Order Detail form for Plaintiff's truck shows that, at Plaintiff's request, Hartt's Maintenance Department looked for an exhaust leak and was unable to find one, but did replace the cab filter. SMF ¶ 41. Also, on December 9, 2010, Plaintiff told

Monique Cote, Hartt's Safety Coordinator, that he had reported an exhaust leak in his truck on November 19, 2010, and that the Maintenance Department had fixed it, and that he had reported another exhaust leak on December 8, 2010, that again had been fixed.  SMF ¶ 42.

Ms. Stetson Reynolds did not, and will not, opine on whether Hartt appropriately repaired the defects in Stark's vehicle.  SMF ¶ 43.  Ms. Stetson Reynolds also testified that a driver has to be operating the vehicle with the defect for it to constitute a violation, stating "[i]f it is sitting in the lot, essentially none of the rules apply."  SMF ¶ 44.

When reporting the mechanical issues discussed above, Plaintiff never mentioned that (i) he was concerned about the safety of his vehicle, (ii) he was concerned that his vehicle was out of compliance with federal, state, or any other regulations, or (iii) he felt Hartt was out of compliance with federal, state or any other regulations.  SMF ¶ 45.  Plaintiff only reported these mechanical issues to the Maintenance Department.  SMF ¶ 46.

D.     **Plaintiff's Post-Offer/Pre-Employment Physical Examinations**

As an OTR Driver, Plaintiff was required by law to maintain a valid commercial driver's license ("CDL") and a current United States Department of Transportation ("DOT") medical certificate.  SMF ¶ 47.  Prior to scheduling an OTR Driver for Driver Orientation, Hartt schedules each Driver for:  (i) the physical examination required by the DOT; (ii) the drug test required by the DOT; and (iii) a job placement assessment ("JPA") to ensure that they are able to perform the essential functions of the job.  SMF ¶ 48.

████████████████████████████████████████

████████████████████████████████████████ Large portions

of Plaintiff's medical records are redacted because Plaintiff is asserting the psychotherapist/patient

privilege with respect to those records.  SMF ¶ 50.  Despite this, Plaintiff claims that he was seeing a

counselor, and not a psychotherapist or psychiatrist.  SMF ¶ 50.

On October 6, 2010, Plaintiff went to Concentra for the physical examination required by DOT

regulations.  As part of the examination, Stark, like all OTR Drivers, was required to provide the

examiner with his medical history on the DOT Physical Examination Report.  SMF ¶ 51.  Specifically,

Plaintiff was required to disclose whether he had a history of, among other things:  (a) any illness or

injury in the last five years; (b) nervous or psychiatric disorders, e.g., severe depression; (c) missing or

impaired hand, arm, foot, leg, finger, toe; (d) spinal injury or disease; (e) chronic low back pain; and (f)

narcotic or habit forming drug use.  SMF ¶ 52.

Plaintiff acknowledges that he filled out and signed the DOT Physical Examination Report.

SMF ¶ 52.  He also acknowledges that he failed to disclose that he had any medical issues, illnesses, or

injuries in the last five years on the Report.  SMF ¶ 52.  Based on this incomplete and inaccurate

information, Plaintiff received a two-year DOT medical certificate.  SMF ¶ 52.

The DOT Physical Examination Report states as follows:  "I certify that the above information is

complete and true.  I understand that inaccurate, false or missing information may invalidate the

examination and my Medical Examiner's Certificate."  SMF ¶ 53.  Plaintiff provided Hartt with his

DOT Physical Examination Report because the DOT requires that Hartt have its drivers' DOT Physical

Examination Reports when it conducts its audits.  SMF ¶ 54.

On October 7, 2010, Plaintiff went to Central Maine Conditioning Clinic ("CMCC") for his JPA.

As part of the JPA, Plaintiff was required to provide the examiner with his medical history on CMCC's

Health History Questionnaire (the "Questionnaire"). SMF ¶ 55. CMCC uses the Questionnaire to obtain information regarding the person's medical history so that the examiner can be sure that the person can safely perform the JPA itself, that the person can safely perform the physical demands of the job as an OTR Driver, and so that CMCC can determine whether it needs to obtain any information from the person's health care providers before making a determination as to whether the person can safely perform the JPA itself and the physical demands of the job. SMF ¶ 56.

Plaintiff was required to disclose the following information on the Questionnaire: (i) whether he had a work or non occupational injury which placed restrictions on him at work; (ii) whether he had any current or chronic orthopedic/musculoskeletal joint pain limitations; (iii) whether he had an injury that might interfere with his ability to perform the job safely; (iv) whether he sometimes gets pain when he performs certain activities; and (v) whether he has now or has had (a) back trouble, back pain, back injury, (b) depression, (c) nervous or mental problems, (d) neck injury or whiplash, or (e) hernia, rupture. SMF ¶ 57. The only medical issue that Plaintiff disclosed on his Questionnaire was his 2009 inguinal hernia repair. SMF ¶ 58. As a result of the JPA, CMCC informed Hartt that Plaintiff was "green" or able to perform the physical requirements of the OTR Driver position. SMF ¶ 58.

CMCC's Questionnaire contained the following statement:

> **Statement of honesty:**
> I have truthfully answered the above questions to the best of my knowledge. I understand that withholding any relevant information or giving false information regarding the above can be cause for termination.
> **I have reviewed this form and agree that this is an accurate reflection of my current situation.**

SMF ¶ 59. Had Plaintiff disclosed his prior injuries, it would have changed the process that Plaintiff went through at CMCC, and may have led to Plaintiff being unable to take the JPA, or failing to pass the JPA. SMF ¶ 60.

Hartt's expert, Craig Curtis, M.D., a physician who has performed DOT Physical Examinations

throughout his career, has opined that Plaintiff failed to disclose certain medical conditions during his DOT Physical Examination that would have influenced his ability to be certified to drive. SMF ¶ 61. Specifically, Dr. Curtis opined that the information Plaintiff provided on his DOT Physical Examination Report was "inaccurate" when compared with his medical records because "the medical records revealed conditions that were not identified" in the DOT Report. SMF ¶ 61. Dr. Curtis also noted in his report that "the medical records provided had large bodies of the record redacted, and there were references to mental health issues and medications that were not disclosed on his DOT history" and "[t]hese medical conditions could likely impact his ability to safety operate a commercial motor vehicle." SMF ¶ 61. ████████████████████████████

████████████████████████████████

████████████████████████████████

████████████

Dr. Curtis would have disqualified Plaintiff from being cleared to drive a commercial motor vehicle and obtaining a DOT medical certificate on October 6, 2010 because: (i) Plaintiff falsified his medical history on the DOT Physical Examination Report, and (ii) Plaintiff's various medical conditions may have disqualified him from driving a commercial vehicle. SMF ¶ 62. Given that Plaintiff's medical records are heavily redacted, Dr. Curtis cannot determine whether Plaintiff's mental health condition(s), or any prescription medications he had to take as a result of those condition(s), would have disqualified him from driving. SMF ¶ 63. Plaintiff's failure to disclose this information disqualifies him from obtaining his DOT medical certificate. SMF ¶ 64. Given Plaintiff's failure to disclose this information during his DOT Physical Examination, Dr. Curtis opined that Plaintiff's DOT medical certificate should have been revoked, and Plaintiff should have had another DOT Physical Examination to ensure he was still physically qualified to perform the essential functions of his job. SMF ¶ 65. Also,

given Plaintiff's injury in December of 2010, Dr. Curtis opined that Plaintiff should have had a new DOT Physical Examination to ensure he was still physically qualified to perform the essential functions of his job. SMF ¶ 66.

The fact that Stark was cleared to return to work by CMCC after his fit-for-duty examination on December 13, 2010 does not mean that he would have been declared qualified to drive a commercial vehicle by a DOT-qualified examiner. SMF ¶ 67.

**E.     Plaintiff Is Out of Work For Two Days For A Herniated Disk**

On or about December 9, 2010, Plaintiff informed Ms. Cote, Hartt's Safety Coordinator, that he was planning to go see his VA doctor for a herniated disk because he had been having pain all week. SMF ¶ 68. Ms. Cote emailed Ms. Rogers, Human Resources Assistant, and Roberta Murphy, Hartt's Safety Manager who handled workers' compensation claims for Hartt, to inform them about Plaintiff's injury. SMF ¶ 68. Ms. Rogers responded that Plaintiff would need to be cleared to return to work. SMF ¶ 68.

That same day, December 9, 2010, Ms. Rogers called Plaintiff to discuss his need for leave, and to determine when he expected to return to work. SMF ¶ 69. Plaintiff stated that he was going to his doctor at the VA because he was having pain related to a herniated disk injury he suffered three (3) years earlier, and that the injury was not work-related. Plaintiff also stated that he did not know when he would be able to return to work, and agreed to obtain a doctor's note stating that he had been cleared to return to work. SMF ¶ 69.

Rick Parisien, Hartt's Director Human Resources and Director of Safety, was not even aware that Plaintiff was going to be out of work as a result of his injury; he just understood that Plaintiff had a doctor's appointment with the VA to have an injury examined. SMF ¶ 70. Plaintiff described his neck issue as a "medical instant" rather than a "medical condition." SMF ¶ 71.

That same day, December 9, 2010, Plaintiff visited his VA doctor, Paula Greenleaf, M.D. Plaintiff's medical records from this appointment state that "he has a herniated disk at C5 at this time" and that he "had work up done and was told" he had a "C5 out" in January of 2008. SMF ¶ 72. On December 10, 2010, Plaintiff provided Hartt with a doctor's note stating that he would be out of work for just three days – from December 9, 2010 to December 11, 2010. SMF ¶ 73. Because Ms. Rogers now had Plaintiff's return to work date, she scheduled Plaintiff for a fit-for-duty examination on December 13, 2010 at CMCC to ensure that he could safely perform the essential functions of his position. SMF ¶ 73. Ms. Rogers considered this the "final step" to getting Plaintiff to return to work. SMF ¶ 74.

On December 13, 2010, Plaintiff went to his fit-for-duty examination at CMCC. That same day, CMCC faxed Ms. Rogers a letter containing the results of the examination, including, among other things, that Plaintiff was cleared to return to work. The letter also stated that Plaintiff believed he aggravated a previous neck injury of a protruding disk when he was driving his vehicle in the snow for three (3) days. Finally, the letter stated that Plaintiff "never mentioned any cervical injuries at his original pre-employment assessment." SMF ¶ 75. It was Mr. Parisien's understanding that Plaintiff passed the JPA and was going to return to work. SMF ¶ 76.

Concerned that Plaintiff was now claiming that he had aggravated a pre-existing injury while working, which could constitute a work-related injury and trigger Hartt's duty to file an Employer's First Report of Injury for workers' compensation purposes, and that Plaintiff had not disclosed the injury on either his DOT Physical Examination Report or the CMCC Questionnaire, Ms. Rogers and Ms. Murphy scheduled a call with Mr. Brainerd. Specifically, on December 14, 2010, Ms. Rogers emailed Anne Tolman, an Assistant at CMCC, and requested a call with Mr. Brainerd. SMF ¶ 77.

During the call, which occurred the next day, December 15, 2010, Mr. Brainerd stated, among

other things, that Plaintiff was cleared to return to work and could perform all of the essential functions of his position. Mr. Brainerd also stated that Plaintiff had not disclosed his prior injury during his JPA, and that the CMCC Questionnaire does state that an employee can be terminated for failing to disclose that information. SMF ¶ 78.

In his Complaint, Plaintiff alleges that during his fit-for-duty examination on December 13, 2010, he told CMCC that he had been diagnosed with a displaced C5 disc by his primary care provider. SMF ¶ 79. Plaintiff now states that he was never actually diagnosed with a displaced disk; it was merely a possibility. SMF ¶ 79. In fact, Plaintiff denies that he ever told anyone, including his doctors, that he had a "herniated disk." Plaintiff also denies being aware that he had any type of "neck problem." SMF ¶ 80. Plaintiff merely acknowledges that he may have questioned whether he might have a herniated disk. SMF ¶ 80.

**F.** **Plaintiff Fails To Call Or Report To Work For Three Consecutive Days, Which Constitutes Job Abandonment Under Hartt's Established Policies**

Mr. Wiles attempted to contact Plaintiff on three occasions from December 14, 2013 through December 16, 2013 to discuss Plaintiff's return to work after he was cleared to return on Monday, December 13, 2010. SMF ¶ 81. Mr. Wiles left voicemail messages for Plaintiff asking him when he was going to come back to work, and asking him to get in touch about work. SMF ¶ 81. Mr. Wiles also explained that if he did not hear from Plaintiff, he was going to treat the failure to respond to his calls as job abandonment by Plaintiff. SMF ¶ 81. Plaintiff never returned Mr. Wiles' phone calls. SMF ¶ 81. Mr. Wiles never received any messages that Plaintiff had been trying to reach him. SMF ¶ 81. Plaintiff himself admits that he did not speak to Mr. Wiles until Friday, December 17, 2010, when Mr. Wiles informed him that his employment had been terminated . SMF ¶ 81.

While Plaintiff's telephone records show that Plaintiff called Hartt, they do not show who Plaintiff called or what was discussed. SMF ¶ 82. Plaintiff himself admits that he was contacting Ms.

Cote during this time period to try to obtain the tools he had left in his truck, which had been taken by another Driver down to Sumter, South Carolina. SMF ¶ 82.

Neither Ms. Rogers nor Ms. Murphy had any involvement in the decision to terminate Stark's employment. Ms. Rogers and Ms. Murphy also had no conversations with Mr. Wiles, or anyone else at Hartt, regarding terminating Plaintiff's employment. SMF ¶ 83.

Because Plaintiff did not respond to Mr. Wiles' phone calls and did not call or report to work from Tuesday, December 14, 2010 through Thursday, December 16, 2010, in accordance with the policies in its Handbook, Hartt determined that Plaintiff had abandoned his job, which Hartt considers a voluntary resignation of employment. Accordingly, Plaintiff's employment terminated on December 16, 2010. SMF ¶ 84.

On Friday, December 17, 2010, Plaintiff reported to Hartt's Auburn terminal. At that time, Mr. Wiles informed Plaintiff that his employment had been terminated for job abandonment because he failed to call or report to work for three (3) consecutive days, despite being cleared to return to work. SMF ¶ 85. Hartt regularly terminated employees for job abandonment. SMF ¶ 86.

## III.    ARGUMENT

## A.    STANDARD FOR GRANTING SUMMARY JUDGMENT

Summary judgment is appropriate when the relevant pleadings, depositions, and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). For summary judgment purposes, "genuine" means that "a reasonable jury could resolve the point in favor of the nonmoving party." A fact is "material" if its "existence or nonexistence has the potential to change the outcome of the case." *Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (citations omitted).

The nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment should enter. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *McCrory v. Spigel*, 260 F.3d 27, 31 (1st Cir. 2001).

Although the Court must view the evidence in the light most favorable to the non-moving party, "[a] properly supported summary judgment motion cannot be defeated by relying upon conclusory allegations, improbable inferences, acrimonious invective, or rank speculation." *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010). Similarly, evidence that is "merely colorable, or is not significantly probative" will not defeat summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). Even when cases involve elusive concepts such as motive or intent, summary judgment is appropriate "if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Benoit v. Technical Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir. 2003). Finally, "[t]he mere existence of a scintilla of evidence" is insufficient to defeat a properly supported motion for summary judgment. *See Anderson*, 477 U.S. at 252.

**B.     Hartt Did Not Retaliate Against Plaintiff For "Whistleblowing"**

**1.     Legal Standard For Whistleblowing Under The MWPA And The STAA**

Plaintiff claims that Hartt terminated his employment in retaliation for his "whistleblowing" activity in violation of the MWPA and the STAA – *i.e.*, because he filled out the DIR forms describing any mechanical defects in his truck – an act that he performed in the normal course of his duties, and in the normal course of Hartt's business. Complaint at ¶¶ 113, 115. To establish a *prima facie* claim of retaliation under the MWPA or STAA, a plaintiff has the burden of proof and persuasion, and must

establish that: (1) he engaged in a protected activity under the MWPA or STAA; (2) he sustained an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action, or the action was a reprisal for engaging in the protected activity. *See, e.g., Figueroa v. Alejandro*, 597 F.3d 423, 431 (1st Cir. 2010); *DiCentes v. Michaud*, 719 A.2d 509, 514 (Me. 1998); *R&B Transp., LLC v. U.S. Dept. of Labor*, 618 F.3d 37, 46 (1st Cir. 2010).

**2.      Plaintiff Did Not Engage In Protected Activity Under The MWPA**

For Plaintiff to establish that he engaged in protected activity under the MWPA by reporting what he reasonably believed was a violation of the law or rule adopted under the laws of this State, a political subdivision of this State or the United States, as set forth in section 833(1)(A) of the MWPA, he must establish the following facts:

(1)      he acted in "good faith;"
(2)      he made an oral or written report;
(3)      the report was made to his employer or a "public body;"
(4)      he reported what he had "reasonable cause" to believe was "a violation of the law or rule adopted by the laws of this State, a political subdivision of this State or the United States"; and
(5)      he either made a prior report to his employer and allowed his employer a reasonable opportunity to correct the violation, condition or practice or he had specific reason to believe that such a report would not result in prompt correction of the violation.

*See* 26 M.R.S.A. § 833(1)(A) and (B).  As set forth below, Complainant cannot make this showing.

First, Plaintiff's actions were part of his normal job requirements as a Driver.  Specifically, as per the policies contained in several portions of the Handbook that Plaintiff received and reviewed during Driver Orientation (including the Maintenance Manual, the Safety Manual, the Vehicle Equipment and Use Policy and the Position Objectives & Responsibilities Policy), Hartt Drivers are required to conduct pre-trip and post-trip inspections of their trucks using specific procedures. *See* SMF ¶¶ 10-22.  If a Driver has a concern about the safety of the truck, the Driver is required to report his concerns to Hartt.  During each day of a trip, the Driver also must complete a DIR containing

information on any maintenance issues that arise with the truck.  *See* SMF ¶¶ 28-31.  The DOT

regulations mandate these responsibilities, by stating that drivers must "prepare a report in writing at the

completion of each day's work on each vehicle operated."  49 C.F.R. § 396.11(a)(1).  The regulations

also state that drivers must "identify the vehicle and list any defect or deficiency discovered by or

reported to the driver which would affect the safety of operation of the vehicle or result in its mechanical

breakdown."  49 C.F.R. § 396.11(b).

Plaintiff was familiar with these requirements, and understood that he was required to report any

unsafe equipment or working conditions to his supervisor while he was employed by Hartt, both because

of Hartt's policies and because of the DOT regulations.  *See* SMF ¶ 31.  In fact, Plaintiff admits that he

reported any mechanical defects with his truck because "that was his job."  SMF ¶ 31.  Given the record

evidence, it is clear that Plaintiff did not "blow the whistle" and make a "report" within the meaning of

the MWPA.  Plaintiff was not seeking to publicize an allegedly unlawful act, a violation of the law, or

any other matter encompassed by the MWPA; he was simply complying with the law and his job

requirements at Hartt.  *See, e.g., Winslow v. County of Aroostook*, 2013 U.S. Dist. LEXIS 20605, *41-42

(D. Me. Feb. 15, 2013) ("[T]he Court cannot find any report by [plaintiff] that was a genuine attempt to

"blow the whistle" on a violation . . . Rather, the record reflects a genuine effort by [plaintiff] during her

tenure . . . to ensure she followed the rules as she understood them."); *Capalbo v. Kris-Way Truck

Leasing, Inc.*, 821 F. Supp. 2d 397, 419 (D. Me. 2011) (granting summary judgment when employee's

MWPA claim was based on required reports he made at the direction of his employer, stating "[n]o

reasonable trier of fact could conclude that the reports described by [plaintiff], which [employer]

required of him, constituted conduct in opposition to an unlawful employment practice of [employer]."); 

*Willis v. Dept. of Agriculture*, 141 F.3d 1139, 1144 (Fed. Cir. 1998) (construing Federal Whistleblower

Protection Act to afford no protection to reports that were required as part of employee's job duties . .

.'") (quotation omitted).

Second, Plaintiff did not report to anyone at Hartt that he believed that Hartt had violated a law or rule, or that he had safety concerns. *See* SMF ¶ 45. Moreover, Plaintiff did not have an objectively reasonable basis to believe that a violation of a law or a rule was occurring. *See Bard v. Bath Iron Works Corp.*, 590 A.2d 152, 154-155 (1991); *Gaines v. K-Five Constr. Corp.*, 2012 U.S. Dist. LEXIS 63480, *20-21 (N.D. Ill. May 7, 2012) (holding employee did not have "reasonable belief" that truck was unsafe when the truck was inspected by the employer's mechanics, and the mechanics determined that the truck was safe). The only mechanical defect that Plaintiff claims was not fixed by Hartt in a timely manner, and that Plaintiff's expert opined might constitute a violation of the FMCR, was an exhaust leak. *See* SMF ¶¶ 39-40. However, Hartt's records demonstrate that upon a review of the truck, Hartt's mechanics could not find any such leak. *See* SMF ¶ 41. Moreover, Plaintiff's expert, Ms. Stetson Reynolds, opined that a driver has to be operating the vehicle with the defect for it to constitute a violation, stating "[i]f it is sitting in the lot, essentially none of the rules apply." SMF ¶ 44. Plaintiff himself states that he never went out on the road with his truck when he knew it had a mechanical defect, and if he discovered a defect while he was on the road, he immediately fixed the defect or called Hartt's Maintenance Department to get it fixed. *See* SMF ¶ 36.

Third, when Plaintiff reported the alleged mechanical issues that he was having with his truck, Hartt mechanics immediately inspected, and to the extent necessary, repaired Plaintiff's truck. *See* SMF ¶ 36. Plaintiff himself acknowledges that all of the alleged defects that he reported were fixed. *See* SMF ¶ 37. Furthermore, the only other person outside of the Maintenance Department that Plaintiff told about the exhaust leak was Ms. Cote, and when Plaintiff told her about the leak on December 9, 2010, he stated that the leak had been fixed. *See* SMF ¶ 42. Because Hartt immediately took corrective action, Plaintiff was not engaging in "protected activity" as defined by the MWPA. *See* 26 M.R.S.A. §

833(1)(A) and (B).

### 3. Plaintiff Did Not Engage In Protected Activity Under The STAA

Plaintiff also cannot establish that he engaged in protected activity under the STAA. Pursuant to the STAA, an employer may not terminate an employee if he or she "has filed a complaint or begun a proceeding related to a violation of a commercial motor vehicle safety or security regulation, standard, or order . . ." 49 U.S.C. § 31105(a)(1)(A)(i).

The STAA, requires that a plaintiff report a *specific* violation of a *specific* DOT regulation. *See Byrd v. Consolidated Motor Freight*, 97 STA 9, p. 7 (ARB May 5, 1998); *Clean Harbors Environmental Services v. Herman*, 146 F.3d 12, 19 (1st Cir. 1998) (citations omitted). The report must be specific enough that it makes an employer aware that the conduct constitutes protected activity. *See BSP Trans Inc. v. U.S. Dept. of Labor*, 160 F.3d 38, 49 (1st Cir. 1998) (citation omitted). Here, Plaintiff's routine reporting of mechanical issues he was having with his truck simply could not have put Hartt on notice that Plaintiff felt that Hartt was engaging in any violations of state or federal regulations. Plaintiff reported these issues to the mechanics in Hartt's Maintenance Department, and never reported to anyone that he believed that the issues he was describing on his DIRs constituted violations of the DOT regulations or created safety issues. *See* SMF ¶ 45.

Moreover, Plaintiff's expert, Ms. Stetson Reynolds, opined that a driver has to be operating the vehicle with the defect for it to constitute a violation, stating "[i]f it is sitting in the lot, essentially none of the rules apply." SMF ¶ 44. Plaintiff states that he never went out on the road with his truck when he knew it had a mechanical defect. *See* SMF ¶ 36. Plaintiff also states that if he discovered a defect while he was on the road, he immediately fixed the defect or called Hartt's Maintenance Department to get it fixed. *See* SMF ¶ 36. Given this record evidence, Plaintiff cannot claim that his reporting of the mechanical issues with his truck constituted protected activity under the STAA, as he never took his

truck on the road with mechanical defects, or had them immediately repaired when he discovered them, and, therefore, they could not have constituted a violation of any federal laws or rules.

### 4. Plaintiff Cannot Establish A Causal Relationship Between His Alleged Protected Activity And His Employment Termination

Plaintiff bears the burden of proving that retaliation was the "but for" cause of the adverse employment action. *See Univ. of Tex. Sw. Medical Center v. Nassar*, 133 S. Ct. 2517 (2013); *Thayer v. Eastern Maine Medical Center*, 740 F. Supp. 2d 191, 197 (D. Me. 2010). Plaintiff has offered absolutely no evidence (because none exists) that his completion of the DIRs in the normal course of his employment at Hartt had any causal connection whatsoever to the termination of his employment. Instead, as Plaintiff is well aware, Hartt terminated his employment for job abandonment because he failed to call or report to work for three (3) consecutive days, despite being cleared to return to work, in violation of Hartt's policies. *See* SMF ¶¶ 81-85. Indeed, the record demonstrates that Mr. Wiles said absolutely nothing about Plaintiff's reporting of the exhaust leak, or any other mechanical issues, during the termination meeting. *See* SMF ¶ 85.

Moreover, with respect to the exhaust leak issue, these types of leaks are frequently reported by Hartt Drivers, and Hartt has never taken an adverse employment action against a Driver for making a report about his or her truck having an exhaust leak. *See* SMF ¶ 40. There is absolutely no evidence that similarly situated employees who did not engage in alleged protected activity were treated more favorably than Plaintiff was. The key question in a disparate treatment case is whether the employer treated the plaintiff less favorably or differently than other similarly situated individuals "because of" his protected status. "In fact, it is boilerplate, in disparate treatment cases, that the absence of any showing that the [employee] was treated differently from similarly situated employees requires a finding for the [employer]." *Thomas v. Digital Equipment Corp.*, 702 F. Supp. 22, 25 (D. Mass. 1988), aff'd, 880 F.2d 1486 (1st Cir. 1989); *see also Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 259 (1981)

("McDonnell Douglas teaches that it is the plaintiff's task to demonstrate that similarly situated employees were not treated equally"); *Cham v. Station Operators, Inc.*, 685 F.3d 87, 97 (1st Cir. 2012); *Garcia v. Bristol-Myers Squibb Co.*, 535 F.3d 23, 31 (1st Cir. 2008) (to demonstrate pretext by "producing evidence that plaintiff was treated differently from similarly situated employees," a plaintiff "must sow that other similarly situated to [him] *in all relevant respects* were treated differently by the employer"). Plaintiff cannot identify any similarly situated employees who have been treated more favorably than he was treated. Accordingly, Plaintiff has not and cannot demonstrate a causal connection between his alleged whistleblower activity and the termination of his employment.

**C.      Hartt Did Not Terminate Plaintiff's Employment Because Of An Alleged Disability In Violation Of The ADA**

To establish a *prima facie* case of disability discrimination, Plaintiff must establish that: (1) he was disabled within the meaning of the ADA; (2) he was a "qualified individual" under the ADA – *i.e.*, he was able to perform, with or without reasonable accommodation, the essential functions of his job; and (3) he suffered an adverse employment action because of his perceived disability or because he had a record of having a disability. *See, e.g., Orta-Castro v. Merck, Sharp & Quimica PR*, 447 F.3d 105, 111 (1st Cir. 2006) (citation omitted); *Berry v. City of South Portland*, 525 F. Supp. 2d 214, 228 (D. Me. 2007). Plaintiff cannot prove any prong of this three-part test.

<u>First</u>, Plaintiff does not claim that he was disabled. Instead, he claims that Hartt perceived him as being disabled or regarded him as having a record of being disabled. Complaint at ¶¶ 100, 111. Plaintiff cannot prove that Hartt either perceived him as being "disabled" or as having a "record" of a disability.

With respect to the "perceived disability" claim, even after the 2008 amendments to the ADA, a condition that is "transitory and minor" does not qualify as a "perceived disability." *See* 42 U.S.C. § 12102(3)(B); *see also Chicago Regional Council of Carpenters v. Thorne Associates , Inc.*, 2012 U.S.

Dist. LEXIS 136647, **20-21 (N.D. Ill. Sept. 25, 2012) ("The 'regarded as' prong 'does not apply to impairments that are 'transitory and minor.'"") (quoting 42 U.S.C. § 12102(3)(B)); *Dube v. Texas Health & Human Services Commission*, 2012 U.S. Dist. LEXIS 87514, *10-11 (W.D. Tex. June 25, 2012) ("The ADAAA . . . restricts the coverage of individuals who are 'regarded as' disabled by excluding individuals with a 'minor' and 'transitory' condition (e.g., a condition that lasts, or is expected to last, six months or less.")). Whether the impairment at issue is "transitory" and "minor" is determined objectively, and not subjectively. *See* 29 C.F.R. § 1630.15(f); *Dube*, 2012 U.S. Dist. LEXIS 87514, *13 ("Even in light of the ADA amendments, Plaintiff fails to create a genuine issue of fact on whether she was 'regarded as' disabled. Subjective belief and conclusory allegations of discrimination are insufficient to defeat summary judgment.").

Here, the only medical issue that anyone at Hartt was aware of involving Plaintiff was the back/neck injury that he reported on December 9, 2010. *See* SMF ¶¶ 68-73. With respect to that injury, the record is clear that Plaintiff was only out of work from December 9, 2010 to December 13, 2010 as a result of his neck injury. *See* SMF ¶¶ 68-73. And, at the time of his termination on December 16, 2010, Plaintiff had been cleared to return to work. *See* SMF ¶¶ 75-76. Indeed, Plaintiff himself described his injury as a "medical instant" rather than a "medical condition." SMF ¶ 71. As a result, Plaintiff's injury clearly qualifies as "transitory and minor," and Hartt could not have objectively perceived him as being disabled. Thus, summary judgment is warranted on Plaintiff's claim for disability discrimination under the ADA. *See, e.g., Neumann v. Plastipak Packaging, Inc.*, 2011 U.S. Dist. LEXIS 126096, *24-25 (N.D. Ohio Oct. 31, 2011) (granting employer summary judgment on perceived disability claim where plaintiff's recuperation from surgery after a back injury was only supposed to last six to eight weeks); *Dugay v. Complete Skycap Svcs., Inc.*, 2011 U.S. Dist. LEXIS 81829, *18 (D. Az. July 26, 2011) (granting employer's motion to dismiss on perceived disability claim where plaintiff was out for injury

due to car accident for just over three (3) months).

There also is no support in the record for Plaintiff's claim that he had a "record" of having a disability. A person has a "record" of a disability within the meaning of the ADA when that person "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k). This prong of the disability definition is used to protect "those who have recovered or are recovering from substantially limiting impairments from discrimination based on their medical history." *Ramos-Echevarria v. Pichis, Inc.*, 659 F.3d 182, 190 (1st Cir. 2011) (quotation omitted). The record demonstrates that Plaintiff has not claimed to have substantial limitations as a result of any disability, and, therefore, he cannot state an ADA claim based on having a record of a disability. *See* SMF ¶ 68-80. Indeed, Hartt had absolutely no records indicating that Plaintiff had any type of disability at the time of his termination. *See* SMF ¶ 68-80.

<u>Second</u>, and more importantly, Plaintiff cannot establish that he is a "qualified individual with a disability" under the ADA because he cannot affirmatively prove that he was physically qualified to drive a commercial motor vehicle under the DOT regulations. To establish a *prima facie* case of disability discrimination, Plaintiff must establish that he was qualified to perform the essential functions of the job, either with or without a reasonable accommodation. *See, e.g., Richardson v. Friendly Ice Cream Corp.*, 594 F.3d 69, 74 (1st Cir. 2010); *Carroll v. Xerox. Corp.*, 294 F.3d 231, 237 (1st Cir. 2002); *Bailey v. Georgia-Pacific Corp.*, 176 F. Supp. 2d 3, 7 (D. Me. 2001).

Here, because of the nature of Hartt's business, which involves commercial transport, both Plaintiff and Hartt are subject to various regulations put in place by the DOT. The DOT's Federal Motor Carrier Safety Administration ("FMCSA") promulgated the Federal Motor Carrier Safety Regulations (the "FMCSR") to "establish minimum qualifications for persons who drive commercial motor vehicles as, for, or on behalf of motor carriers," as well as "minimum duties of motor carriers

with respect to the qualifications of their drivers." 49 C.F.R. §§ 391.1, *et seq.* Under those regulations, "[a] person shall not drive a commercial motor vehicle unless he is physically qualified to do so." 49 C.F.R. § 391.41(a). "A person is physically qualified to drive a motor vehicle if that person: . . . (2) [h]as no impairment of: . . . (ii) [a]n arm, foot, or leg which interferes with the ability to perform normal tasks associated with operating a commercial motor vehicle . . . (7) [h]as no established medical history or clinical diagnosis of rheumatic, arthritic, orthopedic, muscular, neuromuscular, or vascular disease which interferes with his/her ability to control and operate a commercial motor vehicle safely . . . (9) [h]as no mental, nervous, organic, or functional disease or psychiatric disorder likely to interfere with his ability to drive a commercial motor vehicle safely . . . (12)(i) [d]oes not use any drug or substance identified in 21 CFR 1308.11 Schedule I, an amphetamine, a narcotic, or other habit-forming drug." 49 C.F.R. § 391.41(b).

A physician must certify that the driver "does not have any physical, mental, or organic condition that might affect the driver's ability to operate a commercial motor vehicle safely." 49 C.F.R. § 391.43. Drivers must be certified as physically qualified to operate a commercial motor vehicle every two years. *See* 49 C.F.R. § 391.45.

The "Instructions to the Medical Examiner" on the Medical Examination Report for Commercial Driver Fitness Determination (Form 649-F (6045)), as well as the DOT's Medical Advisory Criteria for Evaluation Under 49 C.F.R. Part 391.41 provides:

> Emotional or adjustment problems contribute directly to an individual's level of memory, reasoning, attention, and judgment. These problems often underlie physical disorders. A variety of functional disorders can cause drowsiness, dizziness, confusion, weakness or paralysis that may lead to incoordination, inattention, loss of functional control and susceptibility to accidents while driving. Physical fatigue, headache, impaired coordination, recurring physical ailments and chronic "nagging" pain may be present to such a degree that certification for commercial driving is inadvisable. Somatic and psychosomatic complaints should be thoroughly examined when determining an individual's overall fitness to drive. Disorders of a periodically incapacitating nature, even in the early stages of development, may warrant disqualification.

Many bus and truck drivers have documented that "nervous trouble" related to neurotic, personality, or emotional or adjustment problems is responsible for a significant fraction of their preventable accidents. The degree to which an individual is able to appreciate, evaluate and adequately respond to environmental strain and emotional stress is critical when assessing an individual's mental alertness and flexibility to cope with the stresses of commercial vehicle driving.

When examining the driver, it should be kept in mind that individuals who live under chronic emotional upsets may have deeply ingrained maladaptive or erratic behavior patterns. Excessively antagonistic, instinctive, impulsive, openly aggressive, paranoid or severely depressed behavior greatly interfere with the driver's ability to drive safely. Those individuals who are highly susceptible to frequent states of emotional instability (schizophrenia, affective psychoses, paranoia, anxiety or depressive neuroses) may warrant disqualification. Careful consideration should be given to the side effects and interactions of medications in the overall qualification determination.

Several courts have specifically held that an ADA plaintiff is not considered a "qualified" individual with a disability under the ADA if he is unable to meet the DOT certification requirements. *See, e.g., Bay v. Cassens Transport Co.*, 212 F.3d 969, 975 (7th Cir. May 11, 2000) (holding employee was not "qualified" under the ADA "because he lacked the necessary DOT certification"); *Tate v. NC Pepsi-Cola Bottling Co. of Charlotte*, 2011 U.S. Dist. LEXIS 96896, *9-10 (W.D.N.C. Aug. 29, 2011) ("Because plaintiff had not obtained DOT certification, he was therefore not a 'qualified individual' within the meaning of the ADA."); *Ortiz v. Elgin Sweeping Services, Inc.*, 2011 U.S. Dist. LEXIS 55041, *11-12 (N.D. Ill. May 17, 2011) (holding plaintiff who "failed to satisfy DOT's physical qualification standards and therefore was not a 'qualified individual with a disability' on the day he was terminated" is not protected under the ADA); *Ward v. Skinner*, 943 F.2d 157 (1st Cir. 1991), *cert. denied*, 503 U.S. 959 (1992) (holding epileptic taking anti-convulsant medicine not otherwise qualified to drive commercial vehicles according to DOT regulations, even though risk may be small and in lieu of individualized determination/assessment). This holding is consistent with the legislative history of the ADA. As the United States Supreme Court has explained, "[t]he Senate Labor and Human Resources Committee Report on the ADA stated that 'a person with a disability applying for or currently

holding a job subject to [DOT standards for drivers] must be able to satisfy these physical qualification standards in order to be considered a qualified individual with a disability . . ." *Albertson's Inc. v. Kirkingburg*, 527 U.S. 555, 573 (1999) (quoting S. Rep. No. 101-116, pp. 27-28 (1990)).

As the party with the burden of proof on this issue, Plaintiff must *affirmatively prove* that he was qualified to perform the essential functions of his position at Hartt, and, therefore, was a protected individual under the ADA. *See, e.g., Rios-Jimenez v. Principi*, 520 F.3d 31, 41 (1st Cir. 2008) (granting defendant's summary judgment motion, and stating "[i]n the plaintiffs prima facie showing, she must show that she is qualified to perform the job . . ."); *Matewski v. Orkin Exterminating Co.*, 2003 U.S. Dist. LEXIS 11127, *38-39 (D. Me. July 1, 2003) ("[A] plaintiff carries the burden of demonstrating that he or she is 'qualified' for the job in question."); *Rooney v. Sprague Energy Corp.*, 483 F. Supp. 2d 43, 50 (D. Me. 2007) (stating plaintiff bears the burden of proof on the "qualified individual" inquiry in ADA cases). Because the relevant position here is one that uniquely requires that Plaintiff be medically certified pursuant to DOT regulations, Plaintiff must *affirmatively prove* that he met the DOT's medical certification standards in order to demonstrate that he was qualified to perform the essential functions of his position.[1]

Plaintiff has not and cannot demonstrate that he met the DOT certification requirements during the relevant time period. Plaintiff has not even designated an expert to testify in this respect. *See, e.g., Rios-Jimenez*, 520 F.3d at 42 n.7 (stating that even an unsworn statement by a doctor stating plaintiff was a "qualified individual with a disability" could not defeat summary judgment); *Hrichak v. Pion*, 498 F. Supp. 2d 380 (D. Me. 2007) (holding that a lay witness is not qualified to self-diagnose the nature or

---

[1] Instead, Plaintiff's medical records demonstrate that Plaintiff had several physical and mental health conditions that he failed to disclose during his DOT Physical Examination and his JPA at CMCC on October 6, 2010 and October 7, 2010, respectively. SMF ¶¶ 49-54, 61-67. As is made clear by the language on the DOT Physical Examination Report, Plaintiff's failure to disclose this information could lead to revocation of his DOT medical certificate. SMF ¶¶ 61-62, 64-65 . Plaintiff is also subject to penalties under 49 U.S.C. § 521(b)(2)(B) as a result of his failure to accurately fill out the DOT Physical Examination Report.

severity of an impairment and is not qualified to give an opinion regarding the causal connection between an event and his medical condition, because that requires an expert opinion.).  Furthermore, Hartt's designated medical expert, Dr. Curtis, who regularly performs DOT Physical Examinations, has opined that several of the conditions listed in Plaintiff's medical records would have disqualified him from receiving his DOT medical certificate on October 6, 2010.  *See* SMF ¶¶ 61-62.  Dr. Curtis also opined that Plaintiff's failure to disclose his full medical and mental health history invalidates the DOT medical card that he improperly obtained.  *See* SMF ¶¶ 64-65.  As a result, Plaintiff was not a "qualified" individual with a disability.  *See Seegert v. Monson Trucking, Inc.*, 717 F. Supp. 2d 863, 873 (D. Minn. 2010) (holding that if plaintiff failed to disclose known medical conditions during his DOT physical examination, defendant employer is correct that plaintiff is not qualified for the position).  For these reasons, Plaintiff cannot affirmatively prove that he was a "qualified individual with a disability."

Third, Plaintiff has not produced any facts which give rise to an inference of discrimination based on disability.  Plaintiff cannot prove that Hartt terminated his employment *because of* his alleged disability – *i.e.*, Plaintiff cannot prove that "but for" his alleged disability, Hartt would not have terminated his employment.  *See, e.g., Palmquist v. Shinseki*, 689 F.3d 66, 77 (1st Cir. 2012); *Lewis v. Humboldt Acquis. Corp.*, 681 F.3d 312, 317-22 (6th Cir. 2012) (en banc); *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 961-64 (7th Cir. 2010).  Plaintiff must prove that Hartt terminated his employment for an "unlawful reason."  *See, e.g., Burdine*, 450 U.S. at 253 ("The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."); *Rios-Jimenez*, 520 F.3d at 41 ("The ultimate burden of proving unlawful action rests at all times with [plaintiff]."); *Hyatt v. Norris*, 2009 U.S. Dist. LEXIS 12852, *20 (N.D. Ohio Dec. 29, 2009) ("[Plaintiff] has simply failed to establish that his employment was terminated for an unlawful reason and, therefore, [defendant] is entitled to summary judgment."); *Marcellino v.*

*Federal Express Corp.*, 2010 U.S. Dist. LEXIS 112038, *3-4 (N.D. Ill. Oct. 20, 2010) ("[Defendant] had the right to terminate [plaintiff's] employment for any reason, as long as it was not an unlawful reason, such as discrimination based on a disability.").  Here, even if Hartt did terminate Plaintiff's employment because of his perceived or recorded medical conditions or disabilities, which Hartt adamantly denies, it was not unlawful because these issues disqualified him as a commercial vehicle driver under the DOT regulations.  *See, e.g., Ortiz*, 2011 U.S. Dist. LEXIS 55041, *11-12 (holding plaintiff who "failed to satisfy DOT's physical qualification standards and therefore was not a 'qualified individual with a disability' on the day he was terminated" is not protected under the ADA); *see also Miller v. Ill. Dept. of Corrs.*, 107 F.3d 483, 484 (7th Cir. 1997) (stating that the employer "may have fired [plaintiff] for an improper purpose, but if [plaintiff] can't perform the essential functions of her job, so that she would have been fired anyway, there has been no violation of the [ADA] and [plaintiff] has no right to relief.").

D.     **Plaintiff Is Not Entitled To Punitive Damages**

Plaintiff is not entitled to punitive damages.  Under the Civil Rights Act of 1991, punitive damages are available only if the defendant "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual."  42 U.S.C. § 1981(a)(b)(1).  In 1999, the Supreme Court addressed the standard for proof necessary to obtain punitive damages, and concluded that the defendant's state of mind, rather than the egregiousness of the discriminatory conduct, determines whether punitive damages may be awarded, and that punitive damages are available only in cases in which the employer, at a minimum, has engaged in discriminatory action "in the face of a perceived risk that its actions will violate federal law."  *Kolstad v. American Dental Ass'n.*, 527 U.S. 526, 535-36, 119 S. Ct. 2118 (1999).

Similarly, under the MHRA, a plaintiff may recover punitive damages only if she provides by clear and convincing evidence that the defendant engaged in a discriminatory practice "with malice or

with reckless indifference" to the plaintiff's rights.  *See* 5 M.R.S. § 4613(2)(B)(8)(c); *Batchelder v. Realty Res. Hospitality, LLC,* 914 A.2d 1116, 1121-24 (Me. 2007).

Here, Plaintiff cannot meet its burden of proving that Hartt engaged in discriminatory conduct in the face of a perceived risk (*i.e.*, almost certainly knowing) that it was violating the law, or that it acted with malice or reckless indifference.  Indeed, the facts of this case demonstrate that Hartt fully investigated all of the mechanical defects reported by Plaintiff, and, where necessary, took prompt and effective corrective action.  *See* SMF ¶¶ 33-34, 37.  Plaintiff also has not submitted *any* evidence demonstrating that Mr. Wiles – who made the decision to terminate Plaintiff's employment – acted maliciously in making that decision or had any personal animus toward Plaintiff.  Indeed, Plaintiff admits that he and Mr. Wiles had only met on one occasion – *i.e.,* December 17, 2010, when Mr. Wiles terminated Plaintiff's employment.  *See* SMF ¶ 81.

In *Kolstad*, the Supreme Court also created an affirmative defense to punitive damages for employers who make good faith efforts to comply with the requirements of the anti-discrimination laws.  *See Kolstad*, 527 U.S. at 545-46.  Hartt has demonstrated good-faith efforts to comply with the requirements of the ADA and the MHRA, which absolves Hartt of liability for punitive damages in this case.  *Romano*, 233 F.3d at 669.  Specifically: (1) Hartt has an established policy that prohibits unlawful discrimination; (2) Hartt provides regular training to all of its employees regarding its policy against discrimination at Driver's Orientation; and (3) during Plaintiff's employment with Hartt, he received training regarding discrimination.  *See* SMF ¶¶ 4-9.  Accordingly, Hartt cannot be held liable for punitive damages in this case.

## IV.    CONCLUSION

For the reasons set forth above, summary judgment should be entered in favor of Hartt on Plaintiff's claims under the MWPA, the STAA, and the ADA set forth in the Complaint.

Dated:  September 13, 2013

/s/ Melinda J. Caterine
Melinda J. Caterine
FISHER & PHILLIPS LLP
One Monument Square, Suite 600
Portland, Maine  04101
(207) 774-6001
mcaterine@laborlawyers.com

/s/ Shiloh D. Theberge
Shiloh D. Theberge
FISHER & PHILLIPS LLP
One Monument Square, Suite 600
Portland, Maine  04101
(207) 774-6001
stheberge@laborlawyers.com

Attorneys for Defendant
Hartt Transportation Systems, Inc.

**CERTIFICATE OF SERVICE**

I, Shiloh D. Theberge, hereby certify that on the date set forth below, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification to the following:

Chad T. Hansen
Peter L. Thompson
Allison G. Gray
Maine Employee Rights Group
92 Exchange Street
Second Floor
Portland, Maine 04101
chansen@maineemployeerights.com
pthompson@maineemployeerights.com
agray@maineemployeerights.com

Dated: September 13, 2013

/s/ Shiloh D. Theberge
Shiloh D. Theberge
FISHER & PHILLIPS LLP
One Monument Square, Suite 600
Portland, Maine 04101
(207) 774-6001
stheberge@laborlawyers.com

Attorney for Defendant
Hartt Transportation Systems, Inc.