*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | |
|---|---|
| *JOHN STARK,* | ) |
| | ) |
| *Plaintiff* | ) |
| | ) |
| *v.* | )     *No. 2:12-cv-195-NT* |
| | ) |
| *HARTT TRANSPORTATION* | ) |
| *SYSTEMS, INC.,* | ) |
| | ) |
| *Defendant* | ) |

**MEMORANDUM DECISION ON MOTION TO PROHIBIT PLAINTIFF**
**FROM RELYING ON CERTAIN FACTS AND RECOMMENDED DECISION**
**ON MOTIONS FOR SUMMARY JUDGMENT**

Hartt Transportation Systems, Inc. ("Hartt") moves for summary judgment as to former

employee John Stark's three claims against it, for (i) disability-based discrimination and breach

of confidentiality in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C.

§ 12101 *et seq.* (Count I), (ii) retaliation in violation of the Surface Transportation Assistance

Act of 1982 ("STAA"), 49 U.S.C. § 31105 (Count II), and (iii) retaliation in violation of the

Maine Whistleblower's Protection Act ("MWPA"), 26 M.R.S.A. § 861 *et seq.*, as enforced

through the Maine Human Rights Act ("MHRA"), 5 M.R.S.A. § 4551 *et seq.* (Count III).  *See*

Complaint (ECF No. 1) ¶¶ 1, 110-15; Defendant's Motion for Partial Summary Judgment

(ADA/Confidentiality Claim) ("Defendant's S/J Motion/Confidentiality") (ECF No. 87) at 1, 10;

Defendant's Motion for Partial Summary Judgment (ADA Discrimination/MWPA/STAA

Claims) ("Defendant's S/J Motion/Remaining Claims") (ECF No. 86) at 1, 30.

In connection with its motions, Hartt also seeks to preclude Stark from relying, in

opposing summary judgment, on facts set forth in his opposing statement of material facts that

are not set forth in his additional statement of material facts.  *See* Defendant's Expedited Motion

Requesting Order Prohibiting Plaintiff From Relying on Any Additional Facts Contained in His Opposing Statement of Material Facts That Do Not Appear in His Additional Statement of Material Facts ("Defendant's Motion/Facts") (ECF No. 106).[1]

Stark cross-moves for summary judgment on his claim of violations of ADA confidentiality provisions but not on causation, acknowledging that there is a triable issue as to whether those alleged violations caused Hartt to terminate his employment. *See* Plaintiff's Motion for Partial Summary Judgment ("Plaintiff's S/J Motion") (ECF No. 84) at 1-2, 10.

Oral argument was held before me on the parties' cross-motions for summary judgment on March 25, 2014.

For the reasons that follow, I grant in part and deny in part the Defendant's Motion/Facts and recommend that the court (i) grant the Plaintiff's S/J Motion as to Count I to the extent that Stark alleges that disclosures made on December 13 and 15, 2010, violated ADA confidentiality provisions, but otherwise deny it, (ii) grant the Defendant's S/J Motion/Confidentiality as to Count I to the extent that Stark alleges that the disclosure made on October 7, 2010, violated ADA confidentiality provisions and that there was any violation of the ADA examination provisions, but otherwise deny it, and (iii) grant the Defendant's S/J Motion/Remaining Claims as to Count III, Stark's claim of retaliation in violation of the MWPA, and Count I to the extent that Stark alleges discrimination based on a record of disability in violation of the ADA, but otherwise deny it.

---

[1] I denied that portion of the Defendant's Motion/Facts seeking an expedited ruling. *See* ECF No. 108.

# I.  Applicable Legal Standards

## A.  Federal Rule of Civil Procedure 56

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." *Rodríguez-Rivera v. Federico Trilla Reg'l Hosp. of Carolina*, 532 F.3d 28, 30 (1st Cir. 2008) (quoting *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008)). "A fact is material if it has the potential of determining the outcome of the litigation." *Id.* (quoting *Maymi v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Santoni,* 369 F.3d at 598. Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); Fed. R. Civ. P. 56(c). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

"This framework is not altered by the presence of cross-motions for summary judgment."
*Cochran v. Quest Software, Inc.,* 328 F.3d 1, 6 (1st Cir. 2003). "[T]he court must mull each motion separately, drawing inferences against each movant in turn." *Id.* (citation omitted); *see also, e.g., Wightman v. Springfield Terminal Ry. Co.,* 100 F.3d 228, 230 (1st Cir. 1996) ("Cross motions for summary judgment neither alter the basic Rule 56 standard, nor warrant the grant of summary judgment *per se.* Cross motions simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed. As always, we resolve all factual disputes and any competing, rational inferences in the light most favorable to the [nonmovant].") (citations omitted).

### B. Local Rule 56

The evidence that the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the local rules of this district. *See* Loc. R. 56. The moving party must first file a statement of material facts that it claims are not in dispute. *See* Loc. R. 56(b). Each fact must be set forth in a numbered paragraph and supported by a specific record citation. *See id.* The nonmoving party must then submit a responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts[.]" Loc. R. 56(c). The nonmovant likewise must support each denial or qualification with an appropriate record citation. *See id.* The nonmoving party may also submit its own additional statement of material facts that it contends are not in dispute, each supported by a specific record citation. *See id.* The movant then must respond to the nonmoving party's statement of additional facts, if any, by way of a reply statement of material facts in which it must "admit, deny or qualify such additional facts by reference to the numbered

paragraphs" of the nonmovant's statement. *See* Loc. R. 56(d). Again, each denial or qualification must be supported by an appropriate record citation. *See id*.

Failure to comply with Local Rule 56 can result in serious consequences. "Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted." Loc. R. 56(f). In addition, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact." *Id*.; *see also, e.g., Sánchez-Figueroa v. Banco Popular de P.R.*, 527 F.3d 209, 213-14 (1st Cir. 2008); Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]").

## II. Factual Background

### A. Plaintiff's S/J Motion

The parties' statements of material facts, credited to the extent that they are either admitted or supported by record citations in accordance with Local Rule 56, with disputes resolved in favor of Hartt as the nonmovant, reveal the following.[2]

### 1. Stark Undergoes Two Pre-Employment Physical Examinations

Stark was employed by Hartt from October 8, 2010, until December 17, 2010, as an over-the-road ("OTR") driver, based out of Hartt's Auburn terminal. Plaintiff's Statement of

---

[2] Statements that are qualified are assumed to be admitted subject to that qualification, unless a qualification indicates otherwise. To the extent that I have incorporated one side's qualification into the statement of the other, I have determined that the qualification is supported by the record citation(s) given. I have omitted qualifications that are unsupported by the citation(s) given or are redundant. To the extent that I have taken into consideration a denial of a statement, I have determined that the denial is supported by the citation(s) given.

Undisputed Material Facts ("Plaintiff's SMF") (ECF No. 85) ¶ 1; Defendant Hartt Transportation Systems, Inc.'s Response to Plaintiff John Stark's Statement of Undisputed Material Facts ("Defendant's Opposing SMF") (ECF No. 98) ¶ 1.

On October 6, 2010, Stark underwent a U.S. Department of Transportation ("DOT") physical examination, conducted by Dr. Kevin Flanigan at Concentra in Lewiston, Maine. Plaintiff's SMF ¶ 2; Defendant's Opposing SMF ¶ 2.[3] Dr. Flanigan concluded that Stark met the DOT standard, and Stark was issued a two-year DOT medical certificate. *Id.* ¶ 4.[4]

On October 7, 2010, Stark went to Central Maine Conditioning Clinic ("CMCC") for a separate post-offer, pre-employment job placement assessment ("JPA"). *Id.* ¶ 5. During pre-employment physicals, CMCC classifies individuals into three color categories based upon its JPA. *Id.* ¶ 6.[5] Green means that the individual demonstrates the physical demands of the job. *Id.* Yellow means that he or she demonstrates the physical demands of the job, but there is some relevant history. *Id.* Red means that he or she did not safely demonstrate the physical demands of the job, and CMCC thinks the person would be unsafe to be hired. *Id.* Based on the results of the JPA, CMCC classified Stark as "green." *Id.* ¶ 7.[6]

---

[3] My recitation incorporates Hartt's qualification.

[4] I overrule Hartt's objection, Defendant's Opposing SMF ¶ 4, that Dr. Flanigan's conclusions are inadmissible hearsay. Stark offers the statement not for the truth or falsity of Dr. Flanigan's conclusions but for the fact that he so concluded. Plaintiff's Response to Defendant's Objection to Plaintiff's Statement of Material Fact (ECF No. 103) at 3. My recitation incorporates in part Hartt's qualification. The remainder of the qualification is set forth below in discussing the factual background pertinent to Hartt's motions for summary judgment, save for portions that are unsupported by the citations given.

[5] My recitation incorporates Hartt's qualification.

[6] My recitation incorporates in part Hartt's qualification. Hartt also asserts that, had Stark disclosed his prior injuries, it would have changed the process that he went through at CMCC, and he might have been unable to take the JPA. Defendant's Opposing SMF ¶ 7; Deposition of Robert H. Brainerd, Jr. ("Brainerd Dep.") (ECF No. 77-1), attached to Index for Joint Stipulated Record in Support of the Parties' Motions for Summary Judgment ("Index") (ECF No. 77), at 56-58, 62-63. Hartt further asserts that Stark's disclosure might have led to his failing to pass the JPA, Defendant's Opposing SMF ¶7, but that is unsupported by the citations given. The remainder of Hartt's qualification is set forth below in discussing the factual background pertinent to its motions for summary judgment. The remainder of the qualification is set forth in Hartt's statements of material fact in support of its cross-motion.

The October 7, 2010, examination of Stark by CMCC was different from a DOT examination and was not a DOT examination. *Id*. ¶ 8.[7] As of July 2010, Hartt had started a pilot project with CMCC relating to the post-offer, pre-employment process. *Id*. ¶ 10. According to the pilot project, when a driver was offered a job at Hartt's Auburn office from July 2010 through December 2010, the offer would be contingent on meeting the requirements of the DOT physical and the JPA. *Id*. ¶ 11.[8] The DOT physical and the JPA were two separate requirements. *Id*. ¶ 12.[9] Stark did not complete a DOT examination with CMCC. *Id*. ¶ 13. Rather, he completed a JPA with CMCC, which is a separate pre-employment medical examination. *Id*.[10]

During the course of the October 7, 2010, assessment, Stark also completed a medical questionnaire and a signature page, and a CMCC employee completed a job placement questionnaire based on information that he provided. *Id*. ¶ 14.[11] CMCC uses the information provided on the medical questionnaire to assess whether a person can safely perform the JPA itself and the physical demands of the job of OTR driver, and whether it needs to obtain any information from the person's health care providers to make those determinations. *Id*. ¶ 16.[12]

## 2. CMCC Sends Fax to Hartt on October 7, 2010

CMCC faxed the results of the JPA to Hartt, and Hartt Human Resources Assistant Rose Rogers received them. *Id*. ¶¶ 17, 19.[13] The JPA results dated October 7, 2010, did not indicate that Stark required any reasonable accommodations or had any restrictions. *Id*. ¶ 20.

---

[7] I omit Plaintiff's SMF ¶ 9, which Hartt denies, Defendant's Opposing SMF ¶ 9, viewing the evidence in the light most favorable to Hartt as nonmovant.
[8] My recitation includes Hartt's qualification.
[9] My recitation includes Hartt's qualification.
[10] My recitation includes Hartt's qualification.
[11] My recitation includes Hartt's qualification.
[12] My recitation includes Hartt's qualification.
[13] My recitation includes, in part, Hartt's qualification.

On or about December 9, 2010, Stark informed two of Hartt's employees that he was planning to see his Veterans Administration ("VA") doctor in connection with reports of pain during the prior week. *Id.* ¶ 21.[14]

### 3. CMCC Sends Fax to Hartt on December 13, 2010

On or about December 13, 2010, at Hartt's request, Stark underwent a medical examination at CMCC to ensure that he was fit to return for duty, and was cleared to return to work that same day. *Id.* ¶ 22. The same day, CMCC sent a fax to Rogers regarding Stark that Rogers received. *Id.* ¶ 23. The fax included a report provided to CMCC by Stark in connection with the fitness-for-duty examination that Hartt had Stark attend. *Id.* ¶ 25. It was Hartt's normal procedure to have the company completing a fit-for-duty evaluation provide a report to Hartt like the one Hartt received on December 13, 2010, regarding Stark. *Id.* ¶ 26.[15] Roberta Murphy, who was Hartt's safety manager at that time, testified that in her mind there was nothing unusual from a procedural standpoint about the fact that Rogers received a copy of the December 13, 2010, report from CMCC. *Id.* ¶ 28; Deposition of Roberta Murphy ("Murphy Dep.") (ECF No. 77-7), attached to Index, at 5-6, 29.[16] Rogers testified that she scheduled the fitness-for-duty examination for Stark because either he had informed her that he was ready to return to work or

---

[14] Hartt qualifies this statement, Defendant's Opposing SMF ¶ 21, asserting that (i) on December 9, 2010, Stark informed Monique Cote, Hartt's Safety Coordinator, that he was planning to go see his VA doctor for a herniated disk because he had been having pain all week, Deposition of Monique Cote ("Cote Dep.") (ECF No. 77-2), attached to Index, at 50, (ii) on the same day, Rogers called Stark to discuss his need for leave and determine when he expected to return to work, Deposition of Rose Rogers ("Rogers Dep.") (ECF No. 77-25), attached to Index, at 30-32, and (iii) Stark told Rogers he had had a disk issue for three years, his injury was not work-related, he did not know when he would be able to return to work, and he agreed to obtain a doctor's note stating that he had been cleared to return to work, *id.*

[15] Hartt purports to deny this statement, Defendant's Opposing SMF ¶ 26, but its assertion is in the nature of a qualification, which I have included in my recitation. I omit Plaintiff's SMF ¶ 27, which Hartt correctly observes is unsupported by the citation given, Defendant's Opposing SMF ¶ 27.

[16] Hartt purports to deny this statement, Defendant's Opposing SMF ¶ 28, but its assertion is in the nature of a qualification, which I have included in my recitation.

she had somehow been informed of that fact.  Plaintiff's SMF ¶ 29; Defendant's Opposing SMF ¶ 29.[17]

Hartt referred Stark for the December 13, 2010, fitness-for-duty examination to make sure that he was cleared to perform the functions of his job.  *Id*. ¶ 30.  In the memorandum from CMCC employee Melissa Bilodeau included with the December 13, 2010, fax, she indicated, "As a result of John's present strength and range of motion, I do believe he can return to work safely."  *Id*. ¶ 31.  CMCC staff did not indicate anywhere in the December 13, 2010, fax that Stark required reasonable accommodations or restrictions in connection with performing his job duties for Hartt.  *Id*. ¶ 32.[18]

The fax also contained references to Stark's October 7, 2010, pre-employment physical and the results of that physical.  *Id*. ¶ 33.  The fax stated, "It should be noted that [Stark] never mentioned any cervical injuries at his original pre-employment assessment."  *Id*. ¶ 34.  After receiving the fax, Rogers showed it to Murphy.  *Id*. ¶ 35.  One of the things that Rogers and Murphy discussed when reviewing the fax was that Stark had not provided information on his pre-employment assessment.  *Id*. ¶ 36.

### 4.  Hartt Personnel Discuss Stark with CMCC on December 15, 2010

Murphy decided that she needed to contact Bob Brainerd, owner of CMCC, because she wanted to know why subsequently disclosed information had not been brought forward during Stark's pre-employment assessment.  *Id*. ¶ 37.[19]  On December 14, 2010, Rogers emailed Anne

---

[17] Hartt purports to deny this statement, Defendant's Opposing SMF ¶ 29, but its assertion is in the nature of a qualification, which I have included in my recitation.

[18] Hartt qualifies this statement, Defendant's Opposing SMF ¶ 32, asserting that, in the December 13, 2010, fax, CMCC stated that Stark claimed he had aggravated a preexisting injury while performing his job duties, Exh. 2 (ECF No. 77-10) to Deposition of Rick Parisien ("Parisien Dep.") (ECF No. 77-8), attached to Index, at Page ID No. 474.

[19] Hartt qualifies this statement, Defendant's Opposing SMF ¶ 37, asserting, in cognizable part, that Rogers and Murphy testified that they scheduled a call with Brainerd because they also were concerned that Stark was now (*continued on next page*)

Tolman, an assistant at CMCC, to request a call with Brainerd to discuss the December 13, 2010, fax. *Id.* ¶ 38.[20]  Rogers, Murphy, and Brainerd spoke by telephone on December 15, 2010. *Id.* ¶ 39.  During the call, they discussed Stark's alleged failure to disclose medical information during his October 7, 2010, pre-employment examination. *Id.* ¶ 40.[21]  Brainerd stated that Stark had not disclosed any information about his "back condition" during his pre-employment assessment. *Id.* ¶ 41.[22]

During the call, Rogers wrote down, "Bob said sign form whether pre-existing or not and failed to disclose the info.  We are concerned that you failed to disclose info and we would not have hired you for a job that could have aggravated your condition . . . could have been red." *Id.* ¶ 42.  Rogers testified that she wrote down, "We are concerned that you failed to disclose info and we would not have hired you for a job that could have aggravated your condition" because it was a statement made during the call. *Id.* ¶ 43.[23]

Murphy's notes of the call state, "Discussed with Bob Brainerd, did fully disclose medical history which can be caused for termination.  Protruding disc is symptomatic – currently it is now non symptomatic.  He can do the job function, but is symptomatic." *Id.* ¶ 46.[24]  In his notes of the conversation, Brainerd wrote, "Telephone conversation with Roberta and Rose at

---

[20] claiming that he had aggravated a preexisting injury while working, which could constitute a work-related injury, Murphy Dep. at 30-33; Rogers Dep. at 46.  I omit the balance of the qualification, which is not supported by the citations given.

[20] My recitation includes Hartt's qualification.

[21] Hartt qualifies this statement, Defendant's Opposing SMF ¶ 40, asserting that Brainerd stated, among other things, that Stark was cleared to return to work and could perform all of the essential functions of his position, that Stark had not disclosed his prior injury during his JPA, and that the CMCC questionnaire does state that an employee can be terminated for failing to disclose information, Rogers Dep. at 45-48; Murphy Dep. at 38-39; Brainerd Dep. at 66-68.

[22] I omit Hartt's qualification, Defendant's Opposing SMF ¶ 41, which is not supported by the citation given.

[23] Hartt qualifies this statement, Defendant's Opposing SMF ¶ 43, asserting that Rogers testified that she was writing down statements made by Brainerd, Rogers Dep. at 48.

[24] Hartt qualifies this statement, Defendant's Opposing SMF ¶ 46, asserting that this language is a portion of Murphy's notes and that she testified that the notes contained statements made by Brainerd, Exh. 10 (ECF No. 77-18) to Parisien Dep. at 1; Murphy Dep. at 37-39.

Hartt Transportation. Discussion about if John had disclosed any pre-injury during pre-employment." *Id.* ¶ 49.[25]

The decision to terminate Stark was made the next day, December 16, 2010. *Id.* ¶ 50.[26]

When Rogers received the results of Stark's October 7, 2010, JPA, she noted that his JPA had been completed and placed the information in his driver qualification file. Defendant's Statement of Additional Material Facts ("Defendant's Additional SMF"), commencing on page 14 of Defendant's Opposing SMF, ¶ 50; Rogers Dep. at 16-17. The only individuals who have access to the driver qualification file are employees in Hartt's Human Resources Department. Defendant's Additional SMF ¶ 50; Supplemental Affidavit of Rick Parisien ("Suppl. Parisien Aff.") (ECF No. 98-1), attached thereto, ¶ 3.

## B. Defendant's S/J Motions

The parties' statements of material facts, credited to the extent that they are either admitted or supported by record citations in accordance with Local Rule 56, with disputes resolved in favor of Stark as the nonmovant, reveal the following.[27]

---

[25] Hartt qualifies this statement, Defendant's Opposing SMF ¶ 49, asserting that the quoted language is a portion of Brainerd's notes, Exh. 2 (ECF No. 80-2) to Brainerd Dep. at 13.

[26] Hartt qualifies this statement, Defendant's Opposing SMF ¶ 50, asserting that because Stark did not respond to phone calls from Aaron Wiles, Auburn terminal manager, and did not call or report to work from Tuesday, December 14, 2010, through Thursday, December 16, 2010, Wiles determined in accordance with the Hartt's policies that Stark had abandoned his job, which Hartt considers a voluntary resignation of employment, Deposition of Aaron Wiles ("Wiles Dep.") (ECF No. 79-14), attached to Index, at 58-60; Parisien Dep. at 56-59. Hartt further asserts that neither Rogers nor Murphy had any involvement in the decision to terminate Stark's employment and had no conversations with Wiles or anyone else at Hartt regarding that matter. Defendant's SMF ¶ 50; Rogers Dep. at 52-54; Murphy Dep. at 46-47.

[27] Statements that are qualified are assumed to be admitted subject to that qualification, unless a qualification indicates otherwise. To the extent that I have incorporated one side's qualification into the statement of the other, I have determined that the qualification is supported by the record citation(s) given. I have omitted qualifications that are unsupported by the citation(s) given or redundant. To the extent that I have taken into consideration a denial of a statement, I have determined that the denial is supported by the citation(s) given.

### 1. Hartt

Hartt is a national, family owned and managed dry goods motor carrier service that has been in business since 1948. Statement of Material Facts in Support of Defendant's Motions for Partial Summary Judgment ("Defendant's SMF") (ECF No. 88) ¶ 1; Plaintiff's Opposing Statement of Material Facts ("Plaintiff's Opposing SMF") (ECF No. 96) ¶ 1. Its main office is located in Bangor, Maine, and it has terminals in Auburn, Maine, Sumter, South Carolina, and Fulton, Kentucky. *Id*. Hartt has been recognized for its superior safety record by the American Trucking Association's Safety Management Council, the Maine Motor Transport Association, and Reliance Insurance Company each year beginning in 1991. *Id*. ¶ 2.[28]

### 2. Stark

Stark worked as an owner-operator of his own tractor-trailer rig for four years. Plaintiff's Statement of Additional Material Facts ("Plaintiff's Additional SMF"), commencing on page 63 of Plaintiff's Opposing SMF, ¶ 1; Defendant's Reply to Plaintiff's Opposing Statement of Material Facts and Plaintiff's Statement of Additional Facts ("Defendant's Reply SMF") (ECF No. 112) ¶ 1. The work that Stark performed as a driver for other companies prior to starting as an employee for Hartt and as an owner-operator required a commercial driver's license ("CDL") and a DOT card, and Stark had both at all times that that he was driving commercial vehicles. *Id*. ¶ 2.[29] During the period leading up to his employment with Hartt, Stark never had any issues with the mental or physical functions of his commercial driving jobs. Plaintiff's Additional SMF

---

[28] Stark qualifies this statement, Plaintiff's Opposing SMF ¶ 2, asserting, *inter alia*, that DOT records reflect that in the 24 months preceding the filing of the complaint in this matter, DOT inspectors found that Hartt had more than 200 violations of DOT fatigued driver regulations, more than 500 violations of DOT vehicle maintenance regulations, and more than 100 violations of DOT safe driving regulations by Hartt's drivers, Exhs. 2-4 (ECF Nos. 96-2 to 96-4) to Plaintiff's Opposing SMF; Defendant's Objections and Responses to Plaintiff's First Set of Requests for Admission, Exh. 1 (ECF No. 96-1) to Plaintiff's Opposing SMF, ¶¶ 6-8.

[29] Hartt qualifies this statement, Defendant's Reply SMF ¶ 2, referencing opinions of its expert, Craig Curtis, M.D., that are set forth below. The parties use the phrases "DOT card," "DOT certificate," "DOT medical certificate" interchangeably.

¶ 3; Affidavit of John Stark ("Stark Aff.") Exh. 6 (ECF No. 96-6) to Plaintiff's Opposing SMF, ¶ 3.[30]

Prior to becoming a Hartt employee, Stark drove for Hartt for a brief period as an owner-operator. Defendant's SMF ¶ 23; Plaintiff's Opposing SMF ¶ 23. He voluntarily ceased driving for Hartt because he wanted to be home more often. *Id.* In October 2010, Hartt hired Stark as an OTR truck driver. *Id.* ¶ 24. Stark was dispatched out of Hartt's terminal in Auburn, Maine. *Id.* An OTR driver generally drives for two weeks at a time before returning to the terminal. *Id.*

### 3. Hartt's Policies, Procedures, and Driver Orientation

Hartt maintains a comprehensive employee handbook ("Handbook") that it refers to as its "Human Resource Directive: Company Drivers." *Id.* ¶ 3. Prior to beginning work, all Hartt drivers go through an intensive eight-hour driver orientation. *Id.* ¶ 4. On October 8, 2010, Stark attended Hartt's driver orientation. *Id.* During orientation, he received a copy of the Handbook.

---

[30] I overrule Hartt's objection, Defendant's Reply SMF ¶ 3, that Stark is not qualified to testify whether he ever had any issues with the mental or physical functions of his commercial driving job. As Stark notes, *see* Plaintiff's Response to Defendant's Objections to PASMF ("Plaintiff's Obj. Resp.") (ECF No. 115) at 2, an employee is competent to testify as to whether he or she encountered difficulties performing a job, *see Rooney v. Sprague Energy Corp.*, 483 F. Supp.2d 43, 56-57 (D. Me. 2007) (denying employer's motion for summary judgment when, *inter alia*, employee generated issue of material fact as to whether he was qualified to perform the essential functions of his terminal operator position without accommodation through his testimony that, up until the time he was put on leave, he was performing his job in a satisfactory manner and could still do so); *see also, e.g., Doane v. City of Omaha*, 115 F.3d 624, 628 (8th Cir. 1997), *overruling on other grounds recognized in Weber v. Strippit, Inc.*, 186 F.3d 907 (8th Cir. 1999) (affirming trial court's denial of employer's motion for judgment as a matter of law when, *inter alia*, employee "made the requisite showing that his disability does not prevent him from performing the essential functions of the job . . . for instance, he has the necessary educational background, he has a valid motor vehicle license, he had been a successful police officer for many years, he has remained physically fit, and his eyesight is correctable to 20/20"); *EEOC v. J. H. Hein Corp.*, No. 3:08-CV-44-TS, 2009 WL 1657878, at *4 (N.D. Ind. June 12, 2009) (denying employer's motion to strike employee's affidavit when, *inter alia*, "The Court agrees with [the employee] that she has personal knowledge of (and is competent to testify regarding) . . . whether she could keep up and perform her job."). Caselaw cited by Hartt in support of its bid to strike this statement, *Ríos-Jiménez v. Principi*, 520 F.3d 31, 42 n.7 (1st Cir. 2008), and *Hrichak v. Pion*, 498 F. Supp.2d 380 (D. Me. 2007), is distinguishable. In *Ríos-Jiménez*, in support of her statement that she was able to perform the essential functions of her position and was a qualified individual with a disability, the employee offered only the unsworn statement of a doctor. *Ríos-Jiménez*, 520 F.3d at 42 n.7. She also offered only conclusory legal allegations, *see id*, whereas Stark sets forth a fact. In *Hrichak*, the court held that a lay witness was not "competent to offer a self-diagnosis of the cause or nature of his impairment[,]" although he could testify regarding subjective symptoms. *Hrichak*, 498 F. Supp.2d at 382. Stark does not seek to offer a self-diagnosis of any impairment. Hartt alternatively denies this statement, Defendant's Reply SMF ¶ 3; however, I view the evidence in the light most favorable to Stark as nonmovant.

*Id.*[31]  During orientation, Hartt reviews its policies with the drivers regarding compliance with the laws pertaining to disabilities and whistleblower protection.  Defendant's SMF ¶ 5; Parisien Dep. at 7-9.  Hartt also tells its drivers that they should report any and all work-related issues and that there will be no repercussions for doing so.  Defendant's SMF ¶ 5; Parisien Dep. at 8.[32]

The Handbook contains Hartt's Employee Conduct and Disciplinary Action Policy, which includes the following relevant provisions:

> **Employee Conduct and Work Rules**.  The following are example of infractions of rules of conduct that may result in disciplinary action, up to and including termination of employment:
>
> • Dishonesty
> • Falsification of timekeeping records or other Hartt Transportation Systems, Inc. documents
> • Failure to comply with Hartt Transportation Systems, Inc. policies and rules
> • Excessive absenteeism, tardiness or any absence without notice
>
> The foregoing examples are not all inclusive, and there are many other grounds upon which disciplinary action, up to and including termination of employment, may be imposed.
>
> **Attendance and Punctuality**.  To maintain a safe and productive work environment, Hartt Transportation Systems, Inc. expects employees . . . to be reliable and to be punctual in reporting for scheduled work.  You are expected to be at work, on time, each business day.
>
> ***
>
> If you do not report to work for three consecutive days without prior notification, Hartt Transportation Systems, Inc. will consider this an abandonment of your position and that you have voluntarily resigned your employment.

---

[31] Stark qualifies this statement, Plaintiff's Opposing SMF ¶ 4, asserting that Hartt provided him with an incomplete copy of the Handbook that was missing pages, Deposition of John Stark ("Stark Dep.") (ECF No. 78), attached to Index, at 67.

[32] I omit Hartt's further assertion that Stark understood that Hartt had a policy against unlawful discrimination and harassment, Defendant's SMF ¶ 5, which Stark denies, Plaintiff's Opposing SMF ¶ 5, noting that he testified he assumed it had such a policy, Stark Dep. at 79.  Stark purports to deny the remainder of the paragraph, Plaintiff's Opposing SMF ¶ 5, but his assertion that the only retaliation prohibited by Hartt's policy is "retaliation against a person for refusing to grant sexual favors, or actions which create a sexually intimidating, hostile, or offensive working environment[,]" *id.*, is unsupported by the cited policy, which further states: "A person bringing a complaint founded in good faith will suffer no retaliation[,]" Exh. 7 (ECF No. 78-7) to Stark Dep. at 6.

> **Abandonment of Position**. An employee . . . who is absent three consecutive workdays and has not contacted his/her supervisor is considered to have abandoned their position and employment will be terminated.

> **Overview of Prohibited Discrimination and Harassment**: Any decision or action granting or denying employment . . . benefits as to an individual . . . is in violation of this policy when such decision or action is based, in whole or in part, upon the . . . disability, or any other legally protected characteristic of such individual . . . .

Defendant's SMF ¶ 6; Plaintiff's Opposing SMF ¶ 6.[33]

Stark understood that failure to comply with Hartt's policies and rules could be grounds for termination. *Id.* ¶ 8. He also understood that dishonesty could be grounds for termination, as could excessive absenteeism, tardiness, or any absence without notice from work. *Id.*[34]

The Handbook also contains Hartt's Vehicle and Equipment Use Policy:

> **Maintenance.** Please notify a supervisor if any . . . vehicle appears to be damaged, defective, or in need of repair. Prompt reporting of damages, defects, and the need for repairs could prevent deterioration of equipment and possible injury to employees or others.

*Id.* ¶ 10.[35]

The Handbook also contains Hartt's Position Objective and Responsibilities Policy:

> **Safety and Maintenance**. Safety and maintenance involves delivering freight safely, following regulations, and safely operating and maintaining your commercial motor vehicle.

> • Check your equipment daily by doing a pre-trip inspection.
> • Report any unsafe equipment or working conditions to your supervisor.
> • Report any needed repairs or special maintenance to the Maintenance Department.

---

[33] I omit Defendant's SMF ¶ 7, which Stark denies, Plaintiff's Opposing SMF ¶ 7, viewing the evidence in the light most favorable to Stark as nonmovant.

[34] I omit Defendant's SMF ¶ 9, which Stark denies, Plaintiff's Opposing SMF ¶ 9, viewing the evidence in the light most favorable to Stark as nonmovant.

[35] I omit Defendant's SMF ¶ 11, which Stark denies, Plaintiff's Opposing SMF ¶ 11, viewing the evidence in the light most favorable to Stark as nonmovant.

*Id.* ¶ 12.  On October 8, 2010, Stark acknowledged that he received, read, and understood Hartt's Position Objective and Responsibilities Policy.  *Id.* ¶ 13.  He understood that he was responsible for following all of Hartt's policies.  *Id.* ¶ 14.

The Handbook also contains an entire Safety Manual providing detailed information to drivers about how to safely operate their trucks and how to properly complete Driver's Inspections Report ("DIR") forms, also called Vehicle Inspection Reports ("VIRs").  *Id.* ¶ 15.  The Safety Manual contains a "Pre-Trip and Post-Trip Vehicle Safety Inspections" policy, which states that all drivers must "check each safety aspect of the vehicle prior to taking it out on the road," should "mak[e] management and maintenance aware of [any] problem," and should also complete a post-trip inspection after each trip as well.  *Id.*  The manual also includes a checklist and detailed procedure for both inspections.  *Id.*  The Safety Manual also provides a sample DIR form and states that "[a]nytime you find damage or defects to the equipment, not only must it be written on the VIR but you must call the shop to get the defects repaired immediately."  *Id.*

Stark acknowledged that he received driver safety orientation, which includes a review of the Safety Manual, on October 8, 2010.  *Id.* ¶ 16.  Stark was well aware of the process for completing pre-trip inspections and filling out DIR forms, as he had worked as a driver of commercial vehicles for several years prior to his employment at Hartt.  *Id.* ¶ 17.

The Handbook also contains an entire Maintenance Manual providing detailed information to drivers about how to properly operate and maintain the trucks they are driving, the fact that drivers are not allowed to repair their own trucks, and procedures for obtaining repairs both on-site at Hartt's terminals and on the road.  *Id.* ¶ 18.  The Maintenance Manual also includes the "Vehicle Inspection Reports" policy, which provides that "[a]ll company drivers . . . are required by law to complete a [Vehicle Inspection Report] for each tractor and trailer

combination" and, "[i]f you haul the same trailer for consecutive days you need to fill one out for each day." *Id.* ¶ 19. Stark acknowledged that he received driver orientation by the Maintenance Department on October 8, 2010. *Id.* ¶ 20.

Stark understood that he was required to "operate vehicles and equipment in a safe responsible manner and in compliance with federal and state laws and regulations governing vehicle use." *Id.* ¶ 21. Stark also understood that he was "expected to inspect vehicles or equipment before operating to ensure that the vehicle equipment will function in a safe manner." *Id.* He was aware of whom he needed to call at Hartt if he needed repairs while he was out on the road. *Id.* Finally, he understood that Hartt's policy is that "when a driver fails to perform proper maintenance of a vehicle it will result in appropriate disciplinary action." *Id.*

Stark also attended Northeast Technical Institute in Scarborough, Maine, where he studied to obtain his CDL. *Id.* ¶ 22. As part of that schooling, he studied Maine's Commercial Driver License Manual ("CDL Manual"), published by Maine's Bureau of Motor Vehicles. *Id.* The CDL Manual contains all of the information regarding pre-trip and post-trip inspections that is contained in Hartt's Handbook. *Id.*

### 4. Stark Reports Problems With His Truck

As per the policies contained in the Maintenance Manual portion of the Handbook, Hartt drivers are required to conduct pre-trip and post-trip inspections of their trucks using specific procedures. *Id.* ¶ 29. Drivers who have concerns about the safety of their vehicles are required to report their concerns to Hartt. *Id.*[36] During each day of a trip, the driver also must complete a

---

[36] I omit Hartt's assertions that (i) it does not permit its drivers to drive trucks that have mechanical defects or other safety issues, Defendant's SMF ¶ 28, (ii) whenever a driver reports that a vehicle is or could potentially be unsafe, the truck is taken out of rotation and immediately inspected, *id.*, (iii) throughout his employment with Hartt, Stark, using the DIR forms, informed Hartt's Maintenance Department about various mechanical issues that he was having with his truck and, for each and every issue, Hartt immediately had its mechanics investigate the problem and, to the extent necessary, make repairs, *id.* ¶ 33, and, (iv) by making immediate repairs, Hartt avoided violating the Federal (*continued on next page*)

DIR form containing information on any maintenance issues that arise with the truck. *Id*. ¶ 30. Drivers turn these DIR forms into the Maintenance Department at Hartt at the end of each trip. *Id*. Stark was familiar with these requirements when he was hired by Hartt because he previously held jobs as a commercial truck driver, including a brief stint for Hartt as an owner-operator. *Id*. ¶ 31. He also understood that, while he was employed by Hartt, he was required to complete pre-trip safety inspections on his truck and report any unsafe equipment or working conditions to his supervisor. *Id*. He reported the mechanical defects with his truck because that was his job. *Id*.[37]

Stark drove Unit 9478 while he was employed by Hartt. *Id*. ¶ 32. If Stark noticed a defect during his pre-trip inspection, and it was serious enough, he would not take his truck out. *Id*. ¶ 35. Instead, he would go right to the Maintenance Department to have it fixed. *Id*. Stark admits that a driver with a CDL is not permitted to drive a vehicle that he or she knows has a mechanical defect unless he or she has been instructed to drive it somewhere for repairs. *Id*. ¶ 36. Stark never went out on the road with his vehicle when he knew it had a mechanical defect. *Id*. If he discovered issues on the road, he would immediately fix the defect or call Hartt's Maintenance Department to get it fixed. *Id*.[38]

Stark believes that Hartt did not repair two mechanical issues, involving an exhaust leak and a broken bunk heater, in a timely manner. *Id*. ¶ 38. Stark's expert, Jan Stetson Reynolds, opined that a broken bunk heater would not constitute a violation of either the FMCSR or

_____

Motor Carrier Safety Regulations ("FMCSR"), *id*. ¶ 34, which Stark denies, Plaintiff's Opposing SMF ¶¶ 28, 33-34, viewing the evidence in the light most favorable to Stark as nonmovant.
[37] Stark qualifies this statement, Plaintiff's Opposing SMF ¶ 31, asserting that he also reported issues with his truck because he believed that they were safety issues, Stark Dep. at 191-92.
[38] Stark qualifies this statement, Plaintiff's Opposing SMF ¶ 36, asserting that he would report mechanical issues with his truck from the road to Hartt and, rather than pay to have the issues repaired while Stark was on the road, Hartt required that he drive with the issues and finish his route and then would repair them after Stark returned to Hartt's facility, Stark Dep. at 133. I omit Defendant's SMF ¶ 37, which Stark denies, Plaintiff's Opposing SMF ¶ 37, viewing the evidence in the light most favorable to Stark as nonmovant.

Maine's Motor Vehicle Inspection Rules ("MMVIR"). *Id.* ¶ 39. Stark reported the exhaust leak to the Maintenance Department at Hartt and told them, "I have an exhaust leak and you should look at it." *Id.* ¶ 40. He claims that he reported the exhaust leak two or three times but does not recall when he reported it or when it was fixed. *Id.* Exhaust leaks are frequently reported by Hartt drivers, and Hartt had never taken an adverse employment action against a driver for making a report about his or her truck having an exhaust leak. *Id.*[39]

Stark's driver logs and DIR forms give no indication that he reported an exhaust leak. *Id.* ¶ 41. However, on December 8, 2010, Hartt's Repair Order Detail form for Stark's truck shows that, at Stark's request, Hartt's Maintenance Department looked for an exhaust leak and was unable to find one, although it did replace the cab filter. *Id.*[40] Stetson Reynolds did not and will not opine on whether Hartt appropriately repaired the defects in Stark's vehicle. *Id.* ¶ 43. Stetson Reynolds also testified that a driver has to be operating the vehicle with a defect for it to constitute a violation, stating, "[i]f it is sitting in the lot, essentially none of the rules apply." *Id.* ¶ 44. When reporting the mechanical issues discussed above, Stark never mentioned that he was concerned about the safety of his vehicle, he was concerned that his vehicle was out of compliance with federal, state, or any other regulations, or he felt Hartt was out of compliance with federal, state, or any other regulations. Defendant's SMF ¶ 45; Stark Dep. at 162-64.[41]

---

[39] Stark qualifies this statement, Plaintiff's Opposing SMF ¶ 40, asserting, *inter alia*, that Todd Cotier, whose affidavit Hartt cited in support of the final sentence, was not involved in Stark's termination and did not even know who he was, Deposition of Todd Cotier ("Cotier Dep."), Exh. 5 (ECF No. 96-5) to Plaintiff's Opposing SMF, at 26. I omit the rest of Stark's qualification, which is in the nature of legal argument.

[40] I omit Defendant's SMF ¶ 42, which Stark denies, Plaintiff's Opposing SMF ¶ 42, viewing the evidence in the lights most favorable to Stark as nonmovant.

[41] Stark purports to deny this statement, Plaintiff's Opposing SMF ¶ 45; however, regardless of whether he believed that he was reporting safety issues or violations, or whether any of his reported issues actually were violations, he fails to controvert Hartt's statement that he did not tell Hartt that he believed any of the issues were safety issues or violations when he reported them. I omit Defendant's SMF ¶ 46, which Stark denies, Plaintiff's Opposing SMF ¶ 46, viewing the evidence in the light most favorable to Stark as nonmovant.

## 5. Stark's October 6, 2010, DOT Physical Examination

As an OTR driver, Stark was required by law to maintain a CDL and a current DOT medical certificate. *Id*. ¶ 47. Prior to scheduling an OTR driver for driver orientation, Hartt schedules each driver for (i) the physical examination required by the DOT, (ii) the drug test required by the DOT, and (iii) a JPA to ensure that the driver is able to perform the essential functions of the job. *Id*. ¶ 48.[42]

As part of DOT physical examinations, OTR drivers are required to provide the examiner with medical history. Defendant's SMF ¶ 51; Deposition of Craig Curtis, M.D. ("Curtis Dep.") (ECF No. 77-3), attached to Index, at 24-25, 123-25. Specifically, Stark was required to disclose whether he had a history of, among other things, (i) any illness or injury in the last five years, (ii) or psychiatric disorders, *e.g*., severe depression, (iii) missing or impaired hand, arm, foot, leg, finger, toe, (iv) spinal injury or disease, (v) chronic low back pain, and (vi) narcotic or habit forming drug use. Defendant's SMF ¶ 51; Exh. 18 (ECF No. 79-1) to Stark Dep. at 1.[43] Stark acknowledges that he filled out and signed the DOT Physical Examination Report. Defendant's

---

[42] I omit Defendant's SMF ¶¶ 49 and 72, sustaining Stark's objections, Plaintiff's Opposing SMF ¶¶ 49 and 72, that paragraph 49 violates the requirement of Local Rule 56(b) that a movant set forth facts in separately numbered paragraphs in that it consists of more than 50 discrete factual allegations supported at the end by one string citation that includes a general citation to a sealed exhibit consisting of 283 pages of medical records (Exhibit 13 to the Stark Deposition, filed at ECF Nos. 81-1 through 81-6), and paragraph 72 is supported by a general citation to the same 283-page medical record. In response to Stark's objections, Hartt supplies pinpoint citations, *see* Response to Plaintiff's Requests To Strike Contained in His Opposing Statement of Material Facts ("Defendant's Obj. Response"), commencing on page 1 of Defendant's Reply SMF, ¶¶ 49, 72. However, the court does not have the benefit of a response by Stark to the revised versions, and Hartt relies on a numbering format (sequential pages) for Exhibit 13 that is not reflected in the document filed on ECF and would oblige the court to hand-number each page of the lengthy exhibit. Hartt points out that Stark, who produced the document, failed to paginate it, and that because the document is filed under seal, the ECF system generated no Page ID numbers for it. *See id*. However, Hartt overlooks the fact that the ECF system did number the pages within each of the six separately filed sections of the exhibit; for example, ECF No. 81-1 at 3; ECF No. 81-6 at 10. The omission of Defendant's SMF ¶¶ 49 and 72 is not outcome-determinative.

[43] I overrule Stark's objection, Plaintiff's Opposing SMF ¶ 51, that Hartt's citations do not support its statement of fact. While Dr. Curtis, in the cited testimony, did not speak to Stark's experience, Hartt also cited the form that Stark filled out. Stark alternatively denies the statement on the same basis, *id*.; however, for the same reason, he fails to controvert it.

SMF ¶ 52; Stark Dep. at 209-10.[44] During his October 6, 2010, DOT examination, Stark disclosed his history of a hernia repair in 2009. Plaintiff's Additional SMF ¶ 14; Defendant's Reply SMF ¶ 14.[45] The examiner, Dr. Flanigan, did not disqualify Stark for the history of hernia. Plaintiff's Additional SMF ¶ 15; Curtis Dep. at 110-11.[46] Dr. Flanigan concluded that Stark met the DOT standards and issued him a DOT card. Plaintiff's Additional SMF ¶ 16; Defendant's Reply SMF ¶ 16.[47] A copy of the DOT report was faxed to Hartt on October 6, 2010, as evidenced by the fax stamp on the document and the testimony of Parisien. *Id*. ¶ 17.[48] Stark's DOT card expired in October 2012. Plaintiff's Additional SMF ¶ 18; Stark Dep. at 21.[49]

The DOT Physical Examination Report states as follows: "I certify that the above information is complete and true. I understand that inaccurate, false or missing information may invalidate the examination and my Medical Examiner's Certificate." Defendant's SMF ¶ 53; Plaintiff's Opposing SMF ¶ 53. Stark provided Hartt with his DOT Physical Examination Report because the DOT requires that Hartt have its drivers' DOT Physical Examination Reports when it conducts its audits. *Id*. ¶ 54.

---

[44] I omit the remainder of Defendant's SMF ¶ 52, which Stark denies, Plaintiff's Opposing SMF ¶ 52, correctly pointing out that those portions are not supported by the citations given.

[45] Hartt qualifies this statement, Defendant's Reply SMF ¶ 14, asserting that the DOT Physical Examination Report indicates that Stark at some time had a right inguinal hernia repair, Exh. 18 to Stark Dep.

[46] I omit that portion of paragraph 15 stating that Dr. Flanigan did not think that the history of hernia disqualified Stark, Plaintiff's Additional SMF ¶ 15, sustaining Hartt's objection, Defendant's Reply SMF ¶ 15, that Dr. Curtis's testimony as to Dr. Flanigan's thoughts is inadmissible hearsay.

[47] I overrule Hartt's objection, Defendant's Reply SMF ¶ 16, that this statement, which is supported by citations to Dr. Flanigan's October 6, 2010, DOT Physical Examination Report, is inadmissible history. Stark explains that he offers this statement for its effect on the listener, Hartt. *See* Plaintiff's Obj. Resp. at 6-7; *United States v. Cabrera-Rivera*, 583 F.3d 26, 33 n. 4 (1st Cir. 2009) ("Out-of-court statements offered not to prove the truth of the matter asserted but merely to show context – such as a statement offered for the limited purpose of showing what effect the statement had on the listener – are not hearsay.") (citation and internal quotation marks omitted).

[48] I omit the second sentence of Plaintiff's Additional SMF ¶ 17, which is neither admitted nor supported by the citation given.

[49] I omit the remainder of Plaintiff's Additional SMF ¶ 18, which is neither admitted nor supported by the citation given. Hartt otherwise denies the paragraph, Defendant's Reply SMF ¶ 18; however, I view the record in the light most favorable to Stark as nonmovant.

### 6. Stark's October 7, 2010, CMCC Physical Examination

As part of the separate JPA, Stark was required to provide the examiner with his medical history through CMCC's Health History Questionnaire. *Id.* ¶ 55. CMCC uses the information provided on the Health History Questionnaire to assess whether a person can safely perform the JPA itself and the physical demands of the job of OTR driver, and whether it needs to obtain any information from the person's health care providers to make those determinations. Defendant's SMF ¶ 56; Brainerd Dep. at 22-24.[50]

Stark was required to disclose, on the Health History Questionnaire, whether he had (i) a work or non-occupational injury that placed restrictions on him at work, (ii) any current or chronic orthopedic/musculoskeletal joint pain limitations, (iii) an injury that might interfere with his ability to perform the job safely, (iv) pain sometimes upon performing certain activities, and whether he then had, or had had in the past, (i) back trouble, back pain, or back injury, (ii) depression, (iii) nervous or mental problems, (iv) neck injury or whiplash, or (v) hernia, rupture. Defendant's SMF ¶ 57; Plaintiff's Opposing SMF ¶ 57. The only medical issue that Stark disclosed on his Health History Questionnaire was his 2009 inguinal hernia repair. Defendant's SMF ¶ 58; Exh. 2 to Brainerd Dep. at 19-20.[51] The Health History Questionnaire contained the following statement:

> **Statement of honesty:**
> I have truthfully answered the above questions to the best of my knowledge. I understand that withholding any relevant information or giving false information regarding the above can be cause for termination.

---

[50] Stark denies this statement on the basis that it is not supported by the citation given, Plaintiff's Opposing SMF ¶ 56; however, the statement is adequately supported. Brainerd indicates that the JPAs done for Hartt were used not only to assess whether a person could safely perform testing but also whether he or she could safely perform the job. Brainerd Dep. at 24. Thus, Stark does not controvert the underlying statement.

[51] Stark denies this, Plaintiff's Opposing SMF ¶ 58, stating that he also answered yes to a question whether he was having back pain or had any previous back injuries. However, he points to an answer on the CMCC Job Placement Questionnaire, not the Health History Questionnaire. Exh. 2 to Brainerd Dep. at 22. Thus, he does not controvert the underlying statement.

> **I have reviewed this form and agree that this is an accurate reflection of my current situation.**

Defendant's SMF ¶ 59; Plaintiff's Opposing SMF ¶ 59.[52]

### 7. Stark Reports Injury; Undergoes Fitness-for-Duty Examination

On or about December 6, 2010, Stark left a voicemail for Rogers, Hartt's Human Resources Assistant, indicating the he was interested in switching from his position as an OTR driver to a position as a regional driver. *Id.* ¶ 25. Typically, regional drivers are home on the weekends. *Id.* The same day, Rogers emailed Aaron Wiles, the Auburn Terminal Manager and Stark's direct supervisor, and informed him of Stark's voicemail. *Id.* ¶ 26. Wiles responded that the transfer was fine but that Stark would have to "swap trucks" and go to New York City when needed. *Id.* On December 8, 2010, Rogers emailed a status change form alerting the relevant Hartt managers that beginning on December 12, 2010, Stark would be working in the regional driver position. *Id.* ¶ 27.

On or about December 9, 2010, Stark informed Cote, Hartt's Safety Coordinator, that he was planning to go see his VA doctor. Defendant's SMF ¶ 68; Cote Dep. at 50. Cote emailed Rogers and Roberta Murphy, Hartt's Safety Manager who handled workers' compensation claims, to inform them about Stark's injury. Defendant's SMF ¶ 68; Exh. 9 to Parisien Dep. Rogers responded that Stark would need to be cleared to return to work. *Id.*[53] Stark described

---

[52] I omit Defendant's SMF ¶ 60, which Stark denies, Plaintiff's Opposing SMF ¶ 60, viewing the evidence in the light most favorable to Stark as nonmovant.

[53] I omit portions of Defendant's SMF ¶ 68 that Stark denies, Plaintiff's Opposing SMF ¶ 68, as well as Defendant's SMF ¶¶ 69-70, which Stark denies, Plaintiff's Opposing SMF ¶¶ 69-70, viewing the evidence in the light most favorable to Stark as nonmovant.

his neck issue as a "medical instant" rather than a "medical condition." Defendant's SMF ¶ 71; Plaintiff's Opposing SMF ¶ 71.[54]

On December 10, 2010, Stark provided Hartt with a doctor's note stating that he would be out of work for just three days, from December 9-11, 2010. *Id.* ¶ 73. Because Rogers now had Stark's return to work date, she scheduled Stark for a fitness-for-duty examination on December 13, 2010, at CMCC to ensure that he could safely perform the essential functions of his position. *Id.*[55]

On December 13, 2010, Stark went to his fitness-for-duty evaluation at CMCC. *Id.* ¶ 75. Hartt referred Stark for the December 13, 2010, fitness-for-duty evaluation to make sure that he was cleared to perform the functions of his job. Plaintiff's Additional SMF ¶ 27; Defendant's Reply SMF ¶ 27.[56] Hartt does not refer all persons who miss work for fitness-for-duty evaluations. *Id.* ¶ 61.[57] For example, Hartt would not require a fitness-for-duty evaluation for an employee with the flu. Plaintiff's Additional SMF ¶ 62; Rogers Dep. at 34.[58] Hartt only refers drivers for a fitness-for-duty evaluation if it concludes that the condition in question would be a "disqualifier" for their DOT card and to make sure that the employee is not going to injure herself or himself. Plaintiff's Additional SMF ¶ 63; Rogers Dep. at 34.[59] Rogers required that Stark have a fitness-for-duty evaluation because she alleges that he disclosed that he had a

---

[54] Stark qualifies this statement, Plaintiff's Opposing SMF ¶ 71, asserting that he testified that in December 2010 he had a medical "instant" insofar as he had a shoulder issue where he could not turn and could not get his chin off of his shoulder, Stark Dep. at 93-94.

[55] I omit Defendant's SMF ¶¶ 74, 76, which Stark denies, Plaintiff's Opposing SMF ¶¶ 74, 76, viewing the evidence in the light most favorable to Stark as nonmovant.

[56] Hartt qualifies this statement, Defendant's Reply SMF ¶ 27, citing opinions of Dr. Curtis that are set forth below.

[57] Hartt qualifies this statement, Defendant's Reply SMF ¶ 61, asserting that Rogers testified that an employee needs to have a fitness-for-duty evaluation if the condition is a disqualifier on the employee's DOT medical certificate and to make sure that the employee is not going to injure himself or herself, Rogers Dep. at 34.

[58] I omit a portion of this assertion that, as Hartt points out, Defendant's Reply SMF ¶ 62, is unsupported by the citation given.

[59] I omit portions of this assertion that, as Hartt points out, Defendant's Reply SMF ¶ 63, are unsupported by the citation given.

herniated disk and gel was leaking. *Id.* ¶ 64. Rogers was concerned about the herniated disk in terms of whether or not Stark could do his job and whether or not it would be aggravated by doing his work. Plaintiff's Additional SMF ¶ 65; Rogers Dep. at 36.[60]

### 8. CMCC Sends Fax to Hartt on December 13, 2010

The same day, CMCC faxed Rogers a letter containing the results of the examination, including, among other things, that Stark was cleared to return to work. Defendant's SMF ¶ 75; Plaintiff's Opposing SMF ¶ 75. In the memorandum from CMCC employee Bilodeau included with the December 13, 2010, fax, she stated, "As a result of John's present strength and range of motion, I do believe he can return to work safely." Plaintiff's Additional SMF ¶ 28; Defendant's Reply SMF ¶ 28. The letter also stated that Stark believed that he had aggravated a previous neck injury of a protruding disk when he was driving his vehicle in the snow for three days. Defendant's SMF ¶ 75; Plaintiff's Opposing SMF ¶ 75. Finally, the letter stated that Stark "never mentioned any cervical injuries at his original pre-employment assessment." *Id.* Parisien does not know whether anyone informed Stark after he passed the December 13, 2010, fitness-for-duty examination that he was cleared to return to work. Plaintiff's Additional SMF ¶ 29; Defendant's Reply SMF ¶ 29.

### 9. Hartt Personnel Discuss Stark with CMCC on December 15, 2010

During Rogers' and Murphy's December 15, 2010, telephone call with Brainerd, Brainerd stated, among other things, that Stark was cleared to return to work and could perform all of the essential functions of his position. Defendant's SMF ¶ 78; Plaintiff's Opposing SMF

---

[60] Hartt denies this statement on the basis that it is unsupported by the citation given. Defendant's Reply SMF ¶ 65. The statement is supported but for Stark's description of the herniated disk as "alleged," Plaintiff's Additional SMF ¶ 65, which I have omitted.

25

¶ 78.[61]  Brainerd also stated that Stark had not disclosed his prior injury during his JPA and that the CMCC questionnaire does state that an employee can be terminated for failing to disclose that information.  *Id*.[62]

Stark denies that he ever told anyone, including his doctors, that he had a "herniated disk."  *Id*. ¶ 80.  Stark also denies being aware that he had any type of "neck problem."  *Id*.  He merely acknowledges that he may have questioned whether he might have a herniated disk.  *Id*.[63]

## 10. Stark's Employment Is Terminated on December 17, 2010

On Friday, December 17, 2010, Wiles informed Stark that his employment had been terminated.  Defendant's SMF ¶ 85; Wiles Dep. at 60-61.  During the termination meeting, Wiles said nothing about Stark's reporting of the exhaust leak or any other mechanical issues.  Defendant's SMF ¶ 85: Stark Dep. at 173-75.[64]  Hartt regularly terminates employees for job

---

[61] I omit Defendant's SMF ¶ 77, in which Hartt asserts, *inter alia*, that, in scheduling the call with Brainerd, Rogers and Murphy were concerned that Stark was now claiming that he had aggravated a preexisting injury while working, which could constitute a work-related injury and trigger Hartt's duty to file an Employer's First Report of Injury for workers' compensation purposes.  Stark denies that statement, Plaintiff's Opposing SMF ¶ 77, and I view the evidence in the light most favorable to him as nonmovant.

[62] I omit Defendant's SMF ¶ 79, which is neither admitted nor supported by the citation given.

[63] I omit Hartt's assertions that (i) Wiles attempted to contact Stark on three occasions from December 14-16, 2010, to discuss his return to work, Defendant's SMF ¶ 81, (ii) Wiles left voicemail messages for Stark asking when he was going to come back to work and asking Stark to get in touch about work, *id*., (iii) Wiles explained that if he did not hear from Stark, he was going to treat the failure to respond to his calls as job abandonment by Stark, *id*., (iv) Stark never returned Wiles' phone calls, *id*., (v) Wiles never received any messages that Stark had been trying to reach him, *id*., (vi) while Stark's telephone records show that he called Hartt, they do not show who he called or what was discussed, and he admits that he was contacting Cote during this time period to try to obtain tools that he had left in his truck, *id*. ¶ 82, (vii) neither Rogers nor Murphy had any involvement in the decision to terminate Stark's employment and had no conversations with Wiles or anyone else at Hartt regarding that subject, *id*. ¶ 83, and (viii) Hartt terminated Stark's employment on December 16, 2010, because, in accordance with the policies in its Handbook, it determined that he had abandoned his job, which Hartt considers a voluntary resignation of employment, when he did not respond to Wiles' phone calls and did not call or report to work from Tuesday, December 14 through Thursday, December 16, 2010, *id*. ¶ 84.  Stark denies these statements, Plaintiff's Opposing SMF ¶¶ 81-84, and I view the evidence in the light most favorable to him as nonmovant.

[64] I omit Hartt's further assertion that Wiles told Stark on December 17, 2010, that his employment had been terminated for job abandonment because he failed to call or report to work for three consecutive days, Defendant's SMF ¶ 85, which Stark denies, Plaintiff's Opposing SMF ¶ 85, viewing the evidence in the light most favorable to Stark as nonmovant.

abandonment. Defendant's SMF ¶ 86; Plaintiff's Opposing SMF ¶ 86.[65] Stark's telephone records show that he was calling the Maine Department of Labor, Office of Unemployment Security, on December 14, 15, 16, and 17, 2010. *Id.* ¶ 88.[66]

During the period that Stark worked as a commercial driver for Hartt, he was able to perform the physical and mental functions of the job. Plaintiff's Additional SMF ¶ 6; Stark Aff. ¶ 6.[67] Parisien had no issues with Stark during the period of time between his orientation and December 6, 2010. Plaintiff's Additional SMF ¶ 7; Defendant's Reply SMF ¶ 7. As of October 6, 2010, and through the entire period that Stark worked for Hartt he was not suffering from any mental or physical symptoms that affected his ability to drive a commercial vehicle with the exception of the three days in December 2010 that he took leave from work until his neck/shoulder symptoms resolved. Plaintiff's Additional SMF ¶ 9; Stark Aff. ¶ 8.[68]

Since his termination from Hartt, Stark has continued to work as a commercial truck driver. Plaintiff's Additional SMF ¶ 10; Defendant's Reply SMF ¶ 10. In particular, Stark worked for K&K Excavation driving a dump truck from May 2011 until he was laid off in

---

[65] I omit Defendant's SMF ¶ 87, which Stark denies, Plaintiff's Opposing SMF ¶ 87, viewing the evidence in the light most favorable to Stark as nonmovant.

[66] Stark qualifies this statement, Plaintiff's Opposing SMF ¶ 88, asserting that he contacted the Department of Labor because he concluded from the way that Hartt failed to return his calls and kept telling him that they would be meeting to make a "determination" that he was being terminated, and sought guidance on getting a "determination" or something in writing from Hartt regarding the status of his employment, Stark Aff. ¶¶ 9-10.

[67] I omit that portion of paragraph 6 stating that Stark "did not have any problems performing the essential functions of the job[,]" Plaintiff's Additional SMF ¶ 6, sustaining Hartt's objection that it constitutes a legal conclusion, Defendant's Reply SMF ¶ 6. For the same reasons set forth in connection with Plaintiff's Additional SMF ¶ 3, above, I overrule Hartt's additional objection, Defendant's Reply SMF ¶ 6, that Stark was not competent to testify regarding his ability to perform the physical and mental tasks of his job. Hartt alternatively denies this statement in part on the basis that it is unsupported by the record citation given. *Id.* However, the statement is supported by that citation, and I view the evidence in the light most favorable to Stark, as nonmovant. I omit Plaintiff's Additional SMF ¶ 8, in which Stark asserts that he was "medically limited" in his ability to drive for only three days, sustaining Hartt's objection that he is not qualified to testify as to the nature of his medical limitations, Defendant's Reply SMF ¶ 8; *Hrichak*, 498 F. Supp.2d at 382-83.

[68] For the same reasons set forth in connection with Plaintiff's Additional SMF ¶ 3, above, I overrule Hartt's objection, Defendant's Reply SMF ¶ 9, that Stark is not competent to testify regarding any mental or physical symptoms that affected his ability to drive a commercial motor vehicle. Hartt alternatively denies this statement, *id.*; however, I view the evidence in the light most favorable to Stark, as nonmovant.

December 2011, and then again from March 2012 until he was laid off in January 2013. *Id.* Stark was hired by Perry Transport in the summer of 2013 as a commercial driver and has driven for Perry Transport as a full-time commercial driver to the present. *Id.* His current job requires a CDL and a DOT card, and Stark maintains both of these things. *Id.*

## 11. Opinions of Hartt's Medical Expert, Dr. Curtis

Hartt's expert Dr. Curtis, a physician who has performed DOT examinations throughout his career, has opined that Stark failed to disclose certain medical conditions during his DOT physical examination that would have influenced his ability to be certified to drive. Defendant's SMF ¶ 61; Curtis Dep. at 26. Specifically, Dr. Curtis opined that the information Stark provided on his DOT Physical Examination Report was "inaccurate" when compared with his medical records because the "medical records revealed conditions that were not identified" in the DOT report. Defendant's SMF ¶ 61; Exh. 3 (ECF No. 77-6) to Curtis Dep. at 8. Dr. Curtis also noted in his report that the "medical records provided had large bodies of the record redacted," with references to issues that were not disclosed on his DOT history, and that "[t]hese medical conditions could likely impact his ability to safely operate a commercial motor vehicle[.]" *Id.* These medical conditions included the hernia and cervical pain with a degenerative and/or herniated cervical disk with left-sided radiculopathy and arm numbness and weakness. Defendant's SMF ¶ 61; Curtis Dep. at 26-27.[69]

---

[69] I overrule Stark's objections, Plaintiff's Opposing SMF ¶¶ 61-62, to Defendant's SMF ¶¶ 61 and 62 on the basis that Dr. Curtis's expert report is not sworn testimony and, hence, is inadmissible hearsay. Hartt cites not only to Dr. Curtis's unsworn report but also to portions of his deposition testimony discussing that report. Defendant's SMF ¶¶ 61, 62; Defendant's Obj. Resp. ¶¶ 61-62. The report is admissible to the extent that Hartt cites portions of the deposition testimony affirming its contents. *See, e.g., Zurich Am. Ins. v. Lord Elec. Co. of P.R.*, Civil No. 09-1111 (SEC), 2013 WL 3147980, at *3 n.1 (D.P.R. June 19, 2013) (declining on summary judgment to strike unsworn expert report; noting that expert's deposition, in which defendant's counsel participated, cured defect that report was not subject to penalty of perjury). While portions of paragraph 61 are supported only by a citation to the unsworn report, Defendant's ¶ 61, Hartt cures that defect by noting that, during his deposition, Dr. Curtis generally affirmed the contents of his report, Defendant's Obj. Resp. ¶ 61; Curtis Dep. at 14-15; *Zurich*, 2013 WL 3147980, at *3 n.1, (*continued on next page*)

Dr. Curtis would have disqualified Stark from being cleared to drive a commercial motor vehicle and obtaining a DOT medical certificate on October 6, 2010, because (i) Stark falsified his medical history on the DOT Physical Examination Report and (ii) Stark's various medical conditions may have disqualified him from driving a commercial vehicle. Defendant's SMF ¶ 62; Exh. 3 to Curtis Dep. at 8-9; Curtis Dep. at 51.[70]

Given that Stark's medical records are heavily redacted, Dr. Curtis cannot determine whether his mental health condition(s), or any prescription medications that he had to take as a result of those condition(s), would have disqualified him from driving. Defendant's SMF ¶ 63; Plaintiff's Opposing SMF ¶ 63. Stark's failure to disclose this information disqualifies him from obtaining his DOT medical certificate. *Id.* ¶ 64.[71] Given Stark's failure to disclose this information during his DOT physical examination, Dr. Curtis opined that Stark's DOT medical

and offering a sworn affidavit by Dr. Curtis attesting to the report's veracity, Affidavit of Craig W. Curtis MD, F.A.A.F.P., MRO, Exh. 1 (ECF No. 112-1) to Defendant's Reply SMF; *Volterra Semiconductor Corp. v. Primarion, Inc.*, 796 F. Supp.2d 1025, 1038-39 (N.D. Cal. 2011) (declining on summary judgment to strike assertedly inadmissible expert reports; observing that, even if reports had not been sworn, plaintiff had "remedied any deficiency by providing a sworn declaration by [the expert] with all of the challenged reports attached"). Stark alternatively denies Defendant's SMF ¶¶ 61 and 62 on the basis that Hartt fails to provide any factual predicate for Dr. Curtis's conclusions and/or that he denies any such factual predicates, Plaintiff's Opposing SMF ¶¶ 61 and 62; however, this does not controvert Hartt's statement that Dr. Curtis reached those conclusions.

[70] Stark denies this statement on the bases that (i) the citations given by Hartt do not support that he intentionally falsified the information provided on the DOT history, or (ii) Dr. Curtis made multiple admissions that he did not know whether any of the alleged conditions would have disqualified Stark from obtaining a DOT card and driving a DOT regulated vehicle. Plaintiff's Opposing SMF ¶ 62. However, the citations provided by Hartt support its statement that, in Dr. Curtis's opinion, (i) Stark falsified his medical history, Curtis Dep. at 51, and (ii) Stark's medical conditions "may have" disqualified him from driving a commercial vehicle, id. at 45-46, 51. While Stark does not succeed in controverting the statement, he denies that (i) he falsified the DOT form, Plaintiff's Opposing SMF ¶ 62; Stark Dep. at 210-12, and (ii) the next step had he provided inadequate information would have been his disqualification for doing so, rather than banning him from driving or from seeking a DOT card in the future. Rather, he states, the next step would have been to repeat the DOT examination process based on more complete information. Plaintiff's Opposing SMF ¶ 62; Curtis Dep. at 99.

[71] Stark qualifies Defendant's SMF ¶¶ 64-65, asserting that Dr. Curtis testified that the appropriate next step would be to give a driver who did not provide adequate information on the DOT history an opportunity to repeat the DOT examination process based on more complete information, Plaintiff's Opposing SMF ¶¶ 64-65, Curtis Dep. at 99, 125-26. I omit Stark's further assertions regarding a July 10, 2013, DOT examination that he underwent, Plaintiff's Opposing SMF ¶¶ 64-65, as well as his additional statements of fact bearing on that subject matter, Plaintiff's Additional SMF ¶¶ 30-33, sustaining Hartt's objection, Defendant's Reply SMF ¶¶ 30-33, that Stark cannot rely on the results of a DOT examination with respect to which he supplied underlying information that he has withheld from Hartt on the basis of invocation of the psychotherapist-patient privilege, *see, e.g., Kronenberg v. Baker & McKenzie LLP*, 747 F. Supp.2d 983, 986 (N.D. Ill. 2010).

certificate should have been revoked and that he should have had another DOT physical examination to ensure that he was still physically qualified to perform the essential functions of his job. *Id.* ¶ 65. Also, given Stark's injury in December 2010, Dr. Curtis opined that Stark should have had a new DOT physical examination to ensure that he was still physically qualified to perform the essential functions of his job. *Id.* ¶ 66. The fact that Stark was cleared to return to work by CMCC after his fitness-for-duty examination on December 13, 2010, does not mean that he would have been declared qualified to drive a commercial vehicle by a DOT-qualified examiner. Defendant's SMF ¶ 67; Curtis Dep. at 105-08.[72]

In response to questions regarding any evidence of symptoms or weakness associated with Stark's history of hernia repair and neck/shoulder condition, Dr. Curtis acknowledges that Stark performed the essential job requirements during the course of the October 7, 2010, JPA. Plaintiff's Additional SMF ¶ 22; Defendant's Reply SMF ¶ 22.[73] Dr. Curtis admits that he is not aware of whether Stark suffered any radiculopathic symptoms in his arm during the period of time he worked for Hartt. *Id.* ¶ 47.[74] Dr. Curtis admits that the fitness-for-duty evaluation completed by CMCC in December 2010 appropriately assessed Stark's condition as of the time of the evaluation. Plaintiff's Additional SMF ¶ 48; Curtis Dep. at 96.[75] Dr. Curtis has no disagreement with the conclusion by CMCC in December 2010 that Stark was fit for duty.

---

[72] Stark disputes this statement, Plaintiff's Opposing SMF ¶ 67, but his assertions, which are set forth below, qualify rather than controvert it.

[73] Hartt qualifies this statement, Defendant's Reply SMF ¶ 22, asserting, *inter alia*, that Dr. Curtis testified that a JPA is not the same as a DOT physical examination because it is a functional assessment and only one piece of the DOT examination, and Stark failed to disclose certain medical conditions during his DOT examination that would have influenced his ability to be certified to drive, Curtis Dep. at 26, 105-08.

[74] Hartt qualifies this statement, Defendant's Reply SMF ¶ 47, asserting that Dr. Curtis also testified that Stark had chronic pain from his neck from 2008 through 2012, Curtis Dep. at 94-95.

[75] Hartt denies this statement in part on the basis that it is unsupported by the citation given, Defendant's Reply SMF ¶ 48; however, it is supported by that citation. Hartt otherwise denies the statement, *id.*, but I view the record in the light most favorable to Stark as nonmovant.

Plaintiff's Additional SMF ¶ 49; Defendant's Reply SMF ¶ 49.[76] Dr. Curtis agrees with the conclusion of CMCC's fitness-for-duty evaluation that Stark was physically able to perform the essential duties of his job. Plaintiff's Additional SMF ¶ 50; Curtis Dep. at 97-98.[77] Dr. Curtis does not know if Stark's neck condition has deteriorated since December 13, 2010, in a way that would disqualify him from driving. Plaintiff's Additional SMF ¶ 51; Curtis Dep. at 99.[78]

According to Dr. Curtis, the next appropriate step would be for Stark to be reassessed by a DOT examiner to determine whether he is able to get another DOT card. Plaintiff's Additional SMF ¶ 52; Defendant's Reply SMF ¶ 52.[79] Dr. Curtis admits that he has never seen a situation where a driver had something happen while on the job that resulted in a change from no radiculopathic symptoms to acute symptoms such as losing control of his or her arm. *Id.* ¶ 53. Dr. Curtis admits that an EMG test done on Stark on March 25, 2011, found that the nerve impingement at Stark's C7 vertebrae were "mild." *Id.* ¶ 54.[80]

Dr. Curtis admits that he does not know whether there is anything in terms of Stark's medical conditions that would have rendered him, in Dr. Curtis' opinion, unsafe to drive. *Id.*

---

[76] Hartt qualifies this statement, Defendant's Reply SMF ¶ 49, asserting, in part, that Dr. Curtis also testified that the fact that Stark was cleared to return for work by CMCC after his fitness-for-duty evaluation did not mean that he had been declared qualified to drive a commercial vehicle by a DOT-qualified examiner, Curtis Dep. at 105-08.

[77] I overrule Hartt's objection, Defendant's Reply SMF ¶ 50, that this statement is a self-serving legal conclusion rather than a statement of fact. While Stark used the phrase "essential functions of his job," Plaintiff's Additional SMF ¶ 50, as Stark observes, Plaintiff's Obj. Resp. at 9-10, Dr. Curtis himself testified that CMCC's "assessment of [Stark's] physical fitness from the physical therapy standpoint would allow [Stark] to do the essential duties[,]" Curtis Dep. at 98. Stark thus sets forth a fact – its opponent's expert's testimony as to his opinion – rather than a self-serving legal conclusion. I perceive no material difference between essential "duties" and essential "functions"; however, in an abundance of caution, I have rephrased the statement to use Dr. Curtis's word. Hartt alternatively denies the statement in part on the basis that it is unsupported by the citation given, Defendant's Reply SMF ¶ 50; however, as noted, it is supported by that citation. Hartt otherwise denies the statement, *id.*, but I view the record in the light most favorable to Stark as nonmovant.

[78] Hartt denies this statement, Defendant's Reply SMF ¶ 51, on the basis that it is unsupported by the citation given. However, it is supported by that citation.

[79] Hartt qualifies this statement, Defendant's Reply SMF ¶ 52, asserting that Dr. Curtis testified that Stark should have had a subsequent DOT physical examination in late December of 2010 or early 2011 after his fitness-for-duty evaluation at CMCC on December 13, 2010, Curtis Dep. at 100-01.

[80] Hartt qualifies this statement, Defendant's Reply SMF ¶ 54, asserting that Dr. Curtis also testified that Stark's medical records indicated that he had chronic nerve impairment in his neck, "some fairly established nerve irritation and impingement[,]" and that certain neck conditions "trigger" the pain, Curtis Dep. at 117-19.

¶ 38.[81]  Dr. Curtis has been involved in 15,000 or more DOT examinations either personally or

as a supervisor.  Plaintiff's Additional SMF ¶ 55; Defendant's Reply SMF ¶ 55.  Dr. Curtis

cannot recall any situation in which he disqualified a driver for a chronic neck condition.  *Id.*

¶ 56.[82]  Dr. Curtis alleges that the assessments done by CMCC are not DOT examinations.  *Id.*

¶ 60.

## III. Discussion

### A.  Cross-Motions: ADA Confidentiality Claim

Stark alleges in Count I of his complaint that Hartt not only unlawfully discriminated

against him on the basis of a perceived disability, in violation of the ADA, but also violated "the

examination and confidentiality provisions of the ADA."  Complaint ¶ 111.

The ADA permits covered entities to "require a medical examination after an offer of

employment has been made to a job applicant and prior to the commencement of the

employment duties of such applicant" if, *inter alia*:

> information obtained regarding the medical condition or history of the applicant is
> collected and maintained on separate forms and in separate medical files and is
> treated as a confidential medical record, except that –
>
> > (i)      supervisors and managers may be informed regarding necessary
> > restrictions on the work or duties of the employee and necessary
> > accommodations;
> >
> > (ii)      first aid and safety personnel may be informed, when appropriate,
> > if the disability might require emergency treatment; and
> >
> > (iii)      government officials investigating compliance with this chapter
> > shall be provided relevant information on request[.]

---

[81] Hartt qualifies this statement, Defendant's Reply SMF ¶ 38, asserting, in part, that Dr. Curtis stated that Stark failed to disclose certain medical conditions during his DOT examination that would have influenced his ability to be certified to drive, Curtis Dep. at 26.

[82] Hartt qualifies this statement, Defendant's Reply SMF ¶ 56, asserting that Dr. Curtis was not asked whether he had ever examined a driver with a chronic neck condition and did not testify as to whether such a condition can or cannot be a disqualifying condition, Curtis Dep. at 133.

42 U.S.C. § 12112(d)(3)(B). In addition, following hire, "[a] covered entity may make inquiries into the ability of an employee to perform job-related functions." *Id*. § 12112(d)(4)(B). Medical information gleaned as a result of such an inquiry must be treated in the same manner and is subject to the same exceptions as that gleaned through a post-offer, pre-employment screening. *See id*. § 12112(d)(4)(C).

The purpose of the ADA confidentiality provisions is to "protect disabled employees from job discrimination by ensuring the results of job-related medical examinations would not be kept in their personnel files." *Yoder v. Ingersoll-Rand Co*., 31 F. Supp.2d 565, 569 (N.D. Ohio 1997), *aff'd*, 172 F.3d 51 (6th Cir. 1998).

Stark moves for summary judgment on the elements of an ADA breach of confidentiality claim other than causation, namely, that (i) he was subjected to a pre-employment examination as defined by section 12112(d)(3) on October 7, 2010, and a fitness-for-duty evaluation as defined by section 12112(d)(4)(B) on December 13, 2010, and (ii) Hartt violated the confidentiality requirements of section 12112(d)(3)(B) when protected information was provided to its managers via fax on October 7, 2010, via fax on December 13, 2010, and during a conversation between the owner of CMCC and Hartt's managers on December 15, 2010. *See* Plaintiff's S/J Motion at 1-2. He concedes that there is a triable issue as to whether these asserted breaches of confidentiality caused his termination and damages resulting therefrom. *See id*. at 1.

Hartt does not contest the applicability of section 12112(d) to Stark's October 7, 2010, and December 13, 2010, examinations; however, it contends that the disclosures at issue comported with ADA confidentiality requirements. *See* Defendant's Opposition to Plaintiff's Motion for Partial Summary Judgment ("Defendant's S/J Opposition") (ECF No. 97) at 2-8. It

cross-moves for summary judgment both on that basis and on the basis that any alleged violation caused Stark no damages. *See* Defendant's S/J Motion/Confidentiality at 6-10.[83]

### 1. Existence of Violation

Stark's argument is straightforward. He contends that (i) section 12112 is clear that there are only three scenarios in which information obtained during a medical examination may be disclosed, (ii) only the first scenario is arguably applicable, and (iii) Hartt cannot show that the disclosures at issue fit the first scenario because no information obtained in either examination indicated that he had restrictions or required accommodations. *See* Plaintiff's S/J Motion at 4. He elaborates that:

1. CMCC's fax to Rogers on October 7, 2010, indicated that Stark was classified as "green" and able to perform the duties of his job. *See id*. at 5. In any event, even had Stark been noted to have restrictions or require accommodations, CMCC faxed far more detail than would have been necessary to address those needs. *See id*. at 5 & n.2.

2. CMCC's fax to Rogers on December 13, 2010, indicated that Stark was fit to return to duty. *See id*. at 5-6. In any event, even had Stark been noted to have restrictions or require accommodations, CMCC again transmitted considerably more detail than would have been permissible, in particular its notation that Stark "never mentioned any cervical injuries during his pre-employment assessment." *Id*.

3. Rogers and Murphy scheduled the December 15, 2010, telephone call with

---

[83] As Hartt points out, *see* Defendant's S/J Motion/Confidentiality at 5-6, Stark alleges in his complaint that Hartt violated the examination as well as confidentiality provisions of the ADA, *see* Complaint ¶ 111. Stark makes no argument, in either his own motion for summary judgment or his opposition to that of Hartt, that Hartt violated the examination provisions of the statute, *see generally* Plaintiff's S/J Motion; Plaintiff's Opposition to Defendant's Motion for Summary Judgment on Plaintiff's ADA Confidentiality Claim ("Plaintiff's S/J Opposition/Confidentiality") (ECF No. 99), entitling Hartt to summary judgment as to that claim. At oral argument, on the strength of Hartt's counsel's representation that Hartt does not contest the applicability of 42 U.S.C. § 12112(d) to Stark's October 7, 2010, and December 13, 2010, examinations, Stark's counsel stated that his client does not press the point that Hartt violated the examination provisions of the statute.

CMCC's Brainerd precisely because of their concerns over the disclosure that Stark had not mentioned his neck condition during his October 7, 2010, pre-employment physical. *See id*. at 8. This topic was discussed in some detail during that teleconference. *See id*.

As Stark points out, *see id*. at 6-7, in *Blanco v. Bath Iron Works Corp*., 802 F. Supp.2d 215 (D. Me. 2011), this court denied a defendant employer's motion to dismiss for failure to state a claim when it concluded that "a company physician's disclosure to the employer of an alleged omission in an employee's employment entrance examination questionnaire potentially violate[d] 42 U.S.C. § 12112(d)(3)(B)[,]" *Blanco*, 802 F. Supp.2d at 216. The court observed:

> There is nothing in the Amended Complaint that would allow the Court to conclude that [the company physician] disclosed the contents of the medical questionnaire to the Defendants' management personnel in order to advise them of 'necessary restrictions on the work or duties' for [the employee] or for 'necessary accommodations.' To the contrary, she disclosed the information to management because in her view he had lied on the questionnaire, not to advise them of necessary restrictions or accommodations. The Court cannot squeeze these facts into § 12112(d)(3)(B)(i).

*Id*. at 223. The court rejected the defendant employer's argument that disclosure of an employee's untruthfulness on a medical questionnaire did not constitute a violation of the ADA confidentiality provisions, reasoning:

> The ADA clearly protects the confidentiality of [the employee's] response if truthful and the ADA still protects its confidentiality if not. In other words, there is no prevarication exception to the ADA's confidentiality mandate for employment entrance examinations, much less for information the company doctor perceives is inaccurate. It is the information, accurate or not, that the statute protects.

*Id*. at 224.

Stark posits that precisely the same violation occurred in this case on December 13 and 15, 2010, when CMCC disclosed to Hartt human resources managers confidential information regarding his asserted omission of information during his pre-employment examination. *See*

Plaintiff's S/J Motion at 8. Stark also analogizes this case to *Downs v. Massachusetts Bay Transp. Auth.*, 13 F. Supp.2d 130 (D. Mass. 1998), in which the plaintiff's employer fired him after learning during the course of investigating a workers' compensation claim that he had given false responses to two questions asked during a pre-employment medical examination. *See id*. at 9-10; *Downs*, 13 F. Supp.2d at 132. The *Downs* court held, *inter alia*, that the employer's release of the plaintiff's medical file to its workers' compensation claims representative did not fall within any of the permissible uses of that confidential information under the ADA in part because "the purpose for which the information was sought and used does not meet any of the purposes recited by the ADA[.]" *Downs*, 13 F. Supp.2d at 141-42.

Hartt rejoins that Stark ignores the existence of an exception to the ADA confidentiality requirement for disclosures regarding potential work-related injuries for workers' compensation purposes and the existence of a defense that its challenged actions were required or necessitated by another federal law or regulation, namely, DOT regulations regarding drivers' fitness to drive a commercial motor vehicle. *See* Defendant's S/J Opposition at 2-3.

It adds that:

1. CMCC's disclosure of the results of the October 7, 2010, JPA to Rogers did not violate the ADA confidentiality provision because there is no evidence that the information was shared with anyone but Rogers, who obtained it as part of the hiring process, simply noted that the JPA had been completed, and placed it in Stark's driver qualification file, separate from his personnel file. *See id*. at 3-4. Hartt contends that, in any event, the disclosure on that date caused Stark no damages: he was hired and commenced work as a commercial truck driver. *See id*. at 4.

2. CMCC's disclosures of December 13 and 15, 2010, were made only to Parisien,

Hartt's Director of Human Resources and Director of Safety, Rogers, its Human Resources Assistant, and Murphy, its Safety Manager, all of whom needed to be aware of the issue to determine any necessary accommodations for Stark, whether Hartt needed to file a report of occupational injury form for workers' compensation purposes, whether Stark could safely perform his job duties in compliance with DOT requirements, and whether Stark was qualified to hold a commercial driver's license. *See id*. at 4-5. Hartt notes that, despite the fact that the fitness-for-duty evaluation concluded that Stark could return safely, it also stated that he believed he had aggravated a previous neck injury of a protruding disk when driving his vehicle in the snow for three days. *See id*. at 5. It argues that this makes it clear that the disclosure is covered under the exception for potential work-related injuries for workers' compensation purposes and raised questions whether Stark was qualified to hold a commercial driver's license under the DOT regulations. *See id*.

Hartt distinguishes *Blanco* on the basis that it did not involve an employer's supervening duties pursuant to the DOT regulations, and *Downs* on the basis that the workers' compensation claims representative was permitted unlimited access to the employee's entire medical file, which went beyond the scope of the release he had signed, and the question that the employee had answered inaccurately during his pre-employment examination was an impermissible question as to whether he had filed previous claims for workers' compensation. *See id*. at 6-7. Hartt reasons that, to find that it violated the ADA confidentiality provisions in this case would mean that DOT drivers could routinely lie on pre-employment DOT physical examinations without potential consequence, implicating public safety. *See id*. at 7-8.

Stark rejoins that Hartt fails to establish that its actions fit within the confines of any recognized exception to the ADA confidentiality provisions. *See* Plaintiff's S/J

Opposition/Confidentiality at 1-7.

For the reasons that follow, I conclude that Stark is entitled to summary judgment as to the December 13 and 15, 2010, disclosures, but not as to the October 7, 2010, disclosure, with respect to which Hartt is entitled to summary judgment.

With respect to the October 7, 2010, disclosure, Hartt correctly points out that, based on EEOC guidance, the United States Court of Appeals for the Seventh Circuit has construed section 12112(d) to permit the results of a post-offer, pre-employment medical examination to be disclosed to, and used by, appropriate decision-makers involved in the hiring process. *See* Defendant's S/J Opposition at 4; *O'Neal v. City of New Albany*, 293 F.3d 998, 1009 (7th Cir. 2002); *see also Adams v. Alter Barge Line, Inc*., No. 07-501-DRH, 2009 WL 806598, at *13 (S.D. Ill. Mar. 27, 2009). Indeed, section 12112(d) contemplates that employers will obtain "information . . . regarding the medical condition or history of the applicant[,]" which they are then obligated to maintain in separate medical files and treat as confidential with the three exceptions discussed above. 42 U.S.C. § 12112(d)(3)(B).

There is no dispute that Rogers, a Hartt Human Resources Assistant, received CMCC's October 7, 2010, fax of Starks' JPA and placed it in a "driver qualification file" to which only Human Resources employees had access. *See* Defendant's Additional SMF ¶ 50; Suppl. Parisien Aff. ¶ 3.

CMCC's October 7, 2010, disclosure of the JPA results to an appropriate Hartt employee, who placed them in a segregated file, did not constitute a violation of the ADA's confidentiality provisions.

I reach a different conclusion with respect to the December 13 and 15, 2010, disclosures. In both instances, CMCC disclosed confidential information from Stark's post-offer, pre-

employment physical – that he had not then reported a prior neck injury – without any permissible purpose.

First, the disclosures do not fit within the only arguably applicable ADA exception, the informing of supervisors and managers of "necessary restrictions on the work or duties of the employee and necessary accommodations[.]" 42 U.S.C. § 12112(d)(3)(B)(i). Hartt argues that the disclosures were made only to Parisien, Rogers, and Murphy, all of whom needed to be aware of the neck injury for purposes, *inter alia*, of determining any necessary accommodations for Stark. *See* Defendant's S/J Motion/Confidentiality at 8. However, CMCC noted no restrictions and no need for any accommodations for Stark during either the October 7, 2010, pre-employment examination or the December 13, 2010, fitness-for-duty evaluation.

Second, Hartt fails to make a persuasive case that, in these circumstances, there was an exception to the ADA confidentiality provision for workers' compensation purposes. Hartt reasons that because the December 13, 2010, fax noted that Stark believed he had aggravated a previous neck injury of a protruding disk while driving his vehicle in the snow for three days, it clearly fell within the exception for potential work-related injuries for workers' compensation injuries. *See* Defendant's S/J Opposition at 5. It states that the three Hartt employees with whom the information was shared, Parisien, Rogers, and Murphy, needed to be aware of Stark's neck injury to determine whether Hartt needed to file an Employer's First Report of Injury or Disease form for workers' compensation purposes. *See id*.

In its papers, Hartt relied generally on EEOC Notice No. 915.002, EEOC Enforcement Guidance: Workers' Compensation and the ADA (Sept. 6, 1996) ("EEOC Guidance") in support of this proposition. *See* Defendant's S/J Opposition at 4; Defendant's S/J Motion/Confidentiality at 6-7. At oral argument, its counsel specifically cited Questions 7 and 8 and Footnote 8 of the

EEOC Guidance. Those sections state, in relevant part, that an employer may "ask disability-related questions or require a medical examination of an employee either at the time s/he experiences an occupational injury or when s/he seeks to return to the job following such an injury[,]" provided that the questions or examinations "are job-related and consistent with business necessity[,]" and may also "ask disability-related questions or require a medical examination of an employee with an occupational injury in order to ascertain the extent of its workers' compensation liability[.]" EEOC Guidance ¶¶ 7-8. The EEOC Guidance explains that "[t]his is because the ADA does not invalidate the procedures of any federal, state, or local law 'that provides greater or equal protection for the rights of individuals with disabilities' than is provided by the ADA[, and "[t]hose portions of state workers' compensation laws that protect the rights of individuals to be compensated for work-related injury provide such greater or equal protection." *Id*. ¶ 8 n.8 (quoting 42 U.S.C. § 12201(b)).

However, the EEOC Guidance cautions, with respect to Question 7, that "the questions and examinations must not exceed the scope of the specific occupational injury and its effect on the employee's ability, with or without reasonable accommodation, to perform essential job functions or to work without posing a direct threat[,]" and with respect to Question 8, that "the questions and examinations must be consistent with the state law's intended purpose of determining an employee's eligibility for workers' compensation benefits[,]" may not be used "as an opportunity to ask far-ranging disability-related questions[,]" and "must be limited in scope to the specific occupational injury and its impact on the individual[.]" *Id*. ¶¶ 7-8.

Hartt does not explain, and the evidence does not show, how CMCC's disclosure of Stark's failure during his pre-employment examination on October 7, 2010, to report his neck injury was necessary to ascertain the extent of its workers' compensation liability or the extent of

Stark's ability to perform essential job functions. Indeed, CMCC concluded on December 13, 2010, that he could perform essential job functions safely.[84]

Third, on this record, Hartt fails to make a persuasive case of entitlement to summary judgment on the basis of a DOT defense. As Hartt observes, the ADA provides that it may be a defense to a charge of discrimination "that a challenged action is required or necessitated by another Federal law or regulation[,]" including safety rules and regulations. Defendant's S/J Motion/Confidentiality at 7 (quoting 29 C.F.R. § 1630.15(e)) (emphasis added by Hartt omitted). *See also Albertson's Inc. v. Kirkingburg*, 527 U.S. 555, 573 (1999) ("When Congress enacted the ADA, it recognized that federal safety rules would limit application of the ADA as a matter of law. The Senate Labor and Human Resources Committee Report on the ADA stated that 'a person with a disability applying for or currently holding a job subject to [DOT standards for drivers] must be able to satisfy these physical qualification standards in order to be considered a qualified individual with a disability under title I of this legislation.'") (citation and internal quotation marks omitted). In addition to *Albertson's*, Hartt cites *Campbell v. Federal Express Corp.*, 918 F. Supp. 912, 920 n.9 (D. Md. 1996), and *Big Ridge, Inc. v. Federal Mine Safety & Health Review Comm'n*, 715 F.3d 631, 656 (7th Cir. 2013), in support of the application of a DOT defense in this case. *See* Defendant's S/J Motion/Confidentiality at 7.

---

[84] Hartt cites three other authorities in support of its bid for the application of a workers' compensation exception: 42 U.S.C. § 12201(b), 29 C.F.R. § 1630.14(b)(1) and (c)(1), and 39-A M.R.S.A. § 208. *See* Defendant's S/J Opposition at 5. The cited federal statute, mentioned in Footnote 8 of the EEOC Guidance, merely states, in relevant part, that nothing in the ADA shall be construed to invalidate or limit, *inter alia*, remedies, rights, and procedures afforded by state law that provide greater or equal protection for the rights of individuals with disabilities than the ADA. 42 U.S.C. § 12201(b). The cited regulation merely reiterates the confidentiality exceptions set forth in section § 12112(d)(3). *See* 29 C.F.R. § 1630.14(b)(1) & (c)(1). The cited Maine statute states, in relevant part, that no employee authorization is required for a health care provider to release medical information to an employer if the information "pertains to treatment of an injury or disease that is claimed to be compensable under [the Workers' Compensation] Act." 39-A M.R.S.A. § 208(1). However, there is no evidence that (i) CMCC provided *treatment* to Stark, or (ii) Stark's neck injury ever was claimed to be compensable under workers' compensation provisions.

Neither *Albertson's* nor *Campbell* concerned a clash between a federal safety rule and ADA *confidentiality* provisions. In *Albertson's*, the Supreme Court held that, pursuant to the ADA, an employer who required as a job qualification that an employee meet DOT vision standards need not justify enforcing the regulation solely because the DOT standard could be waived individual cases. *See Albertson's*, 527 U.S. at 558-60. In *Campbell*, the United States District Court for the District of Maryland held that a job applicant's inability to power grasp the steering wheel of a motor vehicle as required by DOT standards rendered him unqualified, for purposes of the ADA, to perform the essential functions of the job of Federal Express courier. *See Campbell*, 918 F. Supp. at 920.

In *Big Ridge*, the court did address a purported clash between ADA confidentiality provisions and federal safety regulations: specifically, a demand by the Federal Mine Safety and Health Administration ("MHSA"), pursuant to the Federal Mine Safety & Health Act of 1977 ("Mine Safety Act"), that 39 mine operators permit MHSA inspectors to review employee medical and personnel records to verify that the mines had not been underreporting miners' injuries and illnesses. *See Big Ridge*, 715 F.3d at 633-34, 655-56. The court held that there was no clash, given that the privacy of the underlying records would be protected by the MHSA and, in any event, if the mine operators were sued for a breach of confidentiality in providing the information, they could raise the defense that the Mine Safety Act required them to permit MSHA agents to inspect and copy employee medical records relevant to mine-related illnesses and injuries. *See id*. at 655-56.

Hartt argues that the disclosures in December 2010 were "required or necessitated" by DOT regulations in that:

1.     DOT regulations bar employers from knowingly permitting a driver to operate a commercial motor vehicle if he or she does not have a current commercial driver's license or is disqualified to drive such a vehicle, and the provision by a driver of false information during a DOT physical examination is grounds for immediate revocation of his or her DOT medical certificate.  *See* Defendant's S/J Motion/Confidentiality at 8 (citing 49 C.F.R. §§ 391.37(a), 391.45, 391.51(2); Defendant's SMF ¶¶ 62, 65).

2.     Stark voluntarily disclosed his preexisting neck injury to Cote and Rogers, and Parisien, Rogers, and Murphy all needed to be aware of both his reported neck injury and his failure to disclose his preexisting neck injury to determine whether he could safely perform his job duties in compliance with DOT requirements.  *See id.* (citing *Pouliot v. Town of Fairfield*, 226 F. Supp.2d 233 (D. Me. 2002), for the proposition that an employer did not violate the ADA's confidentiality provisions when the plaintiff voluntarily shared medical information).

Nonetheless, as Stark points out, *see* Plaintiff's S/J Opposition/Confidentiality at 1-2, CMCC's pre-employment examination was not a DOT physical examination.  Stark underwent a separate DOT physical examination.  Thus, the challenged disclosures were not required for the purpose of determining whether Stark was disqualified as a commercial motor vehicle driver based on the provision of falsified information during his DOT physical examination.

Nor did Stark voluntarily disclose the confidential information at issue, which was generated during the course of required pre-employment and fitness-for-duty examinations.  *See id.* at 6.  In *Pouliot*, by contrast, the court held the ADA confidentiality provisions inapplicable when the plaintiff voluntarily disclosed the very medical information that he complained was disseminated by his employer.  *See Pouliot*, 226 F. Supp.2d at 246.

Finally, Hartt falls short of demonstrating the existence of a triable issue as to whether the December 2010 disclosures were made for the purpose of determining whether Stark could safely perform his job duties in compliance with DOT requirements. Hartt had required that Stark submit to a fitness-for-duty examination precisely for the purpose of determining whether he could safely return to work. CMCC had determined that he could, despite its notation that he had not disclosed a preexisting neck injury during his pre-employment examination. Moreover, the focus of the December 15, 2010, teleconference was on disciplinary consequences for Stark's asserted failure to disclose his neck injury to CMCC.[85]

Here, as in *Blanco*, "[t]he ADA clearly protects the confidentiality of [Stark's] response if truthful and the ADA still protects its confidentiality if not." *Blanco*, 802 F. Supp.2d at 224. There is no triable issue as to whether CMCC's disclosures of information in December 2010 fit any of the three enumerated statutory exceptions or constitute appropriate disclosures for workers' compensation or DOT regulatory purposes.[86]

---

[85] This is not tantamount to a finding that "DOT drivers can routinely lie on their pre-employment DOT Physical Examinations without any potential consequence[,]" endangering public safety. Defendant's S/J Opposition at 7. As noted above, the disclosures at issue were not made as part of a DOT physical examination.

[86] At oral argument, Hartt's counsel further contended that Hartt had an "absolute right" to obtain the information shared by CMCC in December 2010. She noted that the ADA specifically provides that, post-employment, an employer may elicit information that is "job-related and consistent with business necessity" or concerns "the ability of an employee to perform job-related functions." 42 U.S.C. §§ 12112(d)(4)(A)-(B). She reasoned that Stark's failure to disclose his prior neck injury fit those parameters in that it was germane to his ability to perform his job and to Hartt's obligations to ensure that its drivers are qualified pursuant to DOT regulations and to comply with workers' compensation reporting duties. Adopting this view, Hartt's duty to maintain the information in a separate file and treat it as confidential, subject to enumerated exceptions, would have been triggered only after it had permissibly obtained and used the information. *See id*. §§ 12112(d)(3)(B) & (4)(C). Even granting that the statute permits an employer to obtain certain post-employment information, it does not stretch far enough to cover CMCC's *post-employment* disclosures in December 2010 of Stark's failure during his *pre-employment, post-offer* examination in September 2010 to list his neck injury. The statute is clear that, once the pre-employment, post-offer information was obtained and used for permissible pre-employment purposes, it was to be treated as confidential with the enumerated exceptions and "used only in accordance with this subchapter." *Id*. §§ 12112(d)(2)(B) & (3). As this court noted in *Blanco*, "there is no prevarication exception to the ADA's confidentiality mandate for employment entrance examinations, much less for information the company doctor perceives is inaccurate." *Blanco*, 802 F. Supp.2d at 224. "It is the information, accurate or not, that the statute protects." *Id*.

## 2. Causation

Hartt alternatively seeks summary judgment as to the three disclosures at issue on the basis that any alleged violation of the ADA confidentiality provisions did not cause the plaintiff damages. *See* Defendant's S/J Motion/Confidentiality at 9-10. It correctly notes that an individual is not entitled to damages for a technical violation of the ADA. *See id.* at 9; *Martino v. Forward Air, Inc.*, 609 F.3d 1, 4-5 (1st Cir. 2010); *Pouliot*, 226 F. Supp.2d at 246.

With respect to the first disclosure in October 2010, I have recommended that the court find that there was no ADA confidentiality violation. However, if the court disagrees, I conclude that summary judgment is warranted on the alternative basis that Stark fails to generate a triable issue as to any damages flowing therefrom. At that time, Stark was classified as green and was hired and began working for Hartt. He identifies no negative consequence until CMCC made additional disclosures in December 2010. Indeed, at oral argument, Stark's counsel conceded that his client makes no showing of damages stemming from the October 2010 disclosure.

With respect to the December 2010 disclosures, Hartt argues that, even if it terminated Stark's employment for his failure to disclose his medical conditions during his DOT physical examination and his JPA – which it specifically denies – it would not be liable for damages under the ADA because it took that action in accordance with DOT regulations. *See* Defendant's S/J Motion/Confidentiality at 10. For this proposition, Hartt cites *Talbot v. Maryland Transit Admin.*, Civil Action No. WMN-12-1507, 2012 WL 5839945 (D. Md. Nov. 15, 2012), *McCroskey v. United Parcel Serv., Inc.*, No. 3:09-CV-71 (CDL), 2010 WL 5437257 (M.D. Ga. Dec. 22, 2010), and *Barnes v. United Parcel Serv.*, 366 F. Supp.2d 612 (W.D. Tenn. 2005). *See id.* None of these cases involve the interplay of the ADA confidentiality provisions and DOT regulations. *See Talbot*, 2012 WL 5839945 (prospective employee sued for disability

discrimination when employer refused to hire him after he failed DOT medical examination); *McCroskey*, 2010 WL 5437257, at *11 (employee sued for disability discrimination when employer refused, inter alia, to promote him when he did not have a DOT card or DOT exemption on file with employer); *Barnes*, 366 F. Supp.2d at 613-14 (employee sued for racial discrimination after employer fired him for falsifying expiration date of his DOT card).

As discussed above, Hartt fails to demonstrate entitlement to summary judgment on the basis that the December 2010 disclosures of information reported during a non-DOT pre-employment physical examination were required to ensure compliance with DOT regulations.

For the foregoing reasons, I recommend that the court grant the plaintiff's motion as to disclosures made on December 13 and 15, 2010, but otherwise deny it, and grant the defendant's motion as to the disclosure made on October 7, 2010, and any claim of violation of the ADA examination provisions, but otherwise deny it.

### B.  Defendant's Motion/Remaining Claims

### 1.  Motion To Prohibit Stark From Relying on Certain Facts

As a threshold matter, I grant in part and deny in part Hartt's motion to prohibit Stark from relying in his brief opposing summary judgment on any facts contained only in his opposing statement of material facts.  *See* Defendant's Motion/Facts; *see also* Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Plaintiff's S/J Opposition/Remaining Claims") (ECF No. 95).

To the extent that Stark refers, in the Plaintiff's S/J Opposition/Remaining Claims, to facts set forth solely in his opposing statement of material facts, I have considered them solely for the purpose for which Stark offered them – to controvert or qualify specific facts set forth by Hartt.  I have otherwise disregarded them.  To the extent that Stark wished to set forth

affirmative facts in support of his opposition to summary judgment, he should have set them forth in his statement of additional material facts, permitting Hartt a chance to admit, deny, or qualify them. *See* Loc. R. 56(c)-(d). If facts set forth solely in an opposing statement of material facts could be generally considered in opposition to summary judgment, it would render superfluous those sections of Local Rule 56 providing for the filing of a statement of additional facts by a nonmovant and a reply to that statement by the movant. *See id*.

### 2. Whistleblowing Claims

Stark alleges in Count II of his complaint that Hartt unlawfully retaliated against him in violation of the STAA and in Count III that Hartt unlawfully retaliated against him in violation of the MWPA, as enforced through the MHRA. *See* Complaint ¶¶ 112-15. Hartt seeks summary judgment as to both claims on the bases that Stark did not engage in protected activity pursuant to either the MWPA or the STAA and that, even if he makes out a triable case that he did, he fails to establish a causal relationship between the alleged protected activity and his employment termination. *See* Defendant's S/J Motion/Remaining Claims at 16-22. Stark rejoins that his conduct constituted protected activity under both the MWPA and the STAA and that there is a triable issue as to causation. *See* Plaintiff's S/J Opposition/Remaining Claims at 16-25. For the reasons that follow, I conclude that Hartt is entitled to summary judgment as to Stark's MWPA claim but not his STAA claim.

### a. The Elements of an MWPA Case

The MWPA provides, in relevant part:

**1. Discrimination prohibited.** No employer may discharge, threaten or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because:

> **A.** The employee, acting in good faith, or a person acting on behalf of the employee, reports orally or in writing to the employer

or a public body what the employee has reasonable cause to believe is a violation of a law or rule adopted under the laws of this State, a political subdivision of this State or the United States;

**B.**     The employee, acting in good faith, or a person acting on behalf of the employee, reports to the employer or a public body, orally or in writing, what the employee has reasonable cause to believe is a condition or practice that would put at risk the health or safety of that employee or any other individual. . . .

1.     **Initial report to employer required; exception.**  Subsection 1 does not apply to an employee who has reported or caused to be reported a violation, or unsafe condition or practice to a public body, unless the employee has first brought the alleged violation, condition or practice to the attention of a person having supervisory authority with the employer and has allowed the employer a reasonable opportunity to correct that violation, condition or practice.

Prior notice to an employer is not required if the employee has specific reason to believe that reports to the employer will not result in promptly correcting the violation, condition or practice.

26 M.R.S.A. § 833.

"The MWPA prohibits an employer from taking adverse action against an employee who reports a suspected violation of a law or rule." *LePage v. Bath Iron Works Corp*., 2006 ME 130, ¶ 19, 909 A.2d 629, 635. "Although the MWPA provides no private right of action, plaintiffs may file a civil action under the MHRA [Maine Human Rights Act]." *Osher v. University of Me. Sys*., 703 F. Supp.2d 51, 64 n.13 (D. Me. 2010).

"To establish a *prima facie* case of unlawful retaliation under state and federal law, [a plaintiff] must show that (1) she engaged in an activity protected by the applicable statute; (2) she suffered an adverse employment action; and, (3) the adverse employment action was causally connected to the protected activity." *Id*. at 65. "The burden of making out a *prima facie* case is not onerous." *Daigle v. Stulc*, 794 F. Supp.2d 194, 237 (D. Me. 2011) (citations and internal quotation marks omitted).

"Following the shifting burdens analysis described in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973), once the plaintiff has shown a protected activity followed in close proximity by an adverse employment action, this gives rise to an inference that a causal connection is established; the employer, then, will be required to produce some probative evidence to demonstrate a nondiscriminatory reason for the adverse employment action." *LePage*, 2006 ME 130, ¶ 19, 909 A.2d at 636 (citations and internal punctuation omitted). "The final burden to prove the existence of the causal nexus remains with the plaintiff." *Id.* "[U]nder First Circuit authority, the Court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the *prima facie* case." *Daigle*, 794 F. Supp.2d at 237 (citations and internal quotation marks omitted).[87]

### b.  The Elements of an STAA Case

The STAA provides, in relevant part:

**(a) Prohibitions. – (1)** A person may not discharge an employee, or discipline or discriminate against an employee regarding pay, terms, or privileges of employment, because –

> **(A)(i)** the employee, or another person at the employee's request, has filed a complaint or begun a proceeding related to a violation of a commercial motor vehicle safety or security regulation, standard, or order, or has testified or will testify in such a proceeding; or
>
> **(ii)** the person perceives that the employee has filed or is about to file a complaint or has begun or is about to begin a proceeding related to a violation of a commercial motor vehicle safety or security regulation, standard, or order; [or]
>
> ***
>
> **(B)** the employee refuses to operate a vehicle because –

---

[87] "The MWPA analysis is guided by federal case law construing analogous statutes." *Halkett v. Correctional Med. Servs., Inc.*, 763 F. Supp.2d 205, 220 (D. Me. 2011).

(i) the operation violates a regulation, standard, or order of the United States related to commercial motor vehicle safety, health, or security; or

(ii) the employee has a reasonable apprehension of serious injury to the employee or the public because of the vehicle's hazardous safety or security condition[.]

\*\*\*

(2) Under paragraph (1)(B)(ii) of this subsection, an employee's apprehension of serious injury is reasonable only if a reasonable individual in the circumstances then confronting the employee would conclude that the hazardous safety or security condition establishes a real danger of accident, injury, or serious impairment to health. To qualify for protection, the employee must have sought from the employer, and been unable to obtain, correction of the hazardous safety or security condition.

49 U.S.C. § 31105. The STAA "was enacted in 1983 to encourage employee reporting of noncompliance with safety regulations governing commercial motor vehicles." *Brock v. Roadway Express, Inc.*, 481 U.S. 252, 258 (1987). "Congress recognized that employees in the transportation industry are often best able to detect safety violations and yet, because they may be threatened with discharge for cooperating with enforcement agencies, they need express protection against retaliation for reporting these violations." *Id.*

The showings required of employees and employers pursuant to the STAA are similar to those required pursuant to the MWPA:

A prima facie case of unlawful termination under the STAA requires a showing that the employee engaged in protected activity, that the employee was subjected to adverse employment action, and that there was a causal connection between the protected activity and the adverse action. If a complainant makes out a prima facie case, the employer may rebut that showing with evidence of a legitimate, non-retaliatory reason for the adverse employment action. The burden then shifts back to the complainant to prove that the proffered reason is actually a pretext for unlawful retaliation.

*R & B Transp., LLC v. United States Dep't of Labor, Admin. Review Bd.*, 618 F.3d 37, 46 (1st Cir. 2010) (citations and internal quotation marks omitted).

### c. Whether Stark Engaged in Protected Activity Pursuant to the MWPA

Hartt argues that Stark cannot show that he engaged in protected activity pursuant to the MWPA because (i) he merely made reports required by Hartt's own policies and DOT regulations, (ii) he did not report to anyone at Hartt that he believed that Hartt had violated a law or rule or that he had a safety concern, and (iii) when he reported the alleged mechanical issues that he was having with his truck, Hartt mechanics immediately inspected and, to the extent necessary, repaired his truck. *See* Defendant's S/J Motion/Remaining Claims at 16-20. I conclude that Hartt is correct that Stark did not engage in protected activity for purposes of the MWPA.

It is undisputed that Stark was required, pursuant to Hartt's Position Objective and Responsibilities Policy, to check his equipment daily by doing a pre-trip inspection, report any unsafe equipment or working conditions to his supervisor, and report any needed repairs or special maintenance to the Maintenance Department. *See* Defendant's SMF ¶ 12; Plaintiff's Opposing SMF ¶ 12. Stark acknowledged that he received, read, and understood that policy, and understood that he was responsible for following all of Hartt's policies. *See id.* ¶¶ 13-14. Hartt's Maintenance Manual also required drivers who had concerns about the safety of their vehicles to report those concerns to Hartt, complete a DIR form during each day of a trip containing information on any truck maintenance issues that arose, and turn those DIR forms into the Maintenance Department at Hartt at the end of each trip. *See id.* ¶¶ 29-30. Stark was familiar with those requirements. *See id.* ¶ 31. He reported the mechanical defects with his truck because that was his job and because he believed the defects were safety issues. *See id.*

As Hartt points out, *see* Defendant's S/J Motion/Remaining Claims at 18, this court in *Capalbo v. Kris-Way Truck Leasing, Inc*., 821 F. Supp.2d 397 (D. Me. 2011), and *Winslow v.*

*County of Aroostook*, No. 1:11-cv-162-GZS, 2013 WL 594762 (D. Me. Feb. 15, 2013), *aff'd*, 736 F.3d 23 (1st Cir. 2013), held that reports made at the direction of an employer did not constitute protected activity for purposes of the MWPA. *See Capalbo*, 821 F. Supp.2d at 419; *Winslow*, 2013 WL 594762, at *12-*13.

Stark distinguishes *Capalbo* on the basis that, there, the employee merely made reports at his employer's direction that he was approaching the maximum number of hours permitted by DOT regulations but never complained when his work hours exceeded the maximum. *See* Plaintiff's S/J Opposition/Remaining Claims at 21-22. Therefore, Stark reasons, the court held that the employee had not reported anything unlawful and granted summary judgment on that basis. *See id*. at 22. Stark distinguishes *Winslow* on the basis that, there, at her supervisor's request, the employee merely drafted and disseminated notes regarding federal monitors' visit and findings, which the monitors themselves made publicly available. *See id*. at 20-21. Stark asserts that he was the only person to bring forward deficiencies with his equipment and did not merely reiterate information that was widely known or publicly available. *See id*. at 21. He contends that his case is closer to *Parks v. City of Brewer*, 56 F. Supp.2d 89 (D. Me. 1999), which the *Winslow* court distinguished, and which he characterizes as rejecting an argument that an employee's report of a violation of a city ordinance was not protected because making such reports was part of his job. *See id*. at 19, 21.

Stark finally contends that Hartt's construction of the MWPA creates an exception not found within the four corners of the statute for reports that are incidentally required as part of one's job. *See id*. at 19. He reasons that the recognition of such an exception not only contravenes the plain meaning of the unambiguous statute but also leads to the "absurd and

illogical" result of treating employees whose jobs require monitoring or reporting unlawful or unsafe conditions differently from those whose jobs do not. *Id*. at 19-20.

Stark's efforts to distinguish *Capalbo* and *Winslow* and to align his case with *Parks* fall flat. Just as the employee in *Capalbo* complied with his employer's directive that he notify his supervisor when he was in danger of violating DOT regulations regarding his maximum number of hours, *see Capalbo*, 821 F. Supp.2d at 419, and the employee in *Winslow* complied with her employer's directives to memorialize and disseminate federal monitors' findings, *see Winslow*, 2013 WL 594762, at *12-*13, Stark complied with Hartt's directive to report his vehicle's mechanical problems to Hartt, both through DIRs and orally.

In addition, Stark conflates *Winslow*'s alternative holdings: that the employee's reports were not protected activity because she was simply fulfilling her job duties and, in any event, the reported conduct would not have been hidden from public view or correction in the absence of her reports. *See id*. The court distinguished *Parks* in the context of the latter holding, observing that *Parks* rejected the employer's argument that a supervisory employee did not engage in protected conduct for purposes of the MWPA because he was not the first person to report the violation. *See id*. at *12; *see also Parks*, 56 F. Supp.2d at 103 (subordinate's report of his own violation to supervisory employee and to the City Council for purposes of gaining its approval could not fairly be characterized as whistleblowing, in contrast to supervisory employee's statements to City Council opposing acquiescence in the violation). *Parks* did not consider the question of whether the supervisory employee should be held not to have engaged in protected activity because he was merely fulfilling his job duties.

Finally, as Hartt notes in its reply, *see* Defendant's Reply to Plaintiff's Opposition to Defendant's Motion for Partial Summary Judgment (ADA Discrimination/MWPA/STAA

Claims) ("Defendant's S/J Reply/Remaining Claims") (ECF No. 111) at 1-2, the First Circuit issued a decision affirming *Winslow* on November 15, 2013 – subsequent to the filing of Hartt's motion and Stark's response – in which it observed: "Though there may be exceptions, the usual rule in Maine is that a plaintiff's reports are not whistleblowing if it is part of his or her job responsibilities to make such reports, particularly when instructed to do so by a superior[,]" *Winslow*, 736 F.3d at 32 (citing, *inter alia*, *Capalb*o).  The First Circuit added, "Similarly, in the Fair Labor Standards Act context, we have held that an employee who reports violations of laws or other requirements *as part of his job* is not engaging in protected activity for the purposes of an anti-retaliation provision."  *Id*. (emphasis in original).  In its reply, Hartt also cites *Hall v. Mid-State Mach. Prods*., Docket No.: 11-CV-068, 2013 Me. Super. LEXIS 169 (Me. Super. Ct. Sept. 4, 2013).  *See* Defendant's S/J Reply/Remaining Claims at 1-2.  In *Hall*, the Maine Superior Court, citing, *inter alia*, *Capalbo,* applied what it termed a "manager rule," holding that a supervisor who reported wrongdoing through normal company channels could not "recover under the MWPA for making a report that was within his normal job duties[,]"  *Hall*, 2013 Me. Super. LEXIS 169, at *21.  While Stark was not a manager, neither was the employee in *Capalbo*, which the *Hall* court cited with favor.  *See id.*; *Capalbo*, 821 F. Supp.2d at 419.

Contrary to Stark's argument, *see* Plaintiff's S/J Opposition/Remaining Claims at 20, this construction of the MWPA does not lead to absurd or illogical results.  In *Kidwell v. Sybaritic, Inc*., 784 N.W.2d 220 (Minn. 2010), a case cited with approval in both *Winslow* and *Capalbo*, *see Winslow*, 736 F.3d at 32; *Capalbo*, 821 F. Supp.2d at 419, the Minnesota Supreme Court construed the phrase "good faith" in a state whistleblower protection statute similar to Maine's to mean that "the report that is claimed to constitute whistle-blowing must be made for the purpose of exposing an illegality and not a vehicle, identified after the fact, to support a belated whistle-

blowing claim." *Kidwell*, 784 N.W.2d at 227 (citation and internal quotation marks omitted). The *Kidwell* court held that the Minnesota WPA did *not* contain "a job duties exception"; however, it observed that "[a]n examination of the employee's job duties could be helpful in answering this central question." *Id.* It reasoned:

> When an employee responsible for investigating and reporting illegal behavior makes a report of such behavior, that employee will need something more than the report itself to support the conclusion that the employee is making the report as a "neutral party" who is intending to "blow the whistle." This is true because when it is the employee's job to report illegality, there is no basis to infer from the mere fact of a report that the employee's report was made to "blow the whistle."

> But . . . even an employee whose job duties include investigating and reporting wrongdoing could show that a report to her employer is protected conduct depending upon to whom the report is made. Where an employee with responsibility for investigating and reporting wrongdoing submits a report documenting wrongdoing outside normal channels, because the employee believes that the normal chain of command is unresponsive, that employee could be viewed as engaging in protected conduct. . . .

> Finally, . . . if an employee is obligated to make a report of wrongdoing, but the report is made outside the scope of the employee's normal or assigned job duties, the report could still be protected conduct under the WPA. . . . [U]nder our whistleblower statute, a reasonable fact-finder could, depending on the evidence, infer that an employee who makes a report based on an employment-related obligation, but not as part of an assigned job duty, was doing so in order to expose an illegality.

*Id.* at 228-29 (citations omitted). In this case, Stark's reports were part and parcel of his assigned job duties, and he conveyed them through normal channels.[88] Even accepting, as Stark asserts, that Hartt did not reasonably promptly correct reported mechanical deficiencies about which he had safety concerns, he does not demonstrate that he engaged in protected conduct for purposes of the MWPA. Hartt, hence, is entitled to summary judgment as to Count III.

---

[88] At oral argument, Stark's counsel contended that his client went outside of normal channels when he reported the exhaust leak to Cote, Hartt's Safety Coordinator. This evidence was set forth only in support of denials made in his opposing statement of material facts and, hence, is not cognizable for this purpose. *See* Plaintiff's Opposing SMF ¶¶ 28, 33-34.

### d. Whether Stark Engaged in Protected Activity Pursuant to the STAA

I reach a different conclusion with respect to whether Stark engaged in protected activity pursuant to the STAA. Hartt argues that he did not because (i) the STAA requires that a plaintiff report a specific violation of a specific DOT regulation, and he reported only routine mechanical issues, and (ii) he cannot claim to have reported a "violation" when he testified that he never went out on the road when he knew his truck had a mechanical defect, and he had any defects immediately repaired when he discovered them. *See* Defendant's S/J Motion/Remaining Claims at 20-21. Hartt cites *Clean Harbors Envtl. Servs., Inc. v. Herman*, 146 F.3d 12, 19 (1st Cir. 1998), and *BSP Trans Inc. v. U.S. Dep't of Labor*, 160 F.3d 38, 49 (1st Cir. 1998), for the proposition that Stark's reports were not specific enough to constitute protected activity. *See id*.

As Stark rejoins, *see* Plaintiff's S/J Opposition/Remaining Claims at 17, Hartt misinterprets the STAA in arguing that an employee is not protected from retaliation unless he explicitly informs his or her employer that a specific DOT regulation is being violated.

In *Clean Harbors*, the First Circuit rejected an employer's argument that the STAA does not cover complaints that are purely internal to an employer, holding that the U.S. Department of Labor Administrative Review Board had reasonably construed "[a]n employee's internal complaint to superiors conveying his reasonable belief that the company was engaging in a violation of a motor vehicle safety regulation" as a "protected activity" for purposes of the STAA. *Clean Harbors*, 146 F.3d at 19 (citation and internal quotation marks omitted). The First Circuit observed:

> We recognize [the employer's] legitimate due process concerns that the internal communications to the employer must be sufficient to give notice that a complaint is being filed and thus that the activity is protected. In the absence of such notice, the beneficial purposes of the act cannot be accomplished. Clearly there is a point at which an employee's concerns and comments are too generalized and informal to constitute 'complaints' that are 'filed' with an employer within the meaning of

the STAA. The risk of inadequate notice to an employer that the employee has engaged in protected activity is greater when the alleged protected complaints are purely oral. Here, however, we have no trouble concluding that [the employee's] oral and written complaints were sufficiently definite to put Clean Harbors on notice that he was engaging in protected activity. The record makes it clear that [the employee's] superiors were well-aware of his fastidious compliance with safety regulations and his oral and written refusals to accommodate this practice for the sake of customer satisfaction.

*Id*. at 22. While, in *Clean Harbors*, the employee had complained to his superiors that their actions would result in regulatory violations, *see id*., the First Circuit did not hold that a complaint *must* be made in that fashion to constitute protected activity for purposes of the STAA. *See id*. *BSP Trans* is not to the contrary. The First Circuit there had "no occasion to identify [the] exact locus" at which an employee's internal complaints are sufficiently definite to constitute protected activity for purposes of the STAA. *See BSP Trans*, 160 F.3d at 49.

As Stark points out, *see* Plaintiff's S/J Opposition/Remaining Claims at 17, this court had occasion to explore that question in *Manske v. UPS Cartage Servs., Inc*., 870 F. Supp.2d 185 (D. Me. 2012). This court determined that a driver's reports to his employer constituted protected activity for purposes of the STAA when those reports were mandated pursuant to DOT regulations either because they concerned listed vehicle conditions or because they concerned issues that "would affect the safety of operation of the vehicle or result in its mechanical breakdown." *Manske*, 870 F. Supp.2d at 203 (citation and internal quotation marks omitted). The court observed: "Congress recognized that by performing ordinary and routine job duties, drivers are often best able to detect safety violations, and Congress therefore mandated reporting requirements." *Id*. at 204 (citation and internal quotation marks omitted).

Hartt contends that *Manske* is distinguishable in that, there, (i) the driver reported several "safety issues" on DIRs, orally on multiple occasions, and during meetings with management, (ii) he specifically stated that he was concerned with his own safety and that of the public, (iii) he

believed that the issues that he reported constituted violations of the DOT regulations and created safety issues, and (iv) his supervisors admitted that they thought he subjectively believed the issues he reported were safety concerns and that they were warranted. *See* Defendant's S/J Reply/Remaining Claims at 3-4. At oral argument, Hartt's counsel argued that, for purposes of the STAA as well as the MWPA, an employee must step outside of his or her normal role and/or make reports through other than normal channels to be considered a "whistleblower." Stark's counsel countered that the STAA does not impose such requirements.

Stark has the better argument. The *Manske* court did not base its holding that the driver in that case had engaged in protected activity on a finding that he had gone beyond normal channels and/or his normal job duties. The court deemed the STAA "a very different statute" from the federal Whistleblower Protection Act, emphasizing that, "in making the required report [pursuant to DOT regulations], it is the employee's determination of whether a defect or deficiency would affect the safety of operation of the vehicle or result in its mechanical breakdown." *Manske*, 870 F. Supp.2d at 204 (citation and internal quotation marks omitted). The court noted that conduct held by other courts to constitute protected activity pursuant to the STAA included a driver's completion of a DVIR [Equipment Daily Inspection and Condition Report]. *See id.* at 205. Moreover, to the extent that Hartt argues that an employee must report a specific violation of a specific DOT regulation, there is no indication that the driver in *Manske* did so. *See id.* at 189-95.

Hartt's second argument – that Stark did not engage in protected activity because there was no underlying violation of DOT regulations for him to report, *see* Defendant's S/J Motion/Remaining Claims at 20-21 – also is unavailing. Stark disputes Hartt's underlying premise that he never drove his truck when he knew it had a mechanical defect. *See* Plaintiff's

S/J Opposition/Remaining Claims at 18; Defendant's SMF ¶ 36; Plaintiff's Opposing SMF ¶ 36.[89]

Hartt fails to demonstrate its entitlement to summary judgment as to Stark's STAA claim on the basis that Stark did not engage in protected conduct.

### e. Causation

Hartt next seeks summary judgment as to Stark's STAA and MWPA whistleblower claims on the bases that Stark cannot establish that retaliation for his reports of vehicle maintenance issues was a "but for" cause of his employment termination or that Hartt treated Stark less favorably than other similarly situated individuals because of his protected status. *See* Defendant's S/J Motion/Remaining Claims at 21-22. Stark rejoins that there is a triable issue on causation, *see* Plaintiff's S/J Opposition/Remaining Claims at 24-25, and I agree.

As a threshold matter, Hartt wrongly asserts that Stark must show that he was treated less favorably than other similarly situated individuals. Caselaw that it cites for that proposition, *see* Defendant's S/J Motion/Remaining Claims at 21-22, pertains to the showing necessary to make out a claim of discrimination on a disparate treatment theory, not a claim of retaliation, *see Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 259 (1981); *Cham v. Station Operators, Inc.*, 685 F.3d 87, 97 (1st Cir. 2012); *García v. Bristol-Myers Squibb Co.*, 535 F.3d 23, 31 (1st Cir.

---

[89] Hartt further contends, for the first time its reply memorandum, that (i) Stark could not have held a "reasonable belief" that his truck was unsafe or there was any violation of the DOT regulations for purposes of the STAA when Hartt's Maintenance Department determined that no exhaust leak existed, and (ii) Stark did not engage in protected activity because the STAA requires that an employee must have sought from his employer, and been unable to obtain, correction of the unsafe condition, and Hartt immediately fixed any alleged mechanical issues that Stark reported or found that they did not require repair. *See* Defendant's S/J Reply/Remaining Claims at 4 & n.2. These arguments, which were advanced for the first time in a reply memorandum, are not cognizable. *See, e.g., In re One Bancorp Sec. Litig.,* 134 F.R.D. 4, 10 n.5 (D. Me. 1991) (the court generally will not address an argument advanced for the first time in a reply memorandum). In any event, these arguments cannot win the day on summary judgment: Stark disputes that Hartt repaired the exhaust leak. *See* Defendant's SMF ¶¶ 28, 33-34; Plaintiff's Opposing SMF ¶¶ 28, 33-34.

2008); *Thomas v. Digital Equip. Corp.*, 702 F. Supp. 22, 25 (D. Mass. 1988), *aff'd* 880 F.2d 1486 (1st Cir. 1989). As the First Circuit noted in the context of a Title VII anti-retaliation claim:

> It . . . does not matter for retaliation purposes whether [supervisor] would have treated a male deputy the same way he treated [employee]. The relevant question is whether [supervisor] was retaliating against [employee] for filing a complaint, not whether he was motivated by gender bias at the time.

*DeCaire v. Mukasey*, 530 F.3d 1, 19 (1st Cir. 2008).

For purposes of establishing that his protected activity was a "but for" cause of his termination, Stark relies heavily on evidence that is set forth only in his opposing statement of material facts. *See* Plaintiff's S/J Opposition/Remaining Claims at 24-25; Plaintiff's Opposing SMF ¶¶ 28, 33-34, 81-84. Nonetheless, as his counsel suggested at oral argument, even disregarding that evidence (except for purposes of denial or qualification of specific statements by Hartt), there is sufficient evidence to raise a triable issue on the point.

There is no dispute that (i) Stark believes that Hartt did not timely repair two mechanical issues, involving an exhaust leak and a broken bunk heater, *see* Defendant's SMF ¶ 38; Plaintiff's Opposing SMF ¶ 38, (ii) he claims that he reported the exhaust leak two or three times, although he does not recall when he reported it or when it was fixed, *see id.* ¶ 40, and (iii) Hartt's Repair Order Detail form for Stark's truck shows that, at Stark's request, Hartt's Maintenance Department looked for an exhaust leak on December 8, 2010, and was unable to find one, although it did replace the cab filter, *see id.* ¶ 41. Stark disputes Hartt's statements that it did not permit its drivers to drive trucks with mechanical defects or other safety issues and that, for every problem reported by Stark, it immediately had its mechanics investigate the problem and, to the extent necessary, make repairs. *See* Defendant's SMF ¶¶ 28, 33; Plaintiff's Opposing SMF ¶¶ 28-33. Stark also qualifies Hartt's statement that Stark never went out on the

road with his vehicle when he knew it had a mechanical defect, *see* Defendant's SMF ¶ 36, asserting that, when he reported mechanical issues from the road, Hartt required him to drive with them and finish his route rather than pay to have them repaired while he was on the road, *see* Plaintiff's Opposing SMF ¶ 36.

There is no dispute that Hartt fired Stark on December 17, 2010. *See* Defendant's SMF ¶ 85; Plaintiff's Opposing SMF ¶ 85. Hartt states that it did so because Stark abandoned his job by failing from December 14-16, 2010, either to return to work or to return his supervisor's calls, *see* Defendant's SMF ¶¶ 81-85; however, Stark denies this, *see* Plaintiff's Opposing SMF ¶¶ 81-85.

On this evidence, a reasonable fact-finder could infer that Hartt terminated Stark's employment because Stark reported mechanical defects that Hartt did not repair in a timely fashion. *See, e.g., Zapata-Matos v. Reckitt & Colman, Inc.*, 277 F.3d 40, 45 (1st Cir. 2002) ("disbelief of the [employer's stated] reason may, along with the prima facie case, on appropriate facts, permit the trier of fact to conclude that the employer had discriminated"); *Willinghan v. Town of Stonington*, 847 F. Supp.2d 164, 190 (D. Me. 2012) ("very close temporal proximity between the protected action by the employee and the adverse employment action by the employer may give rise to an inference of causation") (citation and internal quotation marks omitted).

### 3. Disability Discrimination Claim

Hartt next seeks summary judgment as to Stark's claim that it discriminated against him because it regarded him as having a disability or a record of disability, in violation of the ADA. *See* Defendant's S/J Motion/Remaining Claims at 22-29.

"To prevail on a disability discrimination claim, a plaintiff must show by a preponderance of the evidence that he (1) has a disability within the meaning of the ADA; (2) is qualified to perform the essential functions of the job, with or without reasonable accommodations; and (3) was subject to an adverse employment action based in whole or part on his disability." *Ramos-Echevarría v. Pichis, Inc.*, 659 F.3d 182, 186 (1st Cir. 2011).

Hartt contends that Stark cannot prove any prong of the three-part test because (i) his neck injury was transitory and minor, (ii) he cannot affirmatively prove that he was physically qualified to drive a commercial motor vehicle under the DOT regulations, and (iii) he cannot prove that Hartt terminated his employment because of his alleged disability. *See* Defendant's S/J Motion/Remaining Claims at 22-29. Stark disputes all of those points. *See* Plaintiff's S/J Opposition/Remaining Claims at 6-15. For the reasons that follow, I conclude that Hartt fails to demonstrate its entitlement to summary judgment as to this claim.

### a. Whether Stark was "Disabled"

A person is "disabled," for purposes of the ADA, if he or she has "a physical or mental impairment that substantially limits one or more major life activities of such individual;" has "a record of such an impairment;" or is "regarded as having such an impairment[.]" 42 U.S.C. § 12102(1). Pursuant to the ADA as amended by the ADA Amendments Act of 2008 ("ADAAA"), "[a]n individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." *Id.* § 12102(3)(A). However:

> It may be a defense to a charge of discrimination by an individual claiming coverage under the "regarded as" prong of the definition of disability that the

impairment is (in the case of an actual impairment) or would be (in the case of a perceived impairment) "transitory and minor." To establish this defense, a covered entity must demonstrate that the impairment is both "transitory" and "minor." Whether the impairment at issue is or would be "transitory and minor" is to be determined objectively. A covered entity may not defeat "regarded as" coverage of an individual simply by demonstrating that it subjectively believed the impairment was transitory and minor; rather, the covered entity must demonstrate that the impairment is (in the case of an actual impairment) or would be (in the case of a perceived impairment) both transitory and minor. For purposes of this section, "transitory" is defined as lasting or expected to last six months or less.

29 C.F.R. § 1630.15(f); *see also* 42 U.S.C. § 12102(3)(B) (the "regarded as" prong does "not apply to impairments that are transitory and minor").

Hartt argues that Stark's neck injury was transitory and minor given that he was out of work for only five days, from December 9 to 13, 2010, as a result of that injury, had been cleared to return to work at the time of his job termination, and has described the injury as a "medical instant" rather than a "medical condition." *See* Defendant's S/J Motion/Remaining Claims at 23.[90] Nonetheless, as Stark notes, *see* Plaintiff's S/J Opposition/Remaining Claims at 7, Hartt's own expert described Stark's condition as "degenerative," with cervical disk herniation and radiculopathy, *see* Defendant's SMF ¶ 61. Thus, while his impairment may have been only briefly symptomatic in December 2010, Hartt does not adduce objective evidence that it was transitory. *See, e.g., Ruggles v. Virginia Linen Serv., Inc.*, No. 6:12-cv-00064, 2013 WL 4678408, at *6 n.12 (W.D. Va. Aug. 30, 2013) (back injury was not transitory when it had been diagnosed as a permanent degenerative condition).[91]

---

[90] Hartt also seeks summary judgment as to any claim by Stark that he had a "record" of disability. *See* Defendant's S/J Motion/Remaining Claims at 24. Stark offers no argument in opposition to summary judgment on any such claim, *see* Plaintiff's S/J Opposition/Remaining Claims at 6-8, and, at oral argument, his counsel confirmed that he no longer presses any claim that he has a "record" of disability. Hence, Hartt's motion should be granted as to any claim based on Stark's asserted "record" of disability.

[91] Hartt cites *Neumann v. Plastipak Packaging, Inc.*, No. 1:11-CV-522, 2011 WL 5360705 (N.D. Ohio Oct. 31, 2011), and *Dugay v. Complete Skycap Servs., Inc.*, No. CV-10-2404-PHX-GMS, 2011 WL 3159171 (D. Ariz. July 26, 2011), in support of its argument that Stark's injuries were transitory and minor. *See* Defendant's S/J (*continued on next page*)

### b. Whether Stark Was "Qualified"

To establish that he or she is a qualified individual with a disability, a plaintiff "must demonstrate, first, that [he or] she had the necessary skill, experience, education, and other job-related requirements for the . . . position and, second, that [he or] she was able to perform the essential functions of the position with or without reasonable accommodation." *Richardson v. Friendly Ice Cream Corp.*, 594 F.3d 69, 75 (1st Cir. 2010) (citations and internal quotation marks omitted). As Hartt points out, *see* Defendant's S/J Motion/Remaining Claims at 25, DOT regulations bar individuals from driving commercial motor vehicles unless they are "medically certified as physically qualified to do so," 49 C.F.R. § 391.41(a)(1)(i). A person is physically qualified to drive a motor vehicle if he or she, *inter alia*:

> (2) [h]as no impairment of: . . . (ii) [a]n arm, foot, or leg which interferes with the ability to perform normal tasks associated with operating a commercial motor vehicle . . . (7) [h]as no established medical history or clinical diagnosis of rheumatic, arthritic, orthopedic, muscular, neuromuscular, or vascular disease which interferes with his/her ability to control and operate a commercial motor vehicle safely . . . (9) [h]as no mental, nervous, organic, or functional disease or psychiatric disorder likely to interfere with his/her ability to drive a commercial motor vehicle safely . . . (12)(i) [d]oes not use any drug or substance identified in 21 CFR 1308.11 Schedule I, an amphetamine, a narcotic, or other habit-forming drug.

*Id*. § 391.41(b). Every two years, a physician must certify that the driver is physically qualified to operate a commercial motor vehicle. *See id*. § 391.45.

---

Motion/Remaining Claims at 23-24. In *Neumann*, an unspecified condition causing an employee back and leg pain was found transitory and minor when the employee required only six to eight weeks off from work to recuperate from back surgery, although the condition had persisted for three years. *Neumann*, 2011 WL 5360705, at *1, *11. In *Dugay*, an employee's neck and back injuries suffered in an automobile accident were found transitory and minor when the employee was cleared to return to work slightly more than three months after the accident. *Dugay*, 2011 WL 3159171, at *1, *4. These are not persuasive authorities, in that they conflate the separate analyses of whether an impairment is "transitory" and "minor." *See* Kevin M. Barry, Exactly What Congress Intended?, 17 Emp. Rts. & Emp. Pol'y J. 5, 23-24 & n.110 (2013) (observing, "To discern the meaning of 'minor,' courts will need to look to legislative history and the EEOC's new regulations, which make clear that impairments must be both transitory and minor, the exception should be read narrowly, and examples of 'transitory and minor' impairments include colds and flus."; citing, *inter alia*, *Neumann* and *Dugay* for the proposition that, "If courts do not do this, serious orthopedic injuries, appendicitis, and even mini-strokes might be considered 'transitory and minor[,]' which "would not be consistent with congressional intent.") (footnotes omitted).

Hartt argues that Stark cannot affirmatively show that he was qualified as a commercial vehicle driver pursuant to DOT regulations because (i) he has designated no expert to so testify and is not qualified to offer lay testimony on that subject, (ii) Hartt's medical expert, Dr. Curtis, testified that several of the conditions listed in Stark's medical records would have disqualified him from receiving his DOT certificate on October 6, 2010, and (iii) Dr. Curtis also stated that Stark's failure to disclose his full medical and mental health history invalidated the DOT certificate that he obtained on that date. *See* Defendant's S/J Motion/Remaining Claims at 27-28. Hartt cites *Seegert v. Monson Trucking, Inc*., 717 F. Supp. 2d 863, 873 (D. Minn. 2010), for the proposition that, if a plaintiff failed to disclose known medical conditions during his DOT physical examination, he was not qualified for his position. *See id*. at 28. Hartt also cites several cases for the general proposition that an individual is not considered a "qualified" individual with a disability for ADA purposes if he or she is unable to meet DOT certification requirements. *See id*. at 26 (citing *Bay v. Cassens Transport Co*., 212 F.3d 969, 979 (7th Cir. 2000); *Ward v. Skinner*, 943 F.2d 157 (1st Cir. 1991); *Tate v. NC Pepsi-Cola Bottling Co. of Charlotte, Inc*., No. 3:09cv36, 2011 WL 3813175 (WD.N.C. Aug. 29, 2011), *recon. denied*, 2011 WL 5101731 (W.D.N.C. Oct. 26, 2011), *aff'd*, 473 Fed. Appx. 245 (4th Cir. 2012); and *Ortiz v. Elgin Sweeping Servs., Inc*., No. 10 C 0936, 2011 WL 1930693 (N.D. Ill. May 17, 2011)).

Stark argues that the caselaw cited by Hartt is distinguishable and that he generates sufficient evidence to defeat its bid for summary judgment, including his own testimony regarding his fitness to perform commercial driving, the findings by CMCC during both his pre-employment and fitness-for-duty evaluations that he was fit for duty, and various concessions by Dr. Curtis. *See* Plaintiff's S/J Opposition/Remaining Claims at 8-11.

I conclude that there is a triable issue as to whether Stark was a "qualified" individual. Unlike the employees or job applicants in *Bay*, *Ward*, *Tate*, and *Ortiz*, Stark was issued a DOT certificate following his DOT examination on October 6, 2010. *Compare Bay*, 212 F.3d at 974; *Ward*, 943 F.2d at 159; *Tate*, 2011 WL 3813175, at *2; *Ortiz*, 2011 WL 1930693, at *1. In *Seegert*, as in this case, the employer contended that the employee was not a "qualified" individual with a disability for purposes of the ADA because he would not have obtained a DOT certification if he had not made misrepresentations on his health history forms concerning his drug and alcohol use. *See Seegert*, 717 F. Supp.2d at 869. Nonetheless, the *Seegert* court held that (i) after-acquired evidence of an employee's misconduct does not bar the employee's discrimination claim but, rather, merely serves to limit his or her damages, *see id*. at 868-69, and (ii) a genuine issue of material fact existed regarding whether the employee was qualified under the ADA, given his testimony that he accurately answered the ambiguous, poorly worded questions regarding drug and alcohol use on the health history forms, *see id*. at 870.

Stark also musters sufficient evidence to raise a triable issue as to whether he was qualified under the ADA. I have overruled Hartt's objection that Stark is not competent to testify as to whether he was able to perform the physical and mental functions of his commercial driving jobs. He avers that he was able to do so both prior to and during his employment with Hartt, but for three days during he took leave in December 2010. *See* Plaintiff's Additional SMF ¶¶ 3, 6, 8; Stark Aff. ¶¶ 3, 6, 9. Since being fired from Hartt, he has continued to work as a commercial truck driver. *See* Plaintiff's Additional SMF ¶ 10; Defendant's Reply SMF ¶10. His current job requires a CDL and a DOT card, and he maintains both. *See id*.

Moreover, Dr. Curtis acknowledges that Stark performed the essential job requirements during the course of the October 7, 2010, JPA, Plaintiff's Additional SMF ¶ 22; Defendant's

Reply SMF ¶ 22, and has no disagreement with the conclusion by CMCC in December 2010 that Stark was fit for duty, *id*. ¶ 49. Hartt points out that Dr. Curtis testified that (i) a JPA is not the same as a DOT physical examination because it is a functional assessment and only one piece of the DOT examination, and (ii) Stark failed to disclose certain medical conditions during his DOT examination that would have influenced his ability to be certified to drive. *See* Defendant's Reply SMF ¶ 22; Curtis Dep. at 26, 105-08. Yet, Dr. Curtis admits that he does not know whether there is anything in terms of Stark's medical conditions that would have rendered him, in Dr. Curtis's opinion, unsafe to drive. *See* Plaintiff's Additional SMF ¶ 38; Defendant's Reply SMF ¶ 38. While Dr. Curtis would have disqualified Stark because he falsified his medical history and his medical conditions may have disqualified him from driving a commercial motor vehicle, Defendant's SMF ¶ 62; Exh. 3 to Curtis Dep. at 8-9, the next step would have been to be reassessed by a DOT examiner to determine whether he was able to get another DOT card, Plaintiff's Additional SMF ¶ 52; Defendant's Reply SMF ¶ 52.

This evidence, taken as a whole, raises a triable issue as to whether Stark was a "qualified" individual as of December 6, 2010, defeating Hartt's bid for summary judgment on that prong.

### c. Causation

Hartt finally seeks summary judgment as to Stark's claim of unlawful discrimination in violation of the ADA on the basis that he fails to generate a triable issue on causation. *See* Defendant's S/J Motion/Remaining Claims at 28-29.

Hartt argues that (i) Stark has "not produced any facts which give rise to an inference of discrimination based on disability" and (ii) "even if Hartt did terminate [Stark's] employment because of his perceived or recorded medical conditions or disabilities, which Hartt adamantly

denies, it was not unlawful because these issues disqualified him as a commercial vehicle driver under the DOT regulations." *Id*. In response, Stark contends that he produced ample evidence, both direct and indirect, that he was fired based on a perceived disability. *See* Plaintiff's S/J Opposition/Remaining Claims at 11-15.

Hartt replies that Stark's "lengthy pretext argument misses the point[,]" Hartt having argued that "Stark cannot prove causation because he ultimately must prove that Hartt terminated his employment for an 'unlawful reason[,]'" and "even if Hartt did terminate [Stark's] employment because of his perceived medical conditions, or because he failed to disclose these medical conditions on his DOT Physical Examination Report, which Hartt adamantly denies, it was not unlawful because these issues disqualified him as a commercial vehicle driver under the DOT regulations." Defendant's S/J Reply/Remaining Claims at 7. Hartt theorizes, "Perhaps because [Stark] realizes that this is true, he did not respond to Hartt's argument in this regard." *Id*.

To the contrary, as discussed above, Stark argues persuasively that there is a triable issue whether he was qualified as a commercial vehicle driver pursuant to DOT regulations. While he made that argument in the context of contending that he was a qualified individual with a disability, *see* Plaintiff's S/J Opposition/Remaining Claims at 8-11, it applies with equal force here.

Turning to the issue of causation, Stark's "lengthy pretext argument" relies heavily on citation to facts that are set forth solely in his opposing statement of material facts. *See* Plaintiff's S/J Opposition/Remaining Claims at 11-15. Nonetheless, as his counsel suggested at oral argument, even disregarding that evidence (except for purposes of denial or qualification of

specific statements by Hartt), there is sufficient evidence to raise a triable issue as to whether Hartt terminated Stark based on a perceived disability.

This includes evidence that:

1.      Hartt seemingly had no issues with Stark as of December 6, 2010.  As of that date, Wiles was willing to grant Stark's request to switch positions from an OTR driver to a regional driver, *see* Defendant's SMF ¶ 25; Plaintiff's Opposing SMF ¶ 25, and Parisien had no issues with Stark during the period of time between his orientation and December 6, 2010, *see* Plaintiff's Additional SMF ¶ 7; Defendant's Reply SMF ¶ 7.

2.      On December 9, 2010, Stark informed Cote that he was planning to go see his VA doctor.  *See* Defendant's SMF ¶ 68; Cote Dep. at 50.  On December 10, 2010, Stark provided Hartt with a doctor's note stating that he would be out of work from December 9-11, 2010.  *See* Defendant's SMF ¶ 73; Plaintiff's Opposing SMF ¶ 73.  Rogers scheduled a fitness-for-duty evaluation of Stark for December 13, 2010, at CMCC.  *See id*.

3.      Hartt only refers drivers for fitness-for-duty evaluations if it concludes that the condition in question would be a "disqualifier" for their DOT card and to make sure that the employee is not going to injure himself or herself.  *See* Plaintiff's Additional SMF ¶ 63; Rogers Dep. at 34.  Rogers required that Stark have a fitness-for-duty evaluation because she alleges that he disclosed that he had a herniated disk, and gel was leaking.  *See* Plaintiff's Additional SMF ¶ 64; Defendant's Reply SMF ¶ 64.

4.      On December 13, 2010, CMCC faxed Rogers a letter stating that Stark was cleared to return to work but noting that Stark (i) believed that he had aggravated a previous neck injury of a protruding disk when he was driving his vehicle in the snow for three days and (ii) never mentioned any cervical injuries at his original pre-employment assessment.  *See*

Defendant's SMF ¶ 75; Plaintiff's Opposing SMF ¶ 75; Plaintiff's Additional SMF ¶ 28; Defendant's Reply SMF ¶ 28. Rogers and Murphy quickly convened a conference call with CMCC's Brainerd, who noted that the CMCC questionnaire does state that an employee can be terminated for failing to disclose a prior injury during the JPA. *See* Defendant's SMF ¶ 78; Plaintiff's Opposing SMF ¶ 78.

5. Two days later, on December 17, 2010, Wiles terminated Stark's employment. Defendant's SMF ¶ 85; Wiles Dep. at 60-61. Hartt states that Wiles did so because Stark abandoned his job by failing to return to work or return Wiles' calls from December 14-16, 2010, *see* Defendant's SMF ¶¶ 81-85; but Stark disputes this, *see* Plaintiff's Opposing SMF ¶¶ 81-85.

A reasonable fact-finder crediting Stark's evidence and drawing inferences in his favor could conclude that Hartt terminated his employment based on a perceived disability, given that, (i) as of December 6, 2010, Hartt evidently had no issues with Stark, (ii) Stark took a three-day medical leave of absence commencing on December 9, 2010, (iii) although, on December 13, 2010, Stark was medically cleared to return to duty, Rogers and Murphy convened a conference call with Brainerd on December 15, 2010, during which they discussed Stark's failure to disclose his neck injury, including the possible consequence of termination of employment, (iv) Stark was fired two days later, and (v) Stark disputes Hartt's explanation for his firing. *See, e.g., Zapata-Matos*, 277 F.3d at 45; *Willinghan*, 847 F. Supp.2d at 190.

Stark having confirmed that he does not press his claim of disability discrimination based on having a record of disability, summary judgment should be entered as to that claim. Hartt otherwise fails to demonstrate that it is entitled to summary judgment on Stark's claim of disability discrimination.

### 4. Punitive Damages Request

Hartt finally seeks summary judgment on Stark's bid for punitive damages. *See* Defendant's S/J Motion/Remaining Claims at 29-30. It argues that Stark cannot meet the applicable standard for purposes of both his ADA and MHRA claims of demonstrating that Hartt engaged in discriminatory conduct in the face of a perceived risk (*i.e.*, almost certainly knowing) that it was violating the law or that it acted with malice or reckless indifference. *See id.* at 30; *see also, e.g.*, 42 U.S.C. § 1981a(a)(2) & (b)(1) (complaining party may recover punitive damages under the ADA "if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual"); 5 M.R.S.A. § 4613(2)(B)(8)(c) (complaining party may recover punitive damages under the MHRA "if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the rights of an aggrieved individual protected by this Act"); *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 536 (1999) (pursuant to 42 U.S.C. § 1981a, "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages").

Hartt adds that, in any event, it meets the requisites of the affirmative defense recognized in *Kolstad* for employers who make good-faith efforts to comply with the requirements of anti-discrimination laws. *See* Defendant's S/J Motion/Remaining Claims at 30; *Kolstad*, 527 U.S. at 544-45.

As Stark observes, *see* Plaintiff's S/J Opposition/Remaining Claims at 26, an employee can demonstrate that an employer discriminated in the face of a perceived risk that its actions would violate federal law "by showing that the defendant's employees lied, either to the plaintiff

or to the jury, in order to cover up their discriminatory actions[,]" *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 858 (7th Cir. 2001); *see also, e.g., Davis v. Rennie*, 264 F.3d 86, 115 (1st Cir. 2001) (rebuffing challenge to award of punitive damages, in part, because defendants lied to cover up the conduct of which the plaintiff complained).  As discussed above, a trier of fact crediting Stark's evidence could find that Hartt did so.

As Stark further contends, *see* Plaintiff's S/J Opposition/Remaining Claims at 26-27, Hartt fails to demonstrate its entitlement to the good-faith defense as a matter of law.  Hartt points to the facts that it had an established policy prohibiting unlawful discrimination and provided training regarding that policy to all of its employees during driver orientation, including to Stark.  *See* Defendant's S/J Motion/Remaining Claims at 30; Defendant's SMF ¶¶ 4-9. However, the First Circuit, applying *Kolstad*, has held that "a written statement, without more, is insufficient to insulate an employer from punitive damages liability[,]" and "[a] defendant must also show that efforts have been made to implement its anti-discrimination policy, through education of its employees and active enforcement of its mandate." *Romano v. U-Haul Int'l*, 233 F.3d 655, 670 (1st Cir. 2000).

Hartt, like the employer in *Romano*, "did not put forth evidence of an active mechanism for renewing employees' awareness of the policies through either specific education programs or periodic re-dissemination or revision of [its] written materials[,]" that "supervisors were trained to prevent discrimination from occurring[,]" or that it could point to "examples in which [its] anti-discrimination policies were successfully followed." *Id*.

Hartt fails to demonstrate that it is entitled to summary judgment as to Stark's request for punitive damages.

# IV. Conclusion

For the reasons that follow, I **GRANT** in part and **DENY** in part the Defendant's Motion/Facts and recommend that the court (i) **GRANT** the Plaintiff's S/J Motion as to Count I to the extent that Stark alleges that disclosures made on December 13 and 15, 2010, violated ADA confidentiality provisions, but otherwise **DENY** it, (ii) **GRANT** the Defendant's S/J Motion/Confidentiality as to Count I to the extent that Stark alleges that the disclosure made on October 7, 2010, violated ADA confidentiality provisions and that there was any violation of the ADA examination provisions, but otherwise **DENY** it, and (iii) **GRANT** the Defendant's S/J Motion/Remaining Claims as to Count III, Stark's claim of retaliation in violation of the MWPA, and Count I to the extent that Stark alleges discrimination based on a record of disability in violation of the ADA, but otherwise **DENY** it. Should the court agree, the issues remaining for trial will be whether Hartt's violation of ADA confidentiality provisions by virtue of its December 13 and 15, 2010, disclosures caused Stark's termination and resulting damages (Count I), whether Hartt discriminated against Stark based on perceived disability in violation of the ADA (Count I), and whether Hartt retaliated against Stark for protected activity in violation of the STAA (Count II).

## *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which <u>de novo</u> review by the district court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to <u>de novo</u> review by the district court and to appeal the district court's order.*

Dated this 31st day of March, 2014.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge